New York State Department of State
Division of Corporations, State Records and Uniform Commercial Code
One Commerce Plaza, 99 Washington Avenue
Albany, NY 12231-0001
www.dos.ny.gov

# *Local Law Filing*

**(Use this form to file a local law with the Secretary of State.)**

Text of law should be given as amended. Do not include matter being eliminated and do not use italics or underlining to indicate new matter.

FILED
STATE RECORDS

NOV 27 2017

DEPARTMENT OF STATE

☐County  ☐City  ☒Town  ☐Village
*(Select one:)*

of _____ Monroe _____

**Local Law No.** 6 _____ **of the year 20** 17

**A local law** of the Incorporated Town of Monroe, New York Town Board Amending Chapter 57 of the
*(Insert Title)*
Code of the Town of Monroe

**Be it enacted by the** Town Board _____ **of the**
*(Name of Legislative Body)*

☐County  ☐City  ☒Town  ☐Village
*(Select one:)*

of Monroe _____ **as follows:**

**(Complete the certification in the paragraph that applies to the filing of this local law and strike out that which is not applicable.)**

**1.   (Final adoption by local legislative body only.)**
I hereby certify that the local law annexed hereto, designated as local law No. 6 _____ of 20 17 ___ of the (X̶X̶X̶X̶X̶)(X̶X̶X̶X̶)(Town)(X̶X̶X̶X̶X̶X̶) of Monroe _____ was duly passed by the Town Board _____ on November 20, ___ 20 17 ___, in accordance with the applicable
*(Name of Legislative Body)*
provisions of law.

**2.   (Passage by local legislative body with approval, no disapproval or repassage after disapproval by the Elective Chief Executive Officer*.)**
I hereby certify that the local law annexed hereto, designated as local law No. _____ of 20 _____ of the (County)(City)(Town)(Village) of _____ was duly passed by the
_____ on _____ 20 _____, and was (approved)(not approved)
*(Name of Legislative Body)*
(repassed after disapproval) by the _____ and was deemed duly adopted
*(Elective Chief Executive Officer*)*
on _____ 20 [    ], in accordance with the applicable provisions of law.

**3.   (Final adoption by referendum.)**
I hereby certify that the local law annexed hereto, designated as local law No. _____ of 20 _____ of the (County)(City)(Town)(Village) of _____ was duly passed by the
_____ on _____ 20 _____, and was (approved)(not approved)
*(Name of Legislative Body)*
(repassed after disapproval) by the _____ on _____ 20 _____.
*(Elective Chief Executive Officer*)*
Such local law was submitted to the people by reason of a (mandatory)(permissive) referendum, and received the affirmative vote of a majority of the qualified electors voting thereon at the (general)(special)(annual) election held on _____
20 _____, in accordance with the applicable provisions of law.

**4.   (Subject to permissive referendum and final adoption because no valid petition was filed requesting referendum.)**
I hereby certify that the local law annexed hereto, designated as local law No. _____ of 20 _____ of the (County)(City)(Town)(Village) of _____ was duly passed by the
_____ on _____ 20 _____, and was (approved)(not approved)
*(Name of Legislative Body)*
(repassed after disapproval) by the _____ on _____ 20 _____. Such local
*(Elective Chief Executive Officer*)*
law was subject to permissive referendum and no valid petition requesting such referendum was filed as of _____
20 _____, in accordance with the applicable provisions of law.

**5.   (City local law concerning Charter revision proposed by petition.)**
I hereby certify that the local law annexed hereto, designated as local law No._____ of 20\_\_\_\_\_ of the City of _____ having been submitted to referendum pursuant to the provisions of section (36)(37) of the Municipal Home Rule Law, and having received the affirmative vote of a majority of the qualified electors of such city voting thereon at the (special)(general) election held on _____ 20\_\_\_\_\_ , became operative.

**6.   (County local law concerning adoption of Charter.)**
I hereby certify that the local law annexed hereto, designated as local law No._____ of 20\_\_\_\_\_ of the County of _____State of New York, having been submitted to the electors at the General Election of November _____ 20\_\_\_\_\_, pursuant to subdivisions 5 and 7 of section 33 of the Municipal Home Rule Law, and having received the affirmative vote of a majority of the qualified electors of the cities of said county as a unit and a majority of the qualified electors of the towns of said county considered as a unit voting at said general election, became operative.

**(If any other authorized form of final adoption has been followed, please provide an appropriate certification.)**
I further certify that I have compared the preceding local law with the original on file in this office and that the same is a correct transcript therefrom and of the whole of such original local law, and was finally adopted in the manner indicated in paragraph 1_____ above.

*(Seal)*

Clerk of the County legislative body, City, Town or Village Clerk or officer designated by local legislative body

Date: November 21, 2017

### LOCAL LAW NO. 6 OF 2017 OF THE INCORPORATED TOWN OF MONROE, NEW YORK TOWN BOARD AMENDING CHAPTER 57 OF THE CODE OF THE TOWN OF MONROE

A LOCAL LAW to amend Chapter 57, Zoning, of the Code of the Town of Monroe, Orange County, NY, pursuant to Municipal Home Rule Law Section 10 et seq.

**BE IT ENACTED AS FOLLOWS:**

Section 1. Authority

The adoption of this Local Law is in accordance with Section 10 of the New York Municipal Home Rule Law.

Section 2. Title and Purpose.

This law shall be known as and may be cited as "Local Law No. 6 of 2017" to Amend Chapter 57, Zoning, of the Code of the Town of Monroe. The purpose of this Local Law is to amend Chapter 57 of the Town Code of the Town of Monroe, adopted in 1965 and amended thereafter from time to time, which is hereby repealed, superseded and replaced in its entirety with the attached document identified as Chapter 57 "Zoning," and is hereby incorporated herein in full.

Section 4. Repeal, Amendment, and Supersession of Other Laws.

All other Resolutions, Ordinances or Local Laws of the Town of Monroe which conflict with the provisions of this Local Law are hereby superseded or repealed to the extent necessary to give this Local Law force and effect.

Section 5. State Environmental Quality Review Act.

Pursuant to 6 NYCRR 617, this Local Law is classified as a Type I action and the Town Board has determined, after environmental review, that no negative environmental impacts will result from enactment of this Local Law under the State Environmental Quality Review Act.

Section 6. Severability.

If the provisions of any article, section, subsection, paragraph, subdivision or clause of this Local Law shall be judged invalid by a court of competent jurisdiction, such order of judgment shall not affect or invalidate the remainder of any article, section, subsection, paragraph, subdivision or clause of this Local Law.

Section 7. Effective Date.

This Local Law shall take effect immediately upon filing in the office of the Secretary of State in accordance with Section 27 of the New York Municipal Home Rule Law.

# LOCAL LAW NO. 6 OF 2017

# AMENDING CHAPTER 57, ZONING,

# OF THE CODE OF THE TOWN OF MONROE,

# ORANGE COUNTY, NY

ADOPTED November 20, 2017

## TABLE OF CONTENTS

Page Number

**Article I. Title** ...................................................................................................... I-1

§ 57-1. Short title. ............................................................................................... I-1

**Article II. Word Usage and Definitions** ................................................................ II-1

§ 57-2. Word usage. ............................................................................................ II-1

§ 57-3. Definitions. ............................................................................................. II-1

**Article III. Compliance Required** ........................................................................ II-1

§ 57-4. Compliance with use regulations required; nonconforming uses. ............................ III-1

§ 57-5. Compliance with bulk regulations required; nonconforming structures. ................. III-1

§ 57-6. Continuation of legal existing uses. ..................................................................... III-1

§ 57-7. Use of structures and land. .................................................................................. III-1

**Article IV. Districts; Zoning Map; Schedule** ....................................................... IV-1

§ 57-8. Classes of districts. ............................................................................... IV-1

§ 57-9. Boundaries of districts; Zoning Map. ............................................................ IV-1

§ 57-10. Schedule of District Regulations. .................................................................... IV-2

**Article V. Special Uses** ......................................................................................... V-1

§ 57-11. General procedural requirements. ................................................................ V-1

§ 57-12. Special use permit standards for individual special uses. ............................... V-3

§ 57-13. Individual standards for certain uses. ........................................................... V-4

**Article VI. Site Plan Approval** ............................................................................ VI-1

§ 57-14. Uses requiring site plan approval. ................................................................ VI-1

§ 57-15. Submissions to Planning Board for review. ................................................. VI-1

§ 57-16. Application procedure. .................................................................................. VI-2

§ 57-17. Information required on plan. ....................................................................... VI-6

§ 57-18. Submission of supporting materials. ............................................................ VI-7

§ 57-19. Reserved. ...................................................................................................... VI-8

§ 57-20. Site plan standards. ...................................................................................... VI-8

**Article VII. Environmental and Design Standards** ............................................ VII-1

§ 57-21.1    Minimum lot area. ..................................................................................... VII-1

§ 57-21.2     Ridgeline Protection Overlay (RP-O) District....................................................VII-1

§ 57-21.3. Water Supply Protection Overlay District (WSP-O)............................................VII-6

§ 57-21.4. Scenic roads. ..................................................................................................VII-7

§ 57-21.5. Landscaping and screening. ..........................................................................VII-10

§ 57-21.6. Lighting............................................................................................................VII-13

§ 57-21.7. Cluster Development. .....................................................................................VII-15

§ 57-21.8. Site plan as part of subdivision review; house relocation and standards note. VII-21

**Article VIII. Public Improvements, Surety and Inspections .................................................. VIII-1**

§ 57-22-23. Reserved. ......................................................................................................VIII-1

§ 57-24. List of mandatory public improvements................................................................VIII-1

§ 57-25. List of discretionary public improvements. ..........................................................VIII-1

§ 57-26. Scheduling of public improvements. ....................................................................VIII-2

§ 57-27. Performance, restoration and maintenance bonds. .............................................VIII-3

§ 57-28. Required inspections. .........................................................................................VIII-5

§ 57-29. Public improvement inspection fee.......................................................................VIII-5

§ 57-30. Reserved. ............................................................................................................VIII-6

**Article IX. Architectural and Historic Review ........................................................................ IX-1**

§ 57-31. Architectural review. ...........................................................................................IX-1

§ 57-32. Historic review. ....................................................................................................IX-5

§ 57-33. Required dissimilarity of single-family dwellings. .................................................IX-12

§ 57-34 – 36. Reserved. .....................................................................................................IX-13

**Article X. Prohibited Uses ....................................................................................................... X-1**

§ 57-37. Uses prohibited in all districts. ............................................................................X-1

**Article XI. Supplemental Use and Bulk Requirements ........................................................... XI-1**

§ 57-38. Accessory buildings and uses...............................................................................XI-1

§ 57-39. Supplemental Bulk Requirements. .......................................................................XI-2

§ 57-40. Heights; additional restrictions.............................................................................XI-3

§ 57-41. Yards, courts and density requirements................................................................XI-3

§ 57-42. Commercial and noncommercial swimming pools. ................................................XI-5

§ 57-43. Lots abutting a lake or stream. ............................................................... XI-6

§ 57-44. Supplementary standards for certain uses. ........................................... XI-7

§ 57-45. Minimum habitable floor area and width. ........................................... XI-15

**Article XII. Parking and Loading Space Requirements; Garages and Service Stations .......... XII-1**

§ 57-46. Provision for off-street parking required. ............................................. XII-1

§ 57-47. Method of determining off-street parking requirements. ..................... XII-1

§ 57-48. (Reserved) ............................................................................................ XII-2

§ 57-49. Parking area requirements for nonresidential uses; off-street parking requirements for residential uses. ............................................................................. XII-2

§ 57-50. Required off-street truck-loading spaces. ............................................ XII-4

§ 57-51. Supplemental regulations. ................................................................... XII-4

§ 57-52. Access driveways. .................................................................................. XII-6

§ 57-53. Additional requirements for garages and automotive filling (gasoline) stations... XII-6

§ 57-54. Exceptions and waivers. ....................................................................... XII-6

**Article XIII. Signs ............................................................................................. XIII-1**

§ 57-55. Maximum permitted sizes. .................................................................. XIII-1

§ 57-56. Supplementary regulations. ................................................................ XIII-1

**Article XIV. Nonconforming Uses, Buildings or Structures ................................ XIV-1**

§ 57-57. Unlawful uses; establishment of nonconforming uses. ....................... XIV-1

§ 57-58. Continuance of nonconforming uses. .................................................. XIV-1

§ 57-59. Extension of nonconforming uses. ...................................................... XIV-1

§ 57-60. Changes of nonconforming uses. ........................................................ XIV-1

§ 57-61. Abandonment of nonconforming uses. ............................................... XIV-1

§ 57-62. Nonconforming summer cottage developments. ................................. XIV-2

**Article XV. Zoning Board of Appeals ................................................................. XV-1**

§ 57-63. Establishment, organization, procedures and records. ........................ XV-1

§ 57-63.1. Alternate members. ........................................................................... XV-2

§ 57-64. Appeals. ............................................................................................... XV-3

§ 57-65. Variances. ........................................................................................... XV-3

**Article XVI. Administration and Enforcement .................................................. XVI-1**

iii

§ 57-66. Interpretation of provisions; minimum requirements. .........................................XVI-1

§ 57-67. Effect on other regulations and agreements.......................................................XVI-1

§ 57-68. Enforcement. ....................................................................................................XVI-1

§ 57-69. Right of entry for inspections. ..........................................................................XVI-2

§ 57-70. Building permits; formation of new lots.............................................................XVI-2

§ 57-71. Completion of buildings for which permits have been issued. ............................XVI-2

§ 57-72. Certificates of occupancy...................................................................................XVI-3

§ 57-73. Filing of nonconformance statements by property owners..................................XVI-3

§ 57-74. Fees. ...............................................................................................................XVI-3

§ 57-75. Penalties for offenses. .......................................................................................XVI-4

**Article XVII. Public Records.................................................................................XVII-1**

§ 57-76. Copies of regulations and map to be open to public inspection................................ 1

**Article XVIII. Amendments ...............................................................................XVIII-1**

§ 57-77. Required information. .......................................................................................XVIII-1

**Article XIX. Violations of Previous Law ................................................................ XIX-1**

§ 57-78. Violations not affected. .....................................................................................XIX-1

§ 57-79. Reserved. .........................................................................................................XIX-1

**Article XX. Tree Preservation ...............................................................................XX-1**

§ 57-80. Legislative intent. ..............................................................................................XX-1

§ 57-81. Legislative findings.............................................................................................XX-2

§ 57-82. Reserved. ..........................................................................................................XX-2

§ 57-83. General regulations. ...........................................................................................XX-2

§ 57-84. Tree plan and the subdivision, site plan and special use permit review process ..XX-4

§ 57-85. Tree plan and the building permit process............................................................XX-7

§ 57-86. Activities permitted by right. ..............................................................................XX-8

§ 57-87. Removal of trees on public land. .........................................................................XX-9

§ 57-88.  Trees and public utilities. ...................................................................................XX-9

§ 57-89. Timber harvesting. .............................................................................................XX-10

§57-90. Enforcement and administration..........................................................................XX-12

§ 57-91.  Penalties........................................................................................XX-12

§ 57-92.  Bonds. ..........................................................................................XX-12

§ 57-93.  Landmark, native, protected and specimen tree list...........................XX-13

**Attachments:**

Schedule of District Regulations

Town of Monroe Zoning Map

## Article I. Title

### § 57-1. Short title.

The title of this chapter shall be the "Zoning Law of the Town of Monroe." It is also referred to as the Zoning Chapter herein.

## Article II. Word Usage and Definitions

### § 57-2. Word usage.
For the purposes of this chapter, the following words and terms are used as indicated:

A.  Unless the context clearly indicates the contrary, words used in the present tense include the future, the singular number includes the plural and the plural the singular.
B.  The word "person" includes a profit or nonprofit corporation, company, partnership or individual.
C.  The word "shall" is mandatory and not directory; the word "may" is permissive.
D.  The word "lot" includes the word "plot."
E.  The word "structure" includes the word "building."
F.  The word "use" and the word "used" refer to any purpose for which a lot or land or part thereof is arranged, intended or designed to be used, occupied, maintained, made available or offered for use and to any purpose for which a building or structure or part thereof is arranged, intended or designed to be used, occupied, maintained, made available or offered for use or erected, reconstructed, altered, enlarged, moved or rebuilt with the intention or design of using the same.

### § 57-3. Definitions.
For the purposes of this chapter, the following words and terms are defined as indicated:

ACCESSORY USE OR BUILDING - A subordinate use or building customarily incidental to and located on the same lot occupied by the principal use or building. The term "accessory building" may include a private garage, garden shed or barn, a private playhouse and a private greenhouse.

ARBORIST - A person who has received at least a Bachelor Degree in plant science from an accredited college or university and who has been certified to conduct business in the State of New York by the New York State Chapter of the International Society of Arboriculture (ISA).

ADAPTIVE REUSE OF A HISTORIC BUILDING – Reuse of a building for a purpose than for which it was historically constructed, and in accordance with the provisions of Section 57-13.A of this Zoning Chapter.

ADULT BOOKSTORE - An establishment having as a substantial or significant portion of its stock-in-trade books, magazines, films for sale or viewing on premises by use of motion-picture devices or any other coin-operated means, and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas or an establishment with a segment or section devoted to the sale or display of such material.

ADULT ENTERTAINMENT CABARET - A public or private establishment which is licensed to serve food and/or alcoholic beverages, which features topless dancers, strippers, male or female impersonators or similar entertainers.

ADULT MINI MOTION-PICTURE THEATER - An enclosed building with a capacity of less than 50 persons used for presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas for observation by patrons therein.

ADULT MOTION-PICTURE THEATER - An enclosed building with a capacity of 50 or more persons used regularly and routinely for presenting material having as a dominant theme material distinguished or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas for observation by patrons therein.

AGRICULTURE or HORTICULTURE - The cultivation of the soil for food products or useful or valuable growths of the field or garden, exclusive of facilities for display of products and marketing on the premises, whether wholesale or retail, and shall not be deemed to include poultry or livestock.

ALTERATION - The act of changing, modifying or making different.

ALTERATION, HISTORIC - Any change, construction, reconstruction, covering over, or removal, of a regulated property, building or structure or exterior architectural feature(s) thereof. Alteration shall not include routine maintenance or repair of same required by normal wear and tear with the same materials unless such maintenance would result in a change in the architectural appearance of the structure. Interior alterations that do not affect the exterior architectural features of the regulated structure are not regulated by this section.

REMOVAL OF A STRUCTURE - A type of demolition that involves relocation of a regulated property, building structure or portion thereof to another location on the same lot or on another lot.

AUTOMOBILE SALES - A motor vehicle dealership or establishment that sells new or used passenger automobiles at retail, employing salespeople to sell the vehicles.

AUTOMOTIVE SERVICE STATION - A building or lot or part thereof devoted primarily to fuel dispensing, repairs, servicing, washing or reconditioning of motor vehicle.

BANK OR SAVINGS-AND-LOAN ASSOCIATIONS - A bank or similar financial institution licensed to receive monetary deposits and make loans. Banks may also provide financial services, such as wealth management, currency exchange and safe deposit boxes. A bank may include a drive through facility and ATM machine for the conduct of business.

BASEMENT - A story partly underground, but having at least 1/2 of its height above the average finished grade level of the ground immediately adjacent to the building wall. A "basement" shall not exceed the total gross floor area of the story immediately above it, and shall count as habitable floor area.

BASEMENT, SUBTERRANEAN – Any basement area which exceeds either the gross floor area of the story immediately above it, as per the definition of a "basement", or any basement where the total floor to ceiling height is greater than twelve (12) feet, shall be deemed a subterranean basement and is prohibited.

BED-AND-BREAKFAST - Overnight lodging within an owner-occupied single-family detached dwelling, managed by the property owner, where said lodging is provided to transient guests in one to four guest bedrooms, and up to a maximum of eight guests, for compensation. Breakfast is the only meal served and is included in the charge for the room. This term does not include boardinghouses, motels, hotels, tourist courts, motor lodges, tourist cabins or similar terms.

BLOCK - A tract of land or lot or group of lots bounded by streets, public parks or parkways, railroad right-of- way, reservoir, lake or other body of water or watercourse, unsubdivided land or a boundary line or lines of the Town of Monroe or any combination of the above.

BOTTLED GAS DISTRIBUTION STATION - The commercial retail sale and distribution of propane gas in tank or cylinder to consumers, including its purchase, storage and filling for the purpose above.

BUILDING -A structure constructed or erected on the ground, with a roof supported by columns or walls.

BUILDING, AREA OF - The horizontal area measured around the outside of the foundation walls and of the floors of roofed porches and roofed terraces, inclusive, and including the area of accessory buildings, if any. In the case of split-level dwellings, the first floor area shall be deemed to include floor areas on two nonoverlapping levels separated by a half-story, more or less, of height.

BUILDING HEIGHT – The vertical distance measured from the average elevation of the finished grade to the highest point of such building. Calculation of the average final grade shall be made by drawing the smallest rectangle or square possible that encompasses the entire building area as shown below and averaging the elevations at the midpoint of each side of the rectangle or square. Fill shall not be used to raise the average final grade more than three (3) feet above the existing grade of an existing dwelling located within fifty (50) feet on an adjoining property.



(Final Elevation at Mid-point of A + B + C + D) ÷ 4 = Average Final Grade Elevation

**Adjustments for measuring height where an adjoining dwelling(s) exists:**



No adjustments required for structures on Parcel "X" adjoining Areas A or C;

Adjustment required for structures adjoining Area B.

**BULK REQUIREMENTS** – The various dimensional requirements applicable to uses, buildings, and structures, including those set forth in the Schedule of District Regulations, and including those applicable to yards, building height, lot coverage, floor area ratio, and other such dimensional standards set forth in this Zoning Chapter.

**BUSINESS PARK** - A use consisting of a tract of land developed or used for more than one commercial, industrial, office or residential uses listed as a permitted or special use in the underlying LI zoning district, or the BP-O district, which is designed pursuant to an overall development plan and having some or all of certain infrastructure facilities shared in common, such as driveways, parking areas, drainage, utilities or screening and for which a Declaration of Development has been filed with the Town Clerk.

BUILDING OR LANDSCAPE MATERIALS STORAGE YARD - A building or area of land where building materials, landscape materials equipment and/or supplies used exclusively as part of a contractor's business involving the construction of buildings or landscaping associated with same are stored. Retail or wholesale trade of any contractor materials or supplies is not permitted accessory to a storage yard. The materials processing of organic or inorganic materials including rock crushing, mulching, or soil screening is not permitted in conjunction with this use.

BUILDING, PRINCIPAL - A building in which is conducted the principal use of the lot on which said building is situated.

BUS PASSENGER WAITING SHELTER – Any structure or building located on a bus route that provides shelter to passengers waiting to embark on the bus.

CAR WASH - A building or area of land designed exclusively for the cleaning of motor vehicles whether by machinery line or with hand-operated cleaning devices.

CELLAR - A space having more than 1/2 its height below the average finished grade level of the ground at the cellar building wall. A "cellar" shall not be counted as a story or as habitable floor area.

CEMETERY - Land and buildings, whether privately or publicly owned or operated, used for the disposal or burial of deceased human beings, by cremation or in a grave, mausoleum, vault, columbarium or other repository. Such term shall also include land and buildings used and essential to the providing of cemetery purposes including, but not limited to storage facilities for necessary tools and equipment.

CERTIFICATE OF APPROPRIATENESS - A permit issued by the Planning Board pursuant to § 57-32 of this Zoning Chapter to authorize alteration, demolition or new construction of a regulated property, building or structure.

COURT - A space, either on the ground or above, excepting a main roof, situated on the same lot with a building and which is unoccupied and open to the sky and not a front yard, side yard or rear yard.

COURT, DEPTH OF - The maximum horizontal dimension at right angles to the width.

COURT, HEIGHT OF - The greatest vertical distance measured from the lowest level of such court up to the roof of the building.

COURT, INNER - A court which is not an outer court.

COURT, OUTER - A court extending to a street, front yard or rear yard.

COURT, WIDTH OF - The horizontal dimension parallel to the principal open side in the case of

any outer court and the least horizontal dimension in the case of an inner court.

CRITICAL ROOT ZONE - A circular area around each tree with the trunk at the center and a diameter equal to or greater than the drip line as measured by the width of the canopy of the tree, but in any event, at least a circumference of six feet from the tree trunk in any direction. The Building Inspector may reduce the size of a Critical Root Zone upon recommendation of the Town of Monroe Conservation Commission pursuant to an approved Tree Plan.

CUSTOM WORK, SHOP FOR (See also "workshop.") - A business premises used for the making of clothing, millinery, shoes or other personal articles to individual order and measure for sale at retail on the premises only, not including the manufacture of ready-to-wear or standardized products.

DAY CAMP, CHILD - One or more temporary or permanent tents, buildings or structures, together with the lot or tract of land appertaining thereto, established or maintained as living quarters for temporary seasonal occupancy and not arranged or intended for such occupancy except during the period or part of the period from April 1 to December 1 in any year. The principal use shall be for the daily occupancy of children between the ages of 4 to 18. Child day camps, camps, or summer cottages that do not meet the occupancy standards set forth in the special use standards for a child day camp are prohibited.

DAY-CARE CENTER - A non-residential facility which is either authorized by the New York State Department of Social Services and operated by a service provider found qualified by that Department, or licensed by the New York State Department of Health and operated by a service provider found qualified by that Department, and which in both cases offers an organized program of personal care, supervision 2-7 and activities for three or more children and/or adults for less than 24 hours per day.

DAY SPA - A commercial use where a combination of professionally administered personal care treatments such as massages, facials, body wraps, salt scrubs, and other body treatments are performed. Manicures, pedicures, and hair salon uses may also be included. The facility is only visited for the duration of the treatment and only on a daily basis and the visitation does not involve an overnight stay or accommodation.

DECLARATION OF DEVELOPMENT - A document filed by the initial developer of a business park with the Town Clerk, which shall state the name and place of business of the developer and describe the area and boundaries of the tract of land that will comprise the proposed business park, by reference to Tax Map parcels or any other means of reference acceptable to the Planning Board. The declaration shall also include a statement of intent setting forth the proposed plan of development for the business park.

DEMOLITION - The act of pulling down, destroying, removing, moving, relocating, or razing a regulated property, building or structure or portion thereof, or commencing the work of total or substantial destruction with the intent of completing same, including removal.

DEMOLITION, EMERGENCY - A demolition authorized pursuant to the New York State Uniform Building Code, when, after inspection, it is determined by the Building Inspector or other authorized official, after consultation with the Town Engineer, that a regulated structure poses an imminent threat to the health or safety of the community that cannot be adequately mitigated and that immediate demolition is necessary to protect public health and safety.

DEVELOPER - Any applicant seeking site plan, special use or subdivision approval, whether an owner, contract vendee, lessor, lessee, managing agent, etc., and shall include the agents of said applicant for approval and all successors in interest of same. The term developer shall include any owner, contract vendee, lessor, lessee, managing agent, etc., as the same exists at the time of site plan approval, at the time of building permit issuance and at the time that issuance of a certificate of occupancy is sought.

DBH (Diameter at Breast Height) - The diameter, expressed in inches, of a tree measured at four and one-half feet (4 1/2') at the grade above ground level at the base of the tree.

DUMP - A disposal facility or part of a facility where solid waste, including hazardous waste, is placed in or on land. As used herein, the terms "disposal facility," "waste" and "hazardous waste" shall have the same meaning as those terms are defined in Article 27, Title 9 (§ 27-0901), of the Environmental Conservation Law and, further, hazardous wastes shall include any such wastes as identified by the Commissioner of the Department of Environmental Conservation as such pursuant to his powers of identification contained in § 27-0903 of said law.

DWELLING - A building arranged, intended or designed to be occupied by one or more families living independently of each other on the premises. The term "dwelling" shall include prefabricated buildings and mobile homes, provided that they meet all the requirements of this chapter, the Building Code and all other requirements or ordinances applicable to dwellings.

DWELLING, ACCESSORY APARTMENT - A dwelling unit with its own cooking, sanitary and sleeping facilities and occupied by no more than one family, which accessory apartment is part of and subordinate to a single-family detached dwelling located on an individual lot, and wherein the principal single family detached dwelling is owner-occupied.

DWELLING GROUP, MULTIPLE - A building, group of buildings or housing development operated as a single project and arranged, intended or designed to be occupied by three or more families living independently of each other in separate dwelling units. The term "multiple dwelling group" shall include attached and semi-attached single-family dwellings, patio homes, townhouses, garden apartments, and duplex buildings, which dwellings may be sold or rented individually, provided that a common area is retained by a homeowners' or condominium association or by the property owner for the exclusive benefit of the residents of the multiple dwelling group.

DWELLING, MULTIPLE FAMILY - A building arranged, intended or designed to be occupied by three or more families living independently of each other in separate dwelling units.

DWELLING, SINGLE-FAMILY - A dwelling designed for and used by one family. The existence in design or otherwise of more than one room in a dwelling designed or used for cooking and food preparation and designed to contain or containing cooking facilities and food storage and preparation facilities, commonly known as a "kitchen," shall be prima facie evidence that the dwelling is not designed for or used by one family. This evidentiary rule, however, shall not apply to a kitchen designed for or used solely in observance of religious holy days or feast days. The existence in design of a floor and room layout for a second story substantially similar in design to the floor layout of the ground floor of the same dwelling, which second story can be isolated from the ground floor by a single door or partition, shall likewise be prima facie evidence that the dwelling is not designed for use by one family.

DWELLING, SINGLE-FAMILY ATTACHED - A building containing three or more single-family dwellings each on an individual lot which are attached to one or more single-family dwellings by party wall or walls, but which dwelling occupies all space between foundation and roof. Also referred to as "townhouse" dwellings.

DWELLING, SINGLE-FAMILY DETACHED - A single-family dwelling on an individual lot.

DWELLING, SINGLE-FAMILY SEMI-ATTACHED - A building containing two single-family dwellings, each on an individual lot but which are attached to each other by a party wall, and where each dwelling occupies all space between foundation and roof. Also referred to as a "duplex" building.

EXTERIOR ARCHITECTURAL FEATURES - The architectural style, general design and general arrangement of the exterior of any regulated property, building or structure, including but not limited to the kind and texture of the siding and other building materials and the type and style of the trim, doors, windows, steps, entryways, and other architectural features, but shall not include the kind and color of paint and light fixtures on any regulated structure.

FAMILY -
A. One of the following:
    (1) One or two persons occupying a dwelling unit; or
    (2) Three or more persons occupying a dwelling unit and living together as a traditional family or the functional equivalent of a traditional family.
B. It shall be presumptive evidence that three or more persons living in a single dwelling unit who are not related by blood, marriage or legal adoption do not constitute the functional equivalent of a traditional family.
C. In determining whether individuals are living together as the functional equivalent of a traditional family, the following criteria must be present:
    (1) The group is one which in theory, size, appearance, structure and function resembles a traditional family unit;
    (2) The occupants must share the entire dwelling unit and live and cook together as a single housekeeping unit. A unit in which the various occupants act as separate roomers may not be deemed to be occupied by the functional equivalent of a traditional family;

(3) The group shares expenses for food, rent or ownership costs, utilities and other household expenses;

(4) The group is permanent and stable. Evidence of such permanency and stability may include:

(a) The presence of minor dependent children regularly residing in the household who are enrolled in local schools;

(b) Members of the household have the same address for purposes of voter's registration, driver's license, motor vehicle registration and filing of taxes;

(c) Members of the household are employed in the area;

(d) The household has been living together as a unit for a year or more whether in the current dwelling unit or other dwelling units;

(e) There is common ownership of furniture and appliances among the members of the household; and

(f) The group is not transient or temporary in nature;

(5) Any other factor reasonably related to whether or not the group is the functional equivalent of a family.

FLOOR AREA, MINIMUM HABITABLE - The total horizontal area of all stories of a dwelling unit measured at the outside wall of the building, but excluding garages, carports, open porches, terraces, utility rooms and floor areas with a clear ceiling height of less than seven feet six inches. The minimum habitable floor area of a dwelling unit having more than one story shall be discounted by 300 square feet to allow for stair and additional hallway areas.

FORESTER - A person who has received at least a Bachelor Degree in forest management or associated discipline from an institution accredited by the Society of American Foresters and professional experience in forestry. Such person shall also have voluntarily agreed to meet the standards prescribed by the State of New York Department of Environmental Conservation's (DEC's) Cooperating Foresters Program and be listed on the DEC's Directory of Cooperating Foresters.

GARAGE -A building or part thereof used for the storage or parking of one or more motor vehicles.

GARAGE, PRIVATE - An accessory garage maintained for the convenience of the occupant or occupants of the main building and in which no business or other use is carried on and no service is rendered to the general public.

GASOLINE FILLING STATION - A building or lot or part thereof supplying and selling gasoline or other equivalent fuel for motor vehicles at retail direct from pumps and storage tanks. A "filling station" may include accessory facilities for rendering services such as lubrication, washing and minor repairs with hand tools.

GATHERING PLACE - A- place of assembly allowed by special permit in a residential district, for organizations or loose affiliations of like-minded people regularly meeting to plan or conduct organization functions or other organized activities within habitable areas of a single family

detached dwelling, subordinate to its use as a single-family detached dwelling. Regular meeting means one or more times per month. The maximum size of the area of assembly will be governed by the New York State Uniform Code covering the assemblage of people and the ability of the site to provide for the special conditions determined by the special permit application in order to provide for such gatherings while ensuring the safety of those individuals in attendance and of surrounding properties. The area of assembly shall not occupy more than thirty percent (30%) of the total square footage of the residence excluding bedrooms, corridors, bathrooms and kitchens as further defined in the then current New York State Uniform Code. For the purpose of this use, garages and cellars are not considered habitable space and may not be used for gatherings or be used in calculating the permitted area of a Gathering Place. The Planning Board shall determine the maximum occupancy at the time a special permit is issued, based on provisions of the New York State Uniform Code. Under no circumstances may the number of persons exceed 50.

GOLF COURSE - An area of land laid out for the outdoor play of golf with a series of 9 or 18 holes each including tee, fairway, and putting green and often one or more natural or artificial hazards.

GUEST SLEEPING ROOM - Any habitable room used as a sleeping accommodation for transient occupancy in a hotel with one bathroom for each habitable room and no kitchen or cooking facilities, other than a small refrigerator or coffee maker.

HEALTH FITNESS FACILITY - A building where active exercise and related activities are performed utilizing weight control or muscle-building equipment or apparatus for the purpose of physical fitness. A health fitness facility may also include, as accessory uses, services and activities provided in conjunction with a day spa, a daycare room, physical therapy activities, and refreshments.

HISTORIC BUILDING – Any building which meets the criteria set forth in Section 57-32 of this Zoning Chapter.

HOME OCCUPATION – Any limited personal service, professional service, or business accessory use conducted entirely within a dwelling by the residents thereof, which is clearly incidental and secondary to the use of the dwelling for residential living purposes and does not change the character thereof or have any exterior evidence of such secondary use other than a small nameplate. Home occupations are categorized as "exempt", "minor" or "major" and regulated in accordance with §57-44.B of the Zoning Chapter.

HOSPITAL - A building used for the diagnosis, treatment or other care of human ailments, unless otherwise specified. A "hospital" shall be deemed to include a clinic, convalescent home, nursing home, rest home or other building with an equivalent appellation.

HOTEL - A commercial building or portion thereof, containing guest sleeping rooms, without individual kitchen or cooking facilities, occupied by transient guests who are lodged, with or without meals, which rooms have direct access to the outside and sole access from public hallways. Conference space, a restaurant, and recreational amenities are allowed accessory to a

hotel.

INDOOR MOVIE THEATER - A commercial use operated in a building that contains an auditorium for viewing films (also called movies or cinemas), for entertainment. Nothing herein shall be interpreted to allow adult mini or adult theaters which are defined and regulated as a separate use.

INDOOR PISTOL RANGE – A commercial use operated in a building that contains a firing range with targets for rifle or handgun practice.

INDOOR SPORTS FACILITIES - A commercial establishment in which athletic, recreational or physical activities, training or instruction are primarily conducted. An indoor sports facility may include but is not limited to any of the following: tennis and other racquet courts, swimming pool, spa and sauna facilities, handball and other ball courts, nonmotorized cycling tracks, running tracks, skating, roller or skateboard rink or facility, health and physical fitness training or gym, including free weight and other physical fitness machines, climbing facility, self-defense or martial arts studios, fitness and dance studios, bowling alleys, miniature golf, billiard tables, archery or shooting ranges. Indoor sports facilities may also include electronic and coin- operated devices such as electronic golf and batting cages, as well as other electronic devices such as video games, pinball, mechanical grab machines and the like. Indoor sports facilities may be combined with outdoor sports facilities and may include shower facilities, locker rooms, restaurants and dining facilities as accessory uses and the sale of necessary equipment and appurtenances. Indoor sports facilities shall not mean nor otherwise be interpreted to include adult entertainment, adult bookstore, adult motion-picture theater or adult mini motion-picture theater as those terms are defined in this chapter.

INDUSTRY, NONNUISANCE - Any industry which is not detrimental to the environment in which it is located by reason of the emission of smoke, odor, dust or other air pollutants, radioactivity or electromagnetic disturbances, liquid or solid wastes, noise, vibration or excessive light beyond the limits of its lot, or by reason of generating excessive traffic with attendant hazards, or by potential hazards of fire or explosion and which does not include any open storage yard or outdoor processing of materials.

INVASIVE PLANT SPECIES - A plant genus that is nonnative to the ecosystem under consideration, and whose introduction causes or is likely to cause economic or environmental harm or harm to human health. plants in any stage of development, including, but not limited to trees, shrubs, vines, grasses, sedges, rushes, herbs, mosses, lichens, as well as submergent, emergent, free-floating or floating-leafs, and includes any part of the plant. For purposes of this Chapter, prohibitive invasive plant species are those that are listed by the NYS Department of Environmental Conservation under Section 575.3 of 6 NYCRR Part 575.

JUNKYARD - A lot, land or structure or part used in whole or in part for the storage and/or sale of refuse, which includes but is not limited to wastepaper, rags, scrap metal or other scrap or discarded materials and/or for the collecting, dismantling, storage or salvaging of machinery or

unregistered vehicles and/or for the sale of parts thereof. Two or more such vehicles, unregistered, located on a property for more than 30 days shall be deemed to be a "junkyard." A property on which is located one cubic yard or more of refuse as defined above for more than 30 days shall also be deemed to be a "junkyard." s to the foregoing machinery and vehicles owned by a resident owner of the premises or immediate family residing on the premises may be stored in a legal accessory garage or storage structure for repair, storage or customizing for resident and family use only and not for sale, storage or repair for others. Storage of the above shall not interfere with required garage space for registered vehicles.

LABORATORY AND RESEARCH FACILITIES - A building for experimentation in pure or applied research, design, development and production of prototype machines or devices or of new products and uses accessory thereto, wherein products are not manufactured primarily for wholesale or retail sale, wherein commercial servicing or repair of commercial products is not performed and where there is no display of any materials or products. A research institute or laboratory shall meet the same performance standards as a nonnuisance industry. (See "industry, nonnuisance" above.)

LAND DEVELOPMENT APPLICATION – Any application submitted to obtain approval for any land development, which includes but is not limited to a building permit, certificate of occupancy, site plan, subdivision, floodplain development permit, wetland permit, special use permit.

LAUNDRY OR DRYCLEANING ESTABLISHMENT - A commercial use for pick-up and delivery only of dry-cleaned garments or laundry. Tailoring services are allowed accessory to a laundry or drycleaning establishment.

LOT - A parcel of land occupied or which may be occupied by a building and its accessory buildings, by a dwelling group and its accessory buildings or by a related group of uses or structures, together with such open spaces as are required under the provisions of this chapter. A lot on which a proposed use is intended to be located shall have not less than the minimum area and width required by this chapter for a lot in the district in which such land is situated and shall have its principal frontage on a street or on such other means of access as may be determined in accordance with the provisions of law.

LOT AREA - The total gross area included within lot lines.

LOT AREA, MINIMUM - The total area included within lot lines after deducting any area identified as an environmental constraint set forth in § 57-21.1.

LOT, CORNER - A lot which has an interior angle of less than 135° at the intersection of two street lines. A lot abutting upon a curved street shall be considered a corner lot if the tangents to the curve at the points of intersection of the side lot lines intersect at an interior angle of less than 135°.

LOT COVERAGE - The percentage of the lot area that is occupied by the area of buildings,

structures and all impermeable and/or compacted surfaces, including but not limited to parking lots, access and circulation drives.

LOT, INTERIOR - A lot other than a corner lot.

LOT LINE - Any line dividing one lot from another or from a street or other right-of-way. Any lot line that is not a rear lot line nor a front lot line shall be deemed a side lot line.

LOT LINE, FRONT - A lot line which separates a lot from a street or other means of access. On a corner lot, the owner may specify the front lot line on the plat plan. Otherwise, the "front lot line" shall be deemed to be the lesser of the straight lines which abut the street.

LOT LINE, REAR - The lot line generally opposite to the front lot line. If the rear lot line is less than 10 feet in length or if the lot comes to a point in the rear, the "rear lot line" shall be deemed to be a line parallel to the front lot line not less than 10 feet long lying farthest from the front lot line.

LOT, THROUGH - An interior lot having frontage on two parallel or approximately parallel streets. On a through lot, the owner may designate the front lot line on a plat plan or site plan. The line opposite the front lot line shall be the rear lot line.

LOT, WIDTH OF - The mean dimension of the two lines measured at both the required minimum rear and front yard depths or, in a case where a building setback line is established by the Planning Board at the time of subdivision approval, which line is further removed from the street line than the minimum front yard depth, at such lines. The dimension of width shall be measured along such lines as extended the straight distance from side lot line to side lot line, which lines are generally parallel to the front lot line. In such case where a front or rear lot line is curved, the dimension of lot width shall be measured along a line which is perpendicular to a line bisecting the lot from front to rear. Every point along a lot width line shall be the minimum required distance from the front or rear lot line.

MEDICAL OFFICE - A building in which are located offices used by persons having professional knowledge or skill in the diagnosis and/or treatment of human ailments, including medical, dental, optometric, chiropractic, podiatric, diagnostic and other similar offices and related facilities and laboratories.

MEMBERSHIP CLUB - Premises used by a not-for-profit organization with annual membership dues catering exclusively to members and their guests for social, recreational, athletic, professional, cultural or similar purposes. The members of the organization shall have a financial interest in, and method of control of, the assets and management of the "membership club."

MOBILE HOME - A movable single-family dwelling, having a width of 12 feet or more and a length of 50 feet or more, equipped with a vehicular chassis and provided with all of the following mechanical systems and equipment: plumbing, heating, electrical, cooking and refrigeration.

MOBILE HOME PARK – A lot, parcel or site, with appurtenant facilities and services, for one or more mobile homes approved by the Planning Board as a special use.

MUNICIPAL PARK – A public park, playground, or recreation area, whether available for active or passive recreation, available to Town of Monroe residents.

NEW CONSTRUCTION - The erection or installation of any new building or structure that requires a building permit.

NEWSPAPER OR PRINTING ESTABLISHMENT – A facility involved in the production of books, newspapers, or other printed material.

NONCONFORMING STRUCTURE - A structure lawfully existing at the effective date of this chapter or any amendment thereto affecting such structure which does not conform to the building regulations of this chapter for the district in which it is situated, irrespective of the use to which such structure is put. (See § 57-5.)

NONCONFORMING USE - Any use of a building, structure, lot or land or part thereof lawfully existing at the effective date of this chapter or any amendment thereto affecting such use, which does not conform to the use regulations of this chapter for the district in which it is located.

OFFICE - A use where services are performed involving predominately administrative or clerical operations for either business or professional purposes. Office use, as defined herein, also includes medical offices.

OUTDOOR SPORTS FACILITIES - A commercial establishment in which athletic, recreational or physical activities, training or instruction are primarily conducted. An outdoor sports facility may include but is not limited to any of the following: tennis courts, swimming pool, ball courts or fields, including but not limited to croquet, bocce, volleyball, football, baseball, softball, field hockey, lacrosse and soccer, running tracks, nonmotorized cycling tracks, skating, roller or skateboard rink or facility, miniature golf and batting cages. Outdoor sports facilities may also include incidental spectator viewing facilities appurtenant to each individual such court or field where appropriate; provided, however, that no event that involves the public assembly of more than 500 persons at any one time to the outdoor sports portion of the site shall be permitted. Outdoor sports facilities shall specifically exclude the following: sports or activities that would generate unreasonably large crowds, excessive noise or otherwise result in the creation of hazardous or nuisance conditions, including but not limited to the use of motorized watercraft and/or jet skis, tracks, trails or facilities for snowmobiles, tracks, trails or other facilities for any kind of motorized vehicle and/or motorized cycle, whether battery-powered or powered by combustion, aviation and tracks for racing horses, dogs or other animals. Outdoor amplified music systems and/or speakers are specifically prohibited. Outdoor sports facilities shall not include amphitheaters, band shells, campgrounds nor shall the definition mean or otherwise be interpreted to include adult entertainment, adult bookstore, adult motion-picture theater or

adult mini motion- picture theater as those terms are defined in this chapter.

PARKING AREA - A lot or part thereof used for the storage or parking of motor vehicles accessory to a principal use on the same lot which it serves.

PARKING SPACE - A stall or berth which is arranged and intended for parking of one motor vehicle.

PERFORMANCE BOND - Any written and executed guaranty, obligation or promise, made by an owner or developer of property who has received site plan, special use or subdivision approval from the Planning Board, to install public improvements required by the Planning Board or to perform other required acts within a fixed period of time that may be required by the Planning Board pursuant to plan approval, Town Board or any local law or ordinance of the Town.

PERSON - Any person, firm, partnership, corporation, limited liability company, association or legal representative, acting individually or jointly.

PERSONAL SERVICE – A commercial use in which the product offered is the work or action performed, as in shoe repair shop, beauty shop, barber shop, and similar uses.

PLACE OF WORSHIP - A structure or place in which worship, ceremonies, rituals and education pertaining to a particular system of belief are held. Place of Worship may include clergy offices, offices of the place of worship, meeting rooms to be utilized for various activities and community services offered or sponsored by the place of worship, social halls, (except that said social hall may not be utilized as a place of business for a commercial caterer), clergy or caretaker residence, day care and recreation areas.

PLANNING BOARD - The Planning Board of the Town of Monroe, New York.

PUBLIC IMPROVEMENT - Any street, roadway, curb, gutter, sidewalk, parking lot, retaining wall, water main, fire hydrant, sanitary waste disposal facility or structure, storm drain, retention or detention pond, wetland restoration facility, street signs, streetlights, trees, seeding, sodding, tree planting, landscaping improvement or any other public facility or requirement of the Planning Board or any local law or ordinance of the Town identified or characterized as a public improvement as part of an approved plan in order to protect the public health, safety and welfare and where such improvement shall be dedicated to the Town or other public entity or authority Any improvement that is not intended to be dedicated to the Town or other public entity or authority shall be deemed private and shall not fall under this definition.

PUBLIC IMPROVEMENT SECURITY AGREEMENT - A written agreement entered into between a developer and the Town, which provides a schedule for the completion of public improvements required by the Planning Board as part of its approval and which provides for the deposit of a certain amount of approved security with the Town in escrow to secure installation of the required public improvements or to permit the Town to adequately safeguard the project site in those instances where a developer has failed to make public improvements according to the

schedule.

PUBLIC UTILITY BUILDING OR STRUCTURE – Any organization duly authorized to furnish to the public, under public regulation, electricity, gas, water, sewage treatment, television, or cable services.

RESTORATION BOND - Any written and executed guaranty, obligation or promise, made by an owner or developer of property who has received site plan, special use or subdivision approval from the Planning Board as part of said approval, to restore a site to a safe, secure and stable condition, in the event that public improvements have not been properly or timely completed as required by said approval.

RESTAURANT - Any commercial use where food and beverages is sold primarily for on-premise consumption to patrons seated at tables and where food is served at the table.

RESTAURANT, DRIVE THROUGH - Any commercial use where food and beverages are sold for consumption by patrons seated at tables on the premises, or sold to a customer in a vehicle at a drive through facility, primarily for the consumption of food off the premises.

RETAIL – A commercial use involving the sale of goods directly to the public in relatively small quantities for use or consumption rather than for resale.

SANITARY PLANT or WASTEWATER TREATMENT PLANT- A sewerage system, including sewers and a disposal plant, of design approved by the New York State Department of Health.

SCHOOL, PRIVATE – Any educational institution conducting a regularly scheduled curriculum of study similar to that of "public schools" and operated in accordance with the Education Law of the State of New York and chartered by the New York State Board of Regents. For purposes of this Zoning Chapter, private school shall include schools serving grades kindergarten through 12$^{th}$grade.

SCHOOL, PUBLIC – An educational institution operated by a public school district in accordance with the Education Law of the State of New York and chartered by the New York State Board of Regents. For purposes of this Zoning Chapter, public school shall include schools serving grades kindergarten through 12$^{th}$grade.

SELECTIVE SPECIES CUTTING - The practice of removing selective trees of any DBH to discourage the re-establishment of naturally occurring native hardwood forests.

SELF-SERVICE STORAGE FACILITY - A facility containing a structure or structures containing separate, individually leasable or rentable storage spaces of varying sizes.

SEQRA – The New York State Environmental Quality Review Act, and its implementing regulations set forth in 6 NYCRR Part 617.

SHOPPING CENTER, GENERAL - A tract of land with a building intended for one or more uses otherwise allowed as principal permitted uses or by special use permit in the GB district, on a site of 40,000 square feet or more. Any use allowed by special use permit shall obtain same by approval of the Planning Board.

SHOPPING CENTER, NEIGHBORHOOD - A tract of land with a building intended for one or more uses otherwise allowed as principal permitted uses or by special use permit in the NB district, on a site of 20,000 square feet or more. Any use allowed by special use permit shall obtain same by approval of the Planning Board.

SHOPPING CENTER, REGIONAL - A tract of land with a building or buildings planned as a whole and intended for one or more uses otherwise allowed as principal permitted uses or by special use permit in the Business Park Overlay district in accordance with the regulations of same.

SIGN, ADVERTISING - A sign which directs attention to a business, commodity, service or entertainment conducted, sold or offered elsewhere than upon the property, and only incidentally upon the property if at all.

SIGN, BUSINESS - A sign which directs attention to a business or profession conducted upon the property.

SPECIAL USE or SPECIAL PERMIT USE- A use for which the Planning Board may authorize a permit pursuant to the provisions of Article V.

SPECIFIED ANATOMICAL AREAS
A.  Less than completely and opaquely covered human genitals, pubic region or female breast below a point immediately above the top of the areola.
B.  Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

SPECIFIED SEXUAL ACTIVITIES
A.  Human genitals in a state of sexual stimulation or arousal.
B.  Acts of human masturbation, sexual intercourse or sodomy.
C.  Fondling or other erotic touching of human genitals, pubic region, buttock or female breast.

STEEP SLOPE – For purposes of this Zoning Chapter, a steep slope is any slope that equals or exceeds thirty percent (30%).

STORY - That portion of a building which is between one floor level and the next higher floor level or the roof. The following locations shall not be deemed to be a story:

A. a basement where the finished floor immediately above is less than seven (7) feet above the average elevation of the finished grade; and

II-17

B. an attic not meeting the requirements for habitable space under the New York State Uniform Fire Prevention and Building Code.

STORY, HALF -A story with at least two opposite exterior sides meeting a sloping roof not more than two feet above the floor of such story.

STREET – A right-of-way for vehicular traffic including road, highway, avenue, street, parkway, lane or other way, whether public or private.

STREET LINE - The right-of-way line of a street.

STRUCTURE - Anything constructed or erected on or under the ground or upon another structure or building.

SUMMER COTTAGE - A single-family detached dwelling which is arranged, designed and intended to be used or occupied seasonally and only during the period or part of the period from April 1 to December 1 in any year.

SUMMER COTTAGE DEVELOPMENT - Two or more summer cottages, as defined in "summer cottage" above, on one or more lots, arranged and designed with or without accessory structures, such as a machine building, lodge, community center, swimming pool and other recreation facilities.

SWIMMING POOL, COMMERCIAL - Any constructed body of water or structure to contain water and any accessory buildings or equipment pertaining thereto which are operated for profit or gain and are used or intended to be used for swimming or bathing by persons who pay admission on a daily, weekly or other basis, including seasonal tickets.

SWIMMING POOL, NONCOMMERCIAL - Any body of water or structure constructed to contain water and any accessory equipment pertaining thereto, used or intended to be used for swimming or bathing by any family or persons residing on the premises and their guests. Such "noncommercial swimming pool" shall not be operated for gain and shall be located on a lot only as an accessory use to the dwellings thereon, to a membership club or to a motel or hotel.

TAVERN OR BAR - An establishment for the serving and sale of beer, wine and other alcoholic drinks to be consumed on the premises, and sometimes also serving food.

TOWN BOARD – The Town Board of the Town of Monroe.

TOWN CLERK – The Town Clerk of the Town of Monroe.

TRAILER - Any vehicle mounted on or capable of being mounted on wheels, movable either by its own power or by being drawn by another vehicle, and including those vehicles capable of use for living, sleeping quarters, or so as to permit cooking, or equipped to be used for offices, storage

or other commercial use. The term "trailer" shall also include vehicles, if mounted on temporary or permanent foundations with the wheels removed.

TREE - A living woody perennial plant, typically having a single stem or trunk, bark, branches, canopy and critical root zone.

TREE, LANDMARK - A particular tree determined by the Town Board upon the recommendation of the Town of Monroe Conservation Commission to be significant to the community on the basis of age, specimen quality, historical significance or other unique characteristic. A Landmark Tree may be an outstanding example of a tree that has some historical connection with the community's past. Such trees shall be designated "Landmark Trees" by the Town Board by Resolution.

TREE, NATIVE - A particular tree determined by the Town Board upon the recommendation of the Town of Monroe Conservation Commission as uncultivated flora indigenous to the geographic regions of the State of New York, New Jersey, Pennsylvania, Connecticut and Vermont, which have adapted over time to various environmental and social influences such as soil types and hydrology, micro-climates and human influence.

TREE, PARK - Any tree, bush, shrub, or woody vegetation on land areas owned or maintained by the Town of Monroe, but to which the public has free access - as in a park.

TREE, PROTECTED - Any living tree species designated by the New York State Department of Environmental Conservation in the "New York Natural Heritage Program: New York Rare Plant Status List" as endangered, threatened, rare, or vulnerable; or any living tree species designated by the Town of Monroe as Protected because of its uniqueness or vulnerability as a result of environmental stress. A list of protected tree species, whether on the list designated by the Town Board or on the New York State Natural Heritage Program: New York Rare Plant Status List will be developed by the Town of Monroe Conservation Commission and appended to this Article; after approval of the same by the Town Board by Resolution.

TREE REMOVAL - The removal of any tree or trees except the removal of dead trees or trees that pose a hazard, and the removal of fifty percent (50%) or more of the crown, trunk or root system, and other actions causing the death through damaging, severe pruning, poisoning or close trenching.

TREE, SPECIMEN - A tree with a trunk twenty-four inches (24") or more at DBH, or any living tree species designated as a Specimen Tree by the Town of Monroe Town Board by Resolution and upon recommendation of the Monroe Conservation Commission. Specimen Trees of less than twenty-four inches (24") at DBH shall have a particularized characteristic benefiting the public health, welfare or safety.

TREE, STREET - Any tree, shrub, bush or woody vegetation on land lying between property lines on either side of all streets, highways or right of-ways within the Town of Monroe.

TREE TOPPING - Severe cutting back of limbs, to stubs larger than three inches (3") in diameter, within the tree's crown to such a degree as to remove the normal canopy and disfigure the tree. This term shall not apply to severe cutting back of limbs of Landmark, Native, Protected and/or Specimen Trees to preserve or extend tree life upon the recommendation of an Arborist, Forester or Landscape Architect pursuant to an approved Tree Plan.

TRUCK TERMINAL OR DISTRIBUTION CENTER — A facility for the temporary storage of finished products in a warehouse or other specialized building, with or without refrigeration or air conditioning, which is stocked with products to be redistributed to retailers or wholesalers, by vehicle, van, or truck.

USE - The purpose for which land, water or a building or structure is designed, arranged, intended or for which it is or may be occupied or maintained.

USE, ACCESSORY - A use which is customarily incidental and subordinate to the principal use on a lot and located on the same lot therewith, and which shall not occupy more lot area or floor area than the principal use.

USE, PRINCIPAL — The primary or predominant use for which a building or lot is used.

USE, PERMITTED — A use allowed by right.

USE, SPECIAL — A use which is permitted in accordance with Article V of this Zoning Chapter, subject to requirements imposed herein to assure that the proposed use is in harmony with the Zoning Chapter and will not adversely affect the neighborhood if such requirements are met.

UTILITY TOWER - Any aboveground structure which is designed to transmit, relay or receive electronic, light, telephone, telegraph, television or radio signals, or any combination thereof or similar electromagnetic or light signals, no matter by whom constructed or by whom owned or operated and regardless of the intended recipient of such signals. This definition shall not apply to antennas erected upon or appurtenant to residential structures, designed primarily to serve such residential structures.

VARIANCE, AREA - The authorization by the Zoning Board of Appeals for the use of land in a manner which is not allowed by the dimensional or physical requirements of this Zoning Chapter.

VARIANCE, USE - The authorization by the Zoning Board of Appeals for the use of land for a purpose which is otherwise not allowed or is prohibited by this Zoning Chapter.

WAREHOUSE - A use engaged principally in the long-term indoor storage of materials and/or manufactured products, supplies and equipment, excluding bulk storage of materials that are flammable or explosive or that present hazardous conditions. Nothing herein shall be construed to permit retail sale of merchandise to the general public or by membership.

WORKSHOP (See also "custom work, shop for.") - A business or commercial premises used for the making of clothing, millinery, shoes or other personal articles or for performance of a trade or repair work, which is not detrimental to adjoining properties by reason of the emission of smoke, noise, odor, dust, vibration or excessive light beyond the limits of its lot.

YARD - An unoccupied space open to the sky on the same lot with a building or structure (either existing or proposed).

YARD, FRONT - An open unoccupied space on the same lot with a principal building, extending the full width of the lot and situated between the street line and the front line of the nearest roofed portion of a building projected to the side lines of the lot. The depth of the "front yard" shall be measured between the front line of the building and the street line. Covered porches, whether enclosed or unenclosed, shall be considered as part of the main building and shall not project into the required "front yard."

YARD, REAR - An open unoccupied space on the same lot with a principal building, extending the full width of the lot and situated between the rear line of the lot and the rear line of the nearest roofed portion of a building projected to the side lines of the lot. The depth of the "rear yard" shall be measured between the rear line of the lot and the rear line of the building.

YARD, REQUIRED - That portion of a lot which is the minimum required depth in from the side, rear or front lot line for the full length of such yard, which dimension is listed in the Schedule of District Regulations.

YARD, SIDE - An open unoccupied space on the same lot with a main building, situated between the side line of the nearest roofed portion of a building and the adjacent side line of the lot and extending from the rear line of the front yard to the front line of the rear yard.

ZBA – The Zoning Board of Appeals of the Town of Monroe.

## Article III. Compliance Required

### § 57-4. Compliance with use regulations required; nonconforming uses.

Except as hereinafter provided, no building or structure or part thereof and no lot or land or part thereof shall hereafter be used, except in conformity with the use regulations herein prescribed. Any lawful use that does not conform to the use regulations of this Zoning Chapter shall be deemed a nonconforming use, except that uses granted as special uses by the Planning Board pursuant to Article V shall be deemed conforming uses. Use variances granted by the Board of Appeals pursuant to § 57-65 shall be deemed nonconforming uses.

### § 57-5. Compliance with bulk regulations required; nonconforming structures.

Except as hereinafter provided, no building or structure or part thereof shall hereafter be erected, structurally altered, enlarged or rebuilt except in conformity with the Schedule of District Regulations as to height, lot dimension, coverage, yard, court and density regulations herein prescribed. Any building or structure that does not conform to such regulations, herein referred to as the "building regulations" of this chapter, shall be deemed a nonconforming structure, irrespective of the use to which it is put. Variances granted by the Zoning Board of Appeals pursuant to § 57-65 on grounds of practical difficulties or unnecessary hardship, not self-imposed, shall be deemed nonconforming structures.

### § 57-6. Continuation of legal existing uses.

Any legally established existing use of a building or structure, lot or land or part thereof, which use constitutes a conforming use under the provisions of this chapter, may be continued.

### § 57-7. Use of structures and land.

Within any district, no building, structure, lot or land shall be used for other than one or more of the permitted uses, special uses and accessory uses listed in the Schedule of District Regulations, subject to all applicable provisions of this Zoning Chapter.

**Article IV. Districts; Zoning Map; Schedule**

**§ 57-8. Classes of districts.**
For the purposes of this chapter, the Town of Monroe is hereby divided into the following classes of districts:

A.  Residence districts:
    (1) OSR-3 Open Space Residential District
    (2) RR-1 Rural Residential District
    (3) SR-20  Suburban Residential District (20,000 square foot lot with central sewer)
    (3) SR-15  Suburban Residential District (15,000 square foot lot with central sewer)
    (4) SR-10  Suburban Residential District (10,000 square foot lot with central sewer)
    (4) UR-M Urban Residential-Multifamily District

B.  Nonresidential districts:
    (1) NB Neighborhood Business District
    (2) GB General Business District
    (3) LI Light industry District
    (4) HI Heavy Industry District

C.  Overlay Districts:
    (1) RP-O Ridge Protection Overlay
    (2) WSP-O Water Supply Protection Overlay
    (3) BP-O Business Park Overlay
    (4) UT-O Utility Tower Overlay

**§ 57-9. Boundaries of districts; Zoning Map.**
A.  The boundaries of each zoning district is hereby established as shown on the Zoning Map of the Town of Monroe, dated June 2017, which map may be amended from time to time. Said map and all changes contained therein are hereby incorporated and declared to be part of this Zoning Chapter. The Zoning Map of the Town of Monroe dated December 7, 1999, as amended from time to time, is hereby superseded in its entirety by the aforementioned Zoning Map.

B.  The district boundary lines, unless shown otherwise, are intended generally to follow street corner lines, railroad right-of-way lines, reservoirs, lakes or other bodies of water, watercourses, lot lines or boundaries of subdivisions or Town boundary lines or the straight-line projections of such lines, all as shown on the Zoning Map. Where a district boundary line does not follow such a line, its position is shown on the Zoning Map by a specific dimension expressing its distance in feet from such a street center line or other boundary line as indicated.

C.  In case of uncertainty as to the true location of a district boundary line in a particular instance, the determination thereof shall be made by the Building Inspector. An appeal may be taken

to the Board of Appeals as provided in § 57-64.

D.  Reserved.

**§ 57-10.  Schedule of District Regulations.**
Attachment A, the Schedule of District Regulations, is hereby made a part of this Zoning Chapter.

## Article V. Special Uses

### § 57-11. General procedural requirements.

A. Approval of special use permits. The Town Board authorizes the Planning Board to grant special use permits as set forth herein.

B. Application for area variance. Notwithstanding any provision of law to the contrary, where a proposed special use permit contains one or more features which do not comply with the Zoning Chapter, application may be made to the Zoning Board of Appeals for an area variance pursuant to § 57-65, without the necessity of a decision or determination of the Building Inspector.

C. Conditions attached to the issuance of special use permits. The Planning Board may impose such reasonable conditions and restrictions as are directly related to and incidental to the proposed special use permit. Upon its granting of said special use permit, any such conditions must be met prior to the issuance of any building permit.

D. Waiver of requirements. Unless expressly prohibited by this Zoning Chapter and the specific standards set forth in § 57-13, the Planning Board when reasonable, may waive any requirements set forth in § 57-13 for the approval, approval with modifications or disapproval of a special use permit. Any such waiver may be exercised in the event any such requirements are found not to be requisite in the interest of the public health, safety or general welfare or inappropriate to a particular special use permit. No waiver can be granted by implication and any waiver must be granted by specific affirmative vote of the majority of the full membership of the Board based upon findings required herein.

E. Public hearing and decision on special use permits. The Planning Board shall conduct a public hearing within sixty-two (62) days from the day a complete application is received on any matter referred to it under this Article. Public notice of said hearing shall be printed in a newspaper of general circulation in the town at least five (5) days prior to the date thereof. The applicant shall send the notice of public hearing to all persons included on the list of names and addresses utilized for the initial notification required under Section 57-16.A. of the Zoning Chapter. The names and addresses of the owners to be notified of the hearing shall be as they appear on the latest assessment roll of the Town of Monroe (and any adjoining municipalities) and as furnished to the applicant by the Tax Assessor of the municipality. Such notice shall be sent by certified mail, return receipt requested, no less than ten (10) days prior to the hearing. Proof of such mailings and receipts for same shall be filed with the Planning Board prior to or at the time of the hearing. The Planning Board shall decide upon the application within sixty-two (62) days after the close of the public hearing. The time within which the Planning Board must render its decision may be extended by mutual consent of the applicant and the board. The decision of the Planning Board shall be filed in the office of the Town Clerk within five (5) business days after such decision is rendered, and a copy

thereof mailed to the applicant.

F.  Notice to applicant and Orange County Planning Department. As per §274-b of New York State Town Law, at least ten (10) days before such hearing, the Planning Board shall mail notices thereof to the applicant and to the Orange County Planning Department which notice shall be accompanied by a full statement of such proposed action.

G.  Compliance with SEQRA. The Planning Board shall comply with the provisions of SEQRA under article eight of the environmental conservation law and implementing regulations.

H.  Minutes and records. The Secretary of the Planning Board shall keep minutes of the Board's proceedings showing the vote of each member upon every question or, if absent or failing to vote, indicating such fact. The Secretary shall also keep records of examinations and official actions, all of which shall be immediately filed in the office of the Planning Board and shall be a public record. Each decision of the Planning Board with respect to the approval of a special use shall be stated and documented as to provide a definitive authorization to the Building Inspector for the issuance of a building permit or certificate of occupancy.

I.  Site plan. Any application for a special use permit shall require site plan approval to be issued concurrently by the Planning Board in accordance with the site plan regulations contained in this Zoning Chapter.

J.  Deemed to be a conforming use. Any use for which a special use permit has been granted shall be deemed to be a conforming use in the district in which it is located, provided that such permit shall be deemed to affect only the lot or portion thereof for which such permit shall have been granted. The expansion of any special use shall require re-approval of the special use permit by the Planning Board in accordance with the special use permit application and approval procedures contained herein. For purposes of this section, expansion shall be interpreted to mean an increase in the area allocated to the special use, an increase in development coverage, or an increase in the intensity of use, e.g., an increase in traffic or need for on-site parking.

K.  Inspections. In connection with the issuance of a special use permit, the Planning Board may schedule inspections to be conducted by the Building Inspector to ensure continued compliance with this Zoning Chapter and any conditions of the special use permit.

L.  Existing violation. No special use permit shall be issued for a property in violation of this Zoning Chapter unless the granting of a special use permit and site plan approval will result in the correction of said violation.

M.  Expiration. A special use permit shall be deemed to have expired if construction is not completed and a certificate of occupancy issued within 180 days of the date of issuance. Extension of such authorization may be granted by the Planning Board for not more than two (2) additional 90-day periods upon a written request by the applicant fully setting forth the

reasons for such request or upon the Board's own motion. A special use permit shall be deemed to have expired if it ceases operation for a time period equal to or greater than twelve (12) consecutive months for any reason.

N. Fees. An application fee shall accompany the special use permit application in an amount established in the fee schedule duly adopted by the Monroe Town Board.

O. Special use standards. Special uses shall meet all other regulations established in this Zoning Chapter. Where any standard in the Zoning Chapter varies from the individual special uses set forth below, the more restrictive of the standards shall prevail, unless specifically set forth in § 57-13 below.

## § 57-12. Special use permit standards for individual special uses.

On application and after public notice and hearing, the Planning Board may approve by resolution, the issuance of a special use permit for uses that require a permit under this Zoning Chapter. In authorizing a special use permit, the Planning Board shall take into consideration the expressed intent of this Zoning Chapter, the general public health, safety, and welfare, and shall prescribe appropriate conditions and safeguards to ensure accomplishment of the following objectives:

A. Such use shall be one which is specifically authorized as a special use in the district within which such particular site is located.

B. The proposed use shall be deemed to be compatible with adjoining properties, and with the natural and built environment of its surrounds, and shall not be prejudicial to the character of the neighborhood.

C. The site is accessible to fire, police, and other emergency vehicles.

D. The special use is suitable to its site upon consideration of its scale and intensity in relation to environmentally-sensitive features, including but not limited to steep slopes, floodplains, wetlands, and watercourses.

E. Adequate screening and separation distances are provided to buffer the use from adjacent properties where the authorized board deems it necessary.

F. Exterior lighting shall not negatively impacts adjoining properties.

G. The use will not negatively impact ambient noise levels, generate excessive dust or odors, release pollutants, generate glare, or cause any other nuisances.

H. Parking shall be sufficient so as to not create a nuisance or traffic hazard on adjacent properties or roads.

I. Vehicular, pedestrian and bicycle circulation, including levels of service and roadway

geometry, shall be safe and adequate to serve the special use. The Planning Board shall determine that, when taken in conjunction with other existing land uses, it will not generate traffic that would result in an undue burden upon the available access streets. Every effort shall be made to preserve existing trail routes, and where necessary and appropriate, incorporate new trail routes and connections.

J.  The location, arrangement, size, and design of the special use, including all principal and accessory buildings and structures associated with same, shall be compatible with the character of the neighborhood in which it is situated and shall not hinder or negatively impact the use, enjoyment or operation of adjacent properties and uses.

K.  Utilities, including stormwater, wastewater, water supply, solid waste disposal and snow removal storage areas, shall be adequate to serve the special use.

L.  The use shall not negatively impact the visual, scenic or historic character of the Town of Monroe or its environs, and shall incorporate said features into the design of the special use where the Planning determines it is practicable.

M.  The buildings architecture shall be deemed to be consistent and suitable with the neighborhood within which it is located.

N.  Landscaping shall be integrated into the overall design of the special use, and shall include a mix of undisturbed woodland, and areas not used for building, parking, or driveways shall be revegetated and landscaped as required by this Zoning Chapter.

O.  Such special uses shall meet the requirements set forth in § 57-13 unless waived by the Planning Board in accordance with the procedures set forth in this Article V.

**§ 57-13. Individual standards for certain uses.**
In addition to the general standards set forth in § 57-12 above, the following requirements shall apply to individual special uses:

A.  Adaptive reuse of a historic building. The purpose of this special use is to assist in the preservation of the cultural heritage of the Town of Monroe by allowing certain uses to be allowed in structures of historic and architectural merit in a residential zoning district. These uses shall be in addition to any use which is otherwise allowed in zoning district in which the building is located. The following uses may be permitted by special use permit granted by the Planning Board, provided that the Board finds that the application meets all the general conditions of § 57-12 and further meets all the applicable conditions set forth herein.

(1) Allowable uses include:
    (a) Artists' or artisans' studios.
    (b) Art galleries and museums.
    (c) Antique shops.

(d) Rare book, coin or stamp shops.

(e) Sit down restaurants not to exceed an average seating capacity of 50 unless the Planning Board determines that preservation of the structure necessitates a larger size.

(f) Professional offices not to exceed six employees.

(g) Special uses of low traffic volume, normally associated with history, the arts or cultural uses, appropriate to the structure and compatible with the neighborhood.

(2) The historic building shall be listed on the National Register of Historic Places, the State Register of Historic Places, or shall be eligible for listing, or shall be designed locally by the Town of Monroe in accordance with the regulations contained in this Zoning Chapter. Evidence of said eligibility shall be made by submission of a Historic Resource Survey conducted in accordance with guidelines promulgated by the New York State Office of Parks, Recreation and Historic Preservation (OPRHP). The historic survey shall be submitted to the NYS OPRHP and that agency shall determine "eligibility".

(3) The minimum lot area shall be one (1) acre unless the Planning Board finds that the use can be conducted on a smaller lot and meet the standards set forth herein.

(4) There shall be no exterior alteration of the structure except where said alteration makes the building or property consistent with its original historic character. The Planning Board may require that the building be improved to historic design standards as a condition of approval. Continuing maintenance of the building to protect its historic character shall be a condition of any special use permit.

(5) A site plan shall be submitted and said submission is not waivable. The site plan shall be accompanied by schematic architectural drawings which shall show the existing conditions of the structure, and the proposed restoration. The Planning Board shall be provided with a report from an architect qualified on historic preservation as to the appropriateness of the proposed restoration and its compliance with the Secretary of the Interior's national standards for the restoration of historic structures. Upon receipt of the report, the Planning Board must make the following findings before approval is granted:

(a) The exterior (and where appropriate, the interior) restoration shall maintain the architectural and historic integrity of the structure.

(b) The proposed use is compatible with the neighborhood and activities permitted within the structure can adequately be buffered from any surrounding residential home.

(c) The resulting traffic generation will not overburden existing roads and adequate parking can be provided without unduly destroying the landscape or the setting of the structure.

(d) The proposed use is appropriate to the structure, will aid in the preservation of the structure and will not result in undue additions or enlargement to the structure.

B. Adult bookstores, theaters, and similar uses.

(1) Purpose. This article is intended to regulate uses which, because of their very nature, are recognized as having serious objectionable operations characteristics, particularly when several of them are concentrated under certain circumstances thereby having a

V-5

deleterious effect upon the adjacent areas. Special regulation of these uses is necessary to ensure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhood. The primary control or regulation is for the purpose of preventing a concentration of these uses in any one area.

(2) This special uses regulates all adult uses which include, but are not limited to, the following:

    (a) Adult bookstore.

    (b) Adult motion picture theater.

    (c) Adult mini motion-picture theater.

    (d) Adult entertainment cabaret.

(3) Adult uses shall be allowed by special use permit subject to the following conditions:

    (a) No such adult uses shall be allowed within 1,500 feet of another existing adult use or approved site for such use.

    (b) No such adult use shall be located within 500 feet of any zoning district which is zoned for residential use.

    (c) No such adult use shall be located within 500 feet of a preexisting school or place of worship.

    (d) No such adult use shall be located in any zoning district except an HI zoned area.

(4) Exterior display prohibited. No adult use shall be conducted in any manner that permits the observation of any material depicting, describing or relating to specified sexual activities or specified anatomical areas from any public way or from any property not registered as an adult use. This provision shall apply to any display, decoration, sign, show window or other opening.

(5) Registration. It shall be unlawful for the owner or person in control of any property to establish or operate thereon or to permit any person to establish or operate an adult use without first obtained special use permit approval from the Planning Board, and having properly registered and received certification of approved registration. Upon issuance of a special use permit, the owner of a building or premises, his agent for the purpose of managing, controlling or collecting rents or any other person managing or controlling a building or premises, any part of which contains an adult use, shall register with the Town Clerk of the Town of Monroe the following information:

    (a) The address of the premises.

    (b) The name of the owner of the premises and the names of the beneficial owners if the property is in a land trust.

    (c) The address of the owner and the beneficial owners.

    (d) The name of the business or the establishment subject to the provisions of this section.

    (e) The name(s) and addresses of the owner, beneficial owner or the major stockholders of the business or the establishment subject to the provisions of this section.

    (f) The date of initiation of the adult use.

    (g) The nature of the adult use.

    (h) If the premises or building is leased, a copy of the said lease must be attached.

    (i) The owner, manager or agent of a registered adult use shall display in a conspicuous place on the premises a copy of the registration form.

C. Animal kennel or veterinary hospital. No authorization for a building permit shall be granted by the Planning Board unless the use meets the following standards:

(1) In considering the application for a special permit for a kennel or veterinary hospital, the Planning Board shall consider the number, size, breed and temperament of animals to be sheltered and impose reasonable conditions to protect proximate uses, aesthetic impact and safety of the animals sheltered in order to ensure the health, safety and general welfare of the community.

(2) Animal waste shall disposed of in a manner acceptable to the Orange County Department of Health.

(3) Land burial of animals in association with a kennel or veterinary hospital shall be prohibited.

(4) The minimum lot area required shall be one (1) acre plus 500 square feet for the number of animals to be boarded.

(5) All outdoor facilities associated directly with the kennel or veterinary hospital, whether indoors or outdoors, shall be set back a minimum of 100 feet from any property line.

(6) The Planning Board shall evaluate potential noise impacts and shall minimize negative impacts on adjacent uses which may include the use of sound proofing or prohibition of certain outdoor activities.

(7) The Planning Board may require screening of outdoor runs from view.

D. Automotive service or automotive filling station. No authorization for a building permit shall be granted by the Planning Board for an automotive service or gas filling station or car washing station in any district where authorized, unless the Board shall first determine that all applicable provisions of §§ 57-51, 57-52 and 57-53 will be complied with and unless the Board shall further determine that the proposed location of such facility will serve the interests of the residents of the Town without any damaging effect upon adjacent properties.

E. Bed-and-breakfast. No authorization for a building permit shall be granted by the Planning Board unless the use meets the following standards:

(1) The operator of the bed-and-breakfast residence establishment shall be an owner of the property and an occupant of the single-family residential dwelling to which the guest rooms are accessory.

(2) Bed-and-breakfast residences shall be permitted accessory only to single-family detached dwellings. However, in no case shall bed-and-breakfast residences be permitted as an accessory to a single-family detached dwelling having physical access only to a private road. The driveway serving the bed-and-breakfast residence shall have direct physical access to a public road.

(3) Full vehicular turnaround for the single-family detached dwelling and the bed-and-breakfast residence shall be provided unless the Planning Board waives such turnaround requirement for lots having frontage on an access to a minor street.

(4) The establishment and operation of the bed-and-breakfast residence shall not alter the

appearance of the residence structure as a single-family detached dwelling.

(5) Not more than three bedrooms of the single-family detached dwelling shall be permitted to be used as guest rooms. Upon conversion of any portion of floor area in the single-family residential dwelling to a bed-and-breakfast residence establishment, the dwelling shall retain at least one bedroom for the exclusive use for the owner of the dwelling to which the bed-and- breakfast residence is accessory.

(6) Room rental shall be for transient usage only. There shall be a limit of not more than 14 consecutive days for the length of stay by any guest.

(7) The sanitary and water supply systems serving the dwelling shall be found to be adequate to meet the needs of the dwelling, together with the bed-and-breakfast residence use, and adequate waste enclosures shall be provided to contain the solid waste generated by the use.

(8) Parking shall be provided to meet the residence requirement, together with one additional space for each bed-and-breakfast bedroom.

(9) Hard-surfaced walkways equipped with low-level lighting shall be provided from the parking spaces to the bed-and-breakfast residence entrance.

(10) If any outside recreation or any other exterior improvements exist or are planned to be constructed for use of the guest of the bed-and-breakfast residence, those improvements shall be part of the approved site plan.

(11) Food service shall be limited to those renting rooms.

F.  Bus passenger waiting shelter. No authorization for a building permit shall be granted by the Planning Board for a bus passenger waiting shelter unless the Board shall first determine that such use would not operate as a bus depot or bus station and further that the proposed location will serve the interests of the residents of the Town without any damaging effect upon adjacent properties.

G.  Cemetery. No authorization for a building permit shall be granted by the Planning Board for a cemetery in any district where authorized, unless the Board shall first determine that such cemetery is appropriate to the character of its neighborhood and will serve the interests of the residents of the Town without any damaging effect upon adjacent properties.

H.  Child daycare centers. No authorization for a building permit shall be granted by the Planning Board unless the use meets the following standards:

(1) Driveways shall be located at points of sight distance sufficient to afford safe ingress and egress for the posted speed limit and classification of road on which they are located.

(2) Where practicable, day-care centers shall be provided with a one-way traffic flow. Pedestrian circulation areas should, where practicable, avoid crossing traffic circulation ways. Drop-off areas are encouraged and may be provided for temporary vehicular standing near the building entry, but, if such areas are provided, they shall be situated so as to avoid creating conflicts with entering and exiting traffic and with internal vehicular and pedestrian circulation.

(3) Outdoor play areas shall be provided and shall be located in side or rear yard areas. Such

outdoor play areas shall be enclosed by secure fencing at least four feet high unless it can be demonstrated to the satisfaction of the Planning Board that such fencing is not necessary for the protection of health and safety. Outdoor play areas shall include areas for play equipment and/or shall include open yard areas for unstructured play. Such outdoor play areas shall not exceed a ten-percent slope. Access to such play areas shall not require the need to cross a street or vehicular circulation area.

(4) Buffer landscaping and/or fencing may be required where deemed necessary to screen and protect outdoor play areas from dust, dirt or noise or to screen and protect adjacent properties from any site- generated noise. If buffer landscaping is provided, it shall be densely planted so as to create a virtually opaque screen within two years after installation. If buffer fencing is provided, it shall provide opaque coverage and shall be situated with the finished side facing outward from the site. If provided, buffer fencing shall not exceed eight feet in height and shall be set back a distance equal to at least 1 1/2 times its height from any property line. However, in no case shall fencing or buffer landscaping be located so as to interfere with sight distance into or out of the site driveway(s). Buffer landscaping and/or fencing shall be maintained to preserve its intended function and to preserve a well-kept, attractive appearance.

(5) Adequate off-street parking shall be provided to meet the reasonable needs of the facility. At a minimum, one space per staff member shall be provided, with one additional parking space per six children enrolled for the same time period.

(6) Within a residential zoning district, this special permit use is allowed an additional 20 percent lot coverage over what is otherwise allowed for a single family detached dwelling, without or with central sewer facilities, depending on whether the use is served by central sewer.

I.  Child day camp. No authorization for a building permit shall be granted by the Planning Board unless the use meets the following standards:

(1) The minimum lot area shall be 100 acres.

(2) The property shall front to and be served by a major collector road as shown on the NYSDOT Functional Classification Map included in the Town of Monroe Comprehensive Plan Update.

(3) The principal use of the daycamp shall be intended for the seasonal, daily attendance of children between the ages of 4 and 18 and not for overnight occupancy.

(4) The Planning Board may allow overnight occupancy as an incidental use for recreational, social, and cultural purposes, where non-winterized sleeping accommodations are provided for said use, and no heating or plumbing facilities are installed that permit residential year-round occupancy. The maximum continuous timeframe that overnight occupants may utilize the camp during a single season is two weeks, and a registration shall be kept to demonstrate compliance with same. Covenants precluding such occupancy shall be recorded in the County Clerk's office. The density of bungalows or tent stands or such other structures shall not exceed one dwelling unit per gross acre.

(5) Trailer or recreation vehicle campers' facilities nor shall accommodations of any sort be offered for transient or overnight camping.

(6) All recreational facilities, activity areas, and bungalows or tent stands shall be set back no less than 50 feet from any property line, but the Planning Board may increase said setback by more than 50 feet where it determines same is necessary to protect the health, safety and welfare of adjoining residences or residential zoning districts. The setback shall consist of evergreen or deciduous trees or shrubs to provide full visual screening during the time of the camps occupation. Where existing vegetation does not meet this requirement, the Planning Board shall require that additional landscaping be provided.

(7) Recreational facilities are allowed as accessory uses and include but are not limited to swimming pools, tennis courts, playgrounds, ballfields, and similar facilities.

(8) Lighting. If outdoor lighting is provided for any of the foregoing recreational facilities, including swimming pools, which permits use of the facilities after 10:00 p.m., the applicable setback requirements for such facility shall be doubled. All lighting shall be located so as not to be visible at the source from any adjoining property and shall not exceed 15 feet in height.

(9) Noise. A public-address system or any other amplified noises are prohibited.

(10) Existing child daycamp. Nothing herein shall require a pre-existing child daycamp to obtain a special use permit or require the relocation of pre-existing buildings or structures. At such time that a pre-existing child daycamp submit a special use permit for expansion or alteration of the use, the new facilities shall comply with these standards.

(11) Within a residential zoning district, this special permit use is allowed an additional 20 percent lot coverage over what is otherwise allowed for a single family detached dwelling, without or with central sewer facilities, depending on whether the use is served by central sewer.

J. Gathering place. The following provisions shall apply to a gathering place.

(1) Any single family detached dwelling may be used as a gathering place.

(2) The owner or the tenant, consisting of an individual or family, must reside on site.

(3) The lot size should conform to the requirements of the zone in which it is located. Any variances granted in the approval of the original lot and structure will be deemed conforming.

(4) Gathering places must comply with all applicable sections of the then current New York State Uniform Code.

(5) All applicable sections of the then current New York State Uniform Code will be used to determine potential maximum occupancy limits.

(6) Occupancy will be determined upon review of the narrative provided with the special permit application and the specifics of the site. There is no guarantee that the maximum occupancy calculated pursuant to the then current New York State Uniform Code will be permitted as it is subject to substantive and reasoned review by the Planning Board to determine the appropriate maximum number.

(7) The narrative shall include a general description of the proposed use including the days and times of operation. In addition a floor plan shall be provided indicating the location of the area(s) where assembly will occur and providing the additional information as required in the then current New York State Uniform Code.

(8) All plans shall be prepared by a NYS licensed design professional.

(9) The special permit will remain in effect for one year and must be renewed upon expiration or it shall be deemed expired. An affidavit of no change may be presented to the Building Inspector to allow for renewal without the requirement of a further public hearing upon the requested renewal. An affidavit of no change shall include a statement granting permission for inspection by the Building Inspector / Fire Code Official to ensure compliance with the occupancy and safety requirements prior to renewal of the special permit. The Building Inspector/Fire Code Official shall conduct an annual fire inspection prior to issuing a renewal.

(10) The permit is based upon the information submitted at the time of application. Any change to the use, ownership and characteristics as presented will necessitate filing for a revised permit for review and determination. The existence of a prior permit is not a guarantee of renewal. Applicants must demonstrate compliance with the conditions of approval for renewal or in the event of a change in circumstances obtain a revised site plan approval.

(11) Parking. The Applicant will first maximize parking spaces on site. The applicant may count spaces available in driveways within 300 feet of the gathering site, provided letters of authorization for these spaces are provided to the Planning Board and permission to utilize such spaces is not withdrawn. These spaces are to be allocated fully before on street parking resources may be requested. No on street parking is permitted on State or County Roads. The Planning Board may count on-street parking spaces on other roads if it determines that the request is consistent with public safety and does not violate existing parking restrictions.

(13) Required Number of Parking Spaces. The Planning Board shall determine the required number of parking spaces, consistent with the proposed assembly and then current parking requirements for places of assembly within the Town.

(14) Lighting. Applicant should provide the minimum effective lighting to permit safe operations. Low level lighting or bollards are the preferred lighting device for residential and task lighting.

(15) The Gathering Place should maintain the appearance of a typical residence to the maximum extent possible.

(16) Signs are not permitted.

(17) Grandfathering of existing gathering places without approvals is not permitted. Anyone currently operating a non-permitted gathering place is required to file for special permit approval.

(18) The applicant must comply with the requirements of the State Environmental Quality Review Act (SEQRA).

(19) The Town Board shall, from time to time by resolution, establish fees for inspections, as well as issuance and renewal of permits issued pursuant to this section.

K.  Golf course. No authorization for a golf course shall be granted by the Planning Board in any district where authorized unless the Board shall first determine that the location of such use will not cause or create a nuisance to adjoining properties or to the surrounding neighborhood and that such proposed golf course shall be located on a lot at least 175 acres

in size. A golf course may have a clubhouse for guest members, and the Planning Board, in its discretion, may permit sleeping guest room(s) for use exclusively by members.

L. Hotel. No authorization for a building permit shall be granted by the Planning Board unless the use meets the following standards:

(1) The minimum lot area shall be one (1) acre, and there shall be an additional lot area of not less than 5,000 square feet per guest sleeping room.

(2) The maximum stay of any guest shall not exceed more than ten (10) consecutive calendar days. The Planning Board, in its discretion, may approve a hotel with no more twenty-five percent (25%) of its guest sleeping rooms accommodating guests for no more thirty (30) calendar days, where it determines that adequate provisions are available to ensure guest rooms remain occupied by transient guests.

(2) One principal building is permitted on a lot.

(3) Guest sleeping rooms shall not contain kitchen facilities of any nature, shall not be used as apartments for non-transient tenants, shall not contain more than two rooms and shall not be connected by interior doors in groups of more than two.

(4) Each guest sleeping room shall have an area of at least 300 square feet and shall be equipped with a bath facility with a shower or bath, one toilet facility and sink.

(5) The following uses shall be permitted accessory to a hotel: recreation facilities for the sole use of guests; office and lobby; breakfast, meeting and/or conference rooms; restaurant, which shall not exceed 10 percent of the total floor area of the hotel.

(6) A market analysis shall be submitted demonstrating that there is a demand for said hotel space within a five (5) miles radius of its proposed location, taking into consideration existing or approved hotels within said area.

(7) The Planning Board must find that the location is appropriate to the character of its surroundings; that such hotel will not be detrimental to the public health, public safety, morals and general welfare, and its operations will not negatively impact any adjoining residential zoning district or residential use by virtue of noise, lighting, odors, or other operational characteristics.

M. Livestock. No authorization for a building permit shall be granted by the Planning Board unless the use meets the following standards:

(1) Livestock shall include goats, sheep, horses, mules and cattle and similar animals, but shall specifically exclude poultry, hogs and pigs.

(2) Use of livestock shall specifically include the keeping, breeding, raising and boarding of such animals, including the training and rental of horses, riding instruction and horse shows and competitions.

(3) Barns, silos and related farm buildings shall be permitted, provided that such buildings conform to the yard requirements for principal buildings.

(4) No stable or similar animal housing, storage of manure or other odor- or dust-producing substance or use or parking of vehicles shall be permitted within 150 feet of any lot line.

V-12

N. Membership club. No authorization for a building permit shall be granted by the Planning Board for a membership club in any district where authorized, unless the Board shall first determine that such club will serve a purely social or athletic purpose; that it will be operated on an annual membership basis and not conducted as a business; that the nature of such club will not cause or create a nuisance to adjoining properties or to its general neighborhood; and that such proposed membership club does not contain any overnight accommodations. Within a residential zoning district, this special permit use is allowed an additional 20 percent lot coverage over what is otherwise allowed for a single family detached dwelling, without or with central sewer facilities, depending on whether the use is served by central sewer.

O. Mobile home park. No authorization for a building permit shall be granted by the Planning Board for a mobile home park in any district where authorized unless the Board shall first determine that the location of the park is compatible with the surrounding neighborhood and, in addition to such other requirements of this chapter as may apply, that the proposed use also meets the following standards:

    (1) Site standards.
        (a) Minimum size of mobile home park: 15 acres.
        (b) Minimum straight line distance between boundary lines of mobile home parks: 1,500 feet.
        (c) Maximum number of units per acre: 5.25.
        (d) Maximum number of units permitted in any one mobile home park: 185.
        (e) Minimum size and dimensions of mobile home lots:
            [1] Lot size: 5,000 square feet.
            [2] Width of lot: 50 feet.
            [3] Width of lot at front lot line: 35 feet.
            [4] Lot depth: 100 feet.
        (f) Minimum setbacks and yard distances:
            [1] Front line setback: 20 feet.
            [2] Rear yard depth: 10 feet.
            [3] One side yard width: at least 25 feet.
            [4] No unit shall abut a lot line upon which a neighboring unit abuts.
        (g) Minimum distances of units from public streets or highways and property lines.
            [1] From a street owned or maintained or dedicated to the Town of Monroe, State of New York or County of Orange: 30 feet.
            [2] From any other street line: 20 feet.
            [3] From all properties not included in the mobile home park: 25 feet.
        (h) Maximum lot coverage: 60%.
    (2) Parking. Each mobile home unit shall have two parking spaces assigned to it.
    (3) Streets and roads.
        (a) All streets within the mobile home park shall be built in accordance with the minimum construction standards for such established by the Town Board from time to time and shall further conform to the design standards contained in the Town of Monroe

Planning Board regulations. All streets in a mobile home park shall be paved to a width of at least 30 feet, all streets that do not form a loop shall have a forty-foot paved radial turnaround at their terminus and shall not be over 500 feet in overall length.

(b) All roads may be offered for dedication as a public highway to the Town of Monroe. In the event that any roads are not offered for dedication or are not accepted by the Town, suitable legal agreements satisfactory to the Town Board shall be required which permanently assure the proper maintenance of all such roads by a property owners' association or otherwise. Notwithstanding the provisions of Subsection L(3)(a) hereof, any road offered for dedication to the Town of Monroe shall be constructed to the minimum standards set forth in Chapter A63 of the Code of the Town of Monroe to all Town highways.

(c) Vehicular access facilities shall be adequate for the estimated traffic to and from the site, so as to assure the public safety and to avoid traffic congestion. Vehicular entrances and exits shall be clearly visible from the street and at least 75 feet from any street intersection.

(d) Curbs. All streets shall be constructed with curbs at both sides thereof.

(e) Right-of-way width. The right-of-way for any street not dedicated to the Town of Monroe shall be at least 30 feet. Any street dedicated to the Town of Monroe shall have a right-of- way width of at least 50 feet.

(f) Adequate streetlighting shall be provided by means of individual lighting at each lot along one side of each street or by means of conventional street lights placed at least every 500 feet along any street.

(4) Utilities, sewer and water facilities.

(a) All utilities servicing any unit within the mobile home park shall be installed underground in the manner prescribed by the applicable regulations of the utility company and/or governmental agencies having such jurisdiction.

(b) Sewer and water facilities. All units within a mobile home park unit shall be serviced by facilities of Orange County Sewer District No. 1 or by a communal sewerage and water system duly approved in accordance with the applicable terms of the Communal Water Systems Use and Sewerage Systems Laws[3] of the Town of Monroe. No individual septic systems or wells shall be permitted.

(5) Stormwater drainage.

(a) A mobile home park shall have adequate facilities for drainage of surface and subsurface water.

(b) Grading of the entire property shall be such as to facilitate the safe and efficient drainage of surface water.

(c) Gutters, culverts, catch basins, drain inlets, stormwater sewers, approved combined storm sewers or other satisfactory drainage systems shall be utilized where deemed necessary by the Planning Board.

(6) Garbage and refuse.

(a) Adequate sanitary facilities and methods shall be used for the collection, storage, handling and disposal of garbage and refuse.

(b) Garbage and refuse collection points shall be so located that no mobile home is more

than150 feet from such point.

(7) Supplementary building regulations. Each mobile home lot shall have:

    (a) A driveway from the street 12 feet wide and a sidewalk 30 inches wide and shall be provided from the mobile home unit to the street.

    (b) A mobile home stand capable of retaining the mobile home in a fixed position. Such stand shall be adequately compacted and at such elevation, distance and angle, in relation to the accessway, as to facilitate the safe and efficient placement and removal of the mobile home.

    (c) A four-inch concrete patio, with minimum dimensions of 10 feet by 18 feet, located so as to provide safe and easy access from the mobile home.

    (d) Skirts around each side of the mobile home unit.

    (e) Storage sheds for miscellaneous maintenance equipment, toys, lawn furniture, bicycles and the like. Such shed may encroach into any required yard area.

    (f) An inconspicuous fuel oil storage shelter, if fuel oil is used, and suitable utility connections as specified.

    (g) Utility connections, including gas connection where provided, shall be readily accessible at the mobile home stand and shall have means for safe and efficient hookup to the mobile home.

    (h) A water supply connection shall be located a safe distance from a sanitary drainage connection and shall not be subject to surface drainage. Means shall be provided for a suitable watertight connection and danger of freezing.

    (i) A sanitary drainage connection shall be at proper location relative to the mobile home, and piping shall have a continuous grade to the point of disposal. A drainage connection shall be provided with suitable fittings to permit a watertight junction to be made with the mobile home outlet.

    (j) A gas connection, if provided, shall have a suitable gastight connection to the mobile home.

    (k) The electrical system connection shall provide at least 50 amperes of current at 100 to 115/220 to 250 volts. The receptacle or terminal box shall be of an approved weatherproof type. Such receptacle shall have provision for an equipment ground.

    (l) A mobile home park shall contain facilities for the safe, efficient and aesthetically pleasing manner of storage of required fuels.

    (m) Liquefied petroleum gas storage containers having a capacity exceeding 125 gallons shall be located not less than 25 feet from the nearest mobile home structure, building and lot line and shall not be subject to damage from moving vehicles.

    (n) Fuel oil and other flammable materials shall be stored as not to be a fire hazard.

(8) Recreational and public facilities. The following facilities shall be provided in a mobile home park:

    (a) An equipped recreation facility with an area of not less than 1/2 acre, with such equipment as may be deemed adequate by the Planning Board under the circumstances of each application.

    (b) An adequate fire protection system, including fire lanes which shall take into consideration the standards of the National Fire Protection Association and the recommendation of the Town of Monroe Fire Prevention Fire Bureau. Fire lanes shall

be established along each street or road within the mobile home park by prohibiting parking along one side thereof for the entire length of each street. The mobile home park shall adopt rules and regulations to ensure that no such parking will be allowed.

(9) Within a residential zoning district, this special permit use is allowed an additional 20 percent lot coverage over what is otherwise allowed for a single family detached dwelling, without or with central sewer facilities, depending on whether the use is served by central sewer.

P. Multiple dwelling groups in UR-M District.

(1) No authorization for a building permit shall be granted by the Planning Board for a multiple dwelling group in any UR-M District unless it meets the following standards:
   (a) The maximum density in dwelling units per acre for multiple dwelling groups shall be 12 for efficiencies, 10 for one-bedroom units, eight for two-bedroom units and five for two- bedroom-and-den or three-or-more-bedroom units.
   (b) For senior citizen multiple dwelling groups, the densities in dwelling units per acre shall be 14 for efficiencies, 12 for one-bedroom and 10 for two-bedroom units.
   (c) All units in excess of two bedrooms shall be limited to five dwellings per acre.
(2) The maximum building height shall not exceed 35 feet or 2 1/2 stories.
(3) The minimum lot area shall be five acres.
(4) No building shall be erected nearer than 60 feet to any property line, with the of Townhouses or patio homes on individual lots which shall be located at least 25 feet from the interior front and rear lot lines and 15 feet from side lot lines. This requirement shall not prevent the common walls of attached dwellings from being located on a property line nor from preventing one side wall of a patio home from being located on a lot line.
(5) No multiple dwelling group shall be located so as to have access only to minor street or cul-de- sac.
(6) There shall be a community sanitary plant and a community water supply plant adequate to serve the development.
(7) There shall be adequate provision of space between buildings on the lot and of setbacks from driveways, if any, so as to assure ample light, air and privacy, in the interests of public health, safety and general welfare. The distance between any two buildings shall not be less than the height of the higher of such two buildings.
(8) Any parking or garage area, service or drying yard or recreation area shall be screened so as to protect neighboring properties adequately, as well as to assure an attractive environment within the multiple dwelling group site.

Q. Place of Worship. No authorization for a building permit shall be granted by the Planning Board unless the use meets the following standards:

(1) A maximum floor area ratio (FAR) of 0.25 shall not be exceeded. The FAR shall apply to all principal and accessory buildings and structures applicable to the use.
(2) The maximum development coverage shall not exceed 45 percent.
(3) The use shall be located on a lot with no less than one (1) acre.

(4) All structures and parking shall be screened from adjacent properties by evergreen plantings of sufficient height and diameter to substantially eliminate noise and traffic. The width of the planting screen shall not be less than twenty-five (25) feet, and the Planning Board may require a wider buffer to meet this objective.

(5) All parking shall be screened by evergreen or other coniferous trees no less than 2.5 inches in diameter breast height, or with a minimum planting height of six (6) feet, whichever is greater, which trees shall be maintained at all times and replaced if damaged or otherwise destroyed so as to inhibit their screening ability.

(6) Parking requirements shall be determined based upon peak attendance, notwithstanding the frequency of any peak attendance event, and the number and layout designed in accordance with Article XII of the Zoning Chapter.

(7) The place of worship shall maintain frontage on a major collector as identified in the Town of Monroe Comprehensive Plan Update.

(8) All structures shall be in harmony with the surrounding neighborhood and be of a similar design aesthetic.

(9) No parking or loading shall be permitted between the structure and any street line on which the property fronts, although a drop-off shall be permitted in the front yard. All loading and delivery areas shall be located in the rear yard and shall be effectively screened to a height to eight (8) feet from all adjacent residential properties and the public street.

(10) Where the structure is a single family detached dwelling, the owner or tenant must reside on the site.

(11) The structure must comply with all applicable sections of the current New York State Uniform Code.

(12) With the exception of waivers to the New York State Uniform Code over which the Planning Board has no jurisdiction, the Planning Board shall have discretion to waive any number of these conditions to the extent necessary if same place a substantial burden on the religious exercise of a person, religious assembly or institution.

(13) Within a residential zoning district, this special permit use is allowed an additional 20 percent lot coverage over what is otherwise allowed for a single family detached dwelling, without or with central sewer facilities, depending on whether the use is served by central sewer.

R. Public or private school. No authorization for a building permit shall be granted by the Planning Board unless the use meets the following standards:

(1) The school shall be chartered by the Board of Regents.

(2) The school shall maintain frontage on a major collector as identified in the Town of Monroe Comprehensive Plan Update.

(3) The school shall meet the standards published in the Manual of Planning Standards for School Buildings, March 1998, as amended, published by the State of New York, The State Education Department, Office of Facilities Planning.

(1) A maximum floor area ratio (FAR) of 0.25 shall not be exceeded. The FAR shall apply to all principal and accessory buildings and structures applicable to the use.

(2) The maximum development coverage shall not exceed 45 percent.

(3) The use shall be located on a lot with no less than one (1) acre.

(4) All structures and parking shall be screened from adjacent properties by evergreen plantings of sufficient height and diameter to substantially eliminate noise and traffic. The width of the planting screen shall not be less than twenty-five (25) feet, and the Planning Board may require a wider buffer to meet this objective.

(5) All parking shall be screened by evergreen or other coniferous trees no less than 2.5 inches in diameter breast height, or with a minimum planting height of six (6) feet, whichever is greater, which trees shall be maintained at all times and replaced if damaged or otherwise destroyed so as to inhibit their screening ability.

(6) Parking requirements shall be determined based upon peak attendance, notwithstanding the frequency of any peak attendance event, and the number and layout designed in accordance with Article XIII of the Zoning Chapter.

(7) Within a residential zoning district, this special permit use is allowed an additional 20 percent lot coverage over what is otherwise allowed for a single family detached dwelling, without or with central sewer facilities, depending on whether the use is served by central sewer.

S. Public utility building or structure; utility tower. No authorization for a building permit shall be granted by the Planning Board for a public utility building or structure or utility tower in any district where authorized as a special use, unless the Board shall first make the following determinations:

(1) Such use will not include any storage yard, garage or repair shop.

(2) Any request for installation of high tension electric transmission lines shall be studied with respect to their impact on the community and the possibility of damaging effects on surrounding properties or of detriment to the public safety.

(3) No installation of a natural gas regulator or transformer station shall be made in any residential district if adequate service can be provided by locating said transformer station in a business or industrial district. All such installations shall have suitable screening.

(4) A utility tower shall be a special use allowed only within the Utility Tower Overlay district, subject to the applicable provisions of Articles V and VI, §§ 57-14 through 57-20, of Chapter 57 of the Code of the Town of Monroe, and shall be treated as a public utility building in such regard.

T. Self-service storage facilities. No authorization for a building permit shall be granted by the Planning Board unless the use meets the following standards:

(1) Site and design requirements:

(a) Circulation and access. If the site is fenced, the site access drive shall have the fence and its gate set back a minimum of 40 feet from the access road. Internal site circulation lanes shall be adequate in dimensional cross-section, width and turning radii where applicable to provide for the maneuverability of fire trucks. Aisle width

shall be a minimum of 23 feet for either one- or two-way traffic flows.

(b) Security. Provision shall be made for adequate site security and access control. If the facility is gated, adequate provision shall be made for access by emergency service providers when the facility is closed. If fencing is provided for access control, in no case shall barbed wire or razor wire fence components be incorporated into the same. Such fence shall not exceed eight feet in height. Notwithstanding the foregoing, the solid rear and/or side wall(s) of a storage building or buildings may be incorporated into a fence line for purposes of access control subject to Planning Board approval of the exterior finish of the same and other elements in Subsection T(1)(c). Solid or decorative brick, stone, architectural tile, masonry or wood walls may be used for fencing and screening purposes. If provided, fences or their equivalent shall meet the minimum setback requirement for the district. The placement of or incorporation of signs or other advertising media on such fences or walls is not permitted unless expressly so approved by the Planning Board pursuant to Subsection T(1)(h).

(c) Aesthetic, screening, landscaping and lighting. Care shall be taken to provide an aesthetically pleasing, well-landscaped and maintained facility and to avoid a monotonous or fortress-like appearance to the extent that the facility may be visible off site. Required yards shall be landscaped with a mix of trees, shrubs of varying sizes and vegetative ground cover as appropriate to the site and as approved by the Planning Board. The color, material and design of structures, including their roof pitch, shall be reviewed by the Planning Board as to their conformity with surrounding structures and community character to the degree said structures are visible to other properties. Security lighting shall be provided on the site but in no case shall lighting be directed so as to cause a nuisance or hazard to other properties.

(d) Limits on building length and height.

[1] Limit on building length: 220 feet.

[2] Limit on building height: 15 feet for buildings with flat roofs or up to 23 feet for buildings with pitched roofs.

(e) Limits on storage and use. In no case shall self-service storage facilities permit the storage or maintenance of radioactive, toxic, explosive or controlled substances. The servicing or repair of automotive equipment, tools or machinery and the construction or fabrication of goods or materials shall not take place on the site, either inside or outside the bounds of an individual storage unit. The operation of power tools, spray equipment, compressors and other equipment shall not be permitted as an adjunct to the use or lease of any storage unit. Auctions, garage or tag sales or any other commercial or private sales shall not take place on the site either by lessees of storage units or by the owners or operators of the site. Parking spaces required pursuant to Subsection T(3) may not be rented as nor used for vehicular storage spaces. No additional parking spaces other than those required pursuant to Subsection (3) of this section may be provided for the unenclosed storage of vehicles or items, including but not limited to automobiles, motorcycles, trucks, trailers, vans, recreational vehicles, campers, boats or watercraft except that, in the event that the applicant can demonstrate that under no circumstances would the above-listed vehicles or items be visible to any other off-site location either by virtue of existing conditions such as

V-19

topography or other permanent screening or by virtue of proposed permanent screening, such open storage shall be permitted subject to Planning Board approval. Notwithstanding the foregoing, nothing in this paragraph shall be construed as permitting the unenclosed storage of wrecked, inoperable or dismantled vehicles at a self-service storage facility.

(f) Limits on unit size. The maximum size of a storage unit permitted in a self-service storage facility is 600 square feet. In no case shall a single tenant be permitted to rent or lease more than 1,800 square feet in a single, self-service storage facility.

(g) Drainage. Adequate drainage control measures shall be provided on the site so as to avoid increasing the existing rates of flow off the site. Provision shall be made for protecting the quality of the surface water runoff from the site both during the operation of the site as well as during its construction.

(h) Signs. The provisions of § 57-55 shall not apply to this use, but signs shall be permitted as follows: a ground-mounted or pole-mounted sign shall be permitted at the entry of the site. If ground-mounted, such sign shall not be located so as to interfere with the visibility of traffic entering or exiting the site. Such sign shall not be higher than 10 feet, as measured from the top of said sign, and shall not exceed 36 square feet in area. In no case shall any signage or other attention-getting devices be mounted to the roofs, doors or sides of any structures on the site nor to the site fence. On-site circulation signs shall be provided as needed with the review and approval of the Planning Board.

(2) Accessory uses. A leasing office for the purpose of leasing the units within the self-service storage facility may be provided on the site. A manager's apartment may be provided for the use of a resident, on-site manager in addition to an accessory leasing office. The combined total size of the manager's apartment and the leasing office may not exceed 1,200 square feet.

(3) Parking requirements. Self-service storage facilities shall provide a minimum of one parking space per 100 storage units, in addition to one parking space per 200 square feet of gross office space for the leasing office. Such parking spaces shall be located adjacent to the leasing office. If an on-site manager's apartment is provided, two parking spaces adjacent to said apartment shall be provided for such use in addition to that required for the remainder of the facility.

(4) Separation requirements. In order to avoid an excessive concentration of such facilities in the Town of Monroe, self-service storage facilities must be separated from the bounds of a lot containing any other existing such facility or approved site for such a facility within the Town of Monroe by 1,500 feet.

## Article VI. Site Plan Approval

**§ 57-14. Uses requiring site plan approval.**

Site plan approval by the Planning Board shall be required for the following:

A. Any special use permit.

B. Any use in a NB, GB, LI HI, or BP-O zoning districts.

C. Any nonresidential use located within a residential zoning district.

D. A change in the numeric use group classification involving any use listed in Subsections A through C above (any expansion that does not meet all bulk requirements may require variance relief as well).

E. Expansion of any use listed in Subsections A through C above.

F. Any building permit application proposing a change to the location, size (footprint and height) or bedroom count of any building or structure on a lot depicted on a subdivision map approved after October 9, 1968, to the extent that such limits were imposed on the map.

G. Any building permit application for a lot depicted on any subdivision map approved before October 9, 1968, where construction or disturbance of an area of the lot with a slope of 30 percent or more is proposed.

**§ 57-15. Submissions to Planning Board for review.**

A. Site plan approval required. In all cases where this Zoning Chapter requires site plan approval as set forth in § 57-14, no building permit or certificate of occupancy shall be issued by the Building Inspector except upon authorization of, and in conformity with, site plan approval of the Planning Board. The Building Inspector shall review all land development applications, determine whether the use is allowed in the zoning district where proposed, and whether the application shall require site plan review and approval from the Planning Board.

B. Variances. Notwithstanding any provision of law to the contrary, where a proposed site plan contains one or more features which do not comply with this Zoning Chapter, application may be made to the Zoning Board of Appeals for an area variance without the necessity of a decision or determination of the Building Inspector. The site plan application shall have first been before the Planning Board for preliminary review prior to the application being transmitted to the ZBA for consideration.

C. Planning Board waiver of site plan map submission. Upon submission of a site plan application and at the applicant's request, the Planning Board, in its discretion, may waive the submission

of a site plan as set forth herein, if the application meets the following criteria:

(1) requires site plan approval as per § 57-14D or § 57-14E only;

(2) does not require any area or use variances;

(3) does not require additional vehicular access, landscape, wetland or other buffers, a change in signs, lighting, front yard landscaping or major drainage improvements;

(4) does not expand the existing floor area or parking area by more than twenty percent (20%) of the lot area;

(5) was not the subject of a reduction in permitted parking spaces pursuant to § 57-47E, F or G;

(6) is not similar to any application for the same property as submitted within the past three (3) years;

(7) is a change in use which is equally or less intensive than the previous use which existed within the preceding twelve-month period.

The Planning Board shall pass a resolution waiving submission of the site plan, and shall render a decision on the site plan application in accordance with §57-16 of this Article.

D. Applicant disclosures. The applicant shall indicate that he is either the owner of the property, is contract vendee for the property, has an option on the property or is an agent of the owner. An application shall be accompanied by an owner's consent affidavit and an affidavit in accordance with Section 809 of the NYS General Municipal Law.

## § 57-16. Application procedure.

A. Initial application submission.

(1) A site plan application shall be submitted to the Planning Board in accordance with procedures duly established by the Planning Board by resolution.

(2) The application form shall be completed by the applicant, and the owner, as required, and shall be accompanied by a site plan map as provided herein, unless submission is waived in accordance with § 57-15.C. of this Article. A site plan application form must be completed in full and an owner consent affidavit shall be completed in full with original signature(s) and submitted with the application.

(3) All applications for site plan approval shall be accompanied by a list of all property owners whose properties are located within a 250-foot radius of the outermost property boundaries of the project, or as otherwise designated by the Planning Board at its initial meeting at which the plan is presented. The applicant shall also present, with that list, a copy of the tax map or maps from all municipalities where such properties are located which map or maps shall be used to identify all such properties. The applicant shall, before being heard further by the Planning Board, be required to deliver proof that written notice, in form and content approved by an agent of the Planning Board designated for this purpose, of the application has been given to all such neighboring property owners at least ten days prior to the meeting at which the proposed application shall next be considered by the Planning Board.

(4) A short or long Environmental Assessment Form shall accompany the site plan application unless the Planning Board determines that the action is an exempt action (Type II action) as that term is defined in the regulations implementing SEQRA.

(5) The Planning Board may require copies to be transmitted to the Planning Board's consultants and such additional copies as may be required and forwarded to relevant local, county, or state agencies for which review, approval or permits are required. The Planning Board, in its discretion, may submit copies of the site plan application to the following agencies:

   (a) The NY State Department of Transportation (DOT); Orange County Department of Public Works (DPW); the Town Highway Department.

   (b) The Orange County Health Department; Orange County Sewer District No. 1 for any use proposed to be located in the sewer district.

   (c) The Superintendent of the Monroe-Woodbury School District;

   (d) Other agencies as deemed appropriate by the Planning Board.

B. Meetings. The Secretary to the Planning Board shall notify an applicant of the meeting at which the application will be first placed on the Planning Board agenda. All subsequent submissions to the Planning Board shall be accompanied by a written request to be placed upon the agenda of the next available meeting of the Planning Board; each such submission and request shall be submitted to the Planning Board office within the timeframes established by the Planning Board for submission. If the site plan and/or application is deemed incomplete, the Planning Board, in its discretion, may not place the application on the agenda until such time that the requested additional data are submitted.

C. Public hearing. The Planning Board, in its discretion, may conduct a public hearing within sixty-two days from the day an application is deemed complete. The Planning Board shall mail notice of said hearing to the applicant at least ten (10) days before said hearing and shall give notice of said hearing at least five (5) days prior to the date thereof. Notice at least five days prior to the date shall be given in the following manner:

   (1) published in the official newspaper.

   (2) posting a notice of the hearing at Town Hall.

   (3) By requiring the applicant to send a copy of the notice of public hearing by certified mail, return receipt requested, to the owners of all property within 300 feet of the property which is the subject of the site plan application as the names and addresses appear on the latest assessment roll of the Town. Proof of such mailings and receipts for same shall be filed with the Planning Board prior to, or at the time of, said hearing. In the event that the three-hundred-foot requirement extends to properties beyond the Town boundary, the applicant shall acquire the names and addresses of said property owners from the latest assessment roll of the municipality in which said property is located and shall comply with the mailing requirements as set forth herein.

D. Notice to Orange County Planning Department. As per §274-b of New York State Town Law, at least ten (10) days before a public hearing if a hearing is to be held, the Planning Board

VI-3

shall mail notices thereof to the Orange County Planning Department, which notice shall be accompanied by a full statement of such proposed action. In the event a public hearing is not required, such proposed action shall be referred before final action is taken thereon.

E. Compliance with SEQRA. The Planning Board shall comply with the regulations implementing the SEQRA under article eight of the environmental conservation law and its implementing regulations.

F. Decision. The Planning Board shall make a decision on the application within sixty-two days after the close of any public hearing, or after the day the application is deemed complete if no hearing is held. The time within which the Planning Board must render its decision may be extended by mutual consent of the applicant and the board. The Planning Board shall approve, approve with conditions, or disapprove the application.

G. Conditions. The Planning Board is authorized to impose such reasonable conditions and restrictions as are directly related to and incidental to a site plan. Should approvals of other agencies be required, such approval shall be required prior to approval of the site plan or issuance of the building permit, whichever is appropriate.

H. Filing of decision. The decision of the Planning Board shall be filed in the office of the town clerk within five (5) business days after such decision is rendered, and a copy thereof mailed to the applicant.

I. Reservation of parkland on site plans containing residential dwellings.

   (1) Before the Planning Board may approve a site plan containing residential dwellings, such site plan shall also show, when required by the board, a park or parks suitably located for playground or other recreational purposes. Land for park, playground or other recreational purposes may not be required until the Planning Board has made a finding that a proper case exists for requiring that a park or parks be suitably located for playgrounds or other recreational purposes within the town. Such findings shall include an evaluation of the present and anticipated future needs for park and recreational facilities in the town based on projected population growth to which the particular site plan will contribute.

   (2) In the event the Planning Board makes a finding that the proposed site plan presents a proper case for requiring a park or parks suitably located for playgrounds or other recreational purposes, but that a suitable park or parks of adequate Planning Board may require a sum of money in lieu thereof as established by the Town Board. In making such determination of suitability, the board shall assess the size and suitability of lands shown on the site plan which could be possible locations for park or recreational facilities, as well as practical factors including whether there is a need for additional facilities in the immediate neighborhood. Any monies required by the Planning Board in lieu of land for park, playground or other recreational purposes, pursuant to the provisions of this section, shall be deposited into a trust fund to be used by the town exclusively for park,

VI-4

playground or other recreational purposes, including the acquisition of property.

(3) Notwithstanding the foregoing, if the land included in a site plan under review is a portion of a subdivision plat which has been reviewed and approved pursuant to Chapter A65., Subdivision of Land, the Planning Board shall credit the applicant for any land set aside or money donated in lieu thereof under such subdivision plat approval. In the event of resubdivision of such plat, nothing shall preclude the additional reservation of parkland or money donated in lieu thereof

J. Performance Bond. As an alternative to the installation of required infrastructure and improvements, and prior to site plan approval by the Planning Board, a performance bond or other security sufficient to cover the full cost of the same, as estimated by the Planning Board board or a town agent designated by the Planning Board to make such estimate, where such departmental estimate is deemed acceptable by the Planning Board, shall be furnished to the town by the applicant. Such security shall be provided to the town pursuant to Article VIII of this Zoning Chapter.

K. Site plan amendments. Amendments to a site plan shall be acted upon in the same manner as approval of the original site plan.

L. Signing and filing. Following approval by the Planning Board, the site plan shall be signed by the Planning Board Chairperson and the Town Engineer and filed with the Planning Board office and Building Department. The maps shall not be signed until all Planning Board conditions required prior to filing of the signed map are satisfied. Upon signing and filing, the Building Inspector may issue a building permit or certificate of occupancy in reliance thereon. No changes, erasures, modifications or revisions shall be made to any site plan after approval has been granted by the Board and endorsed, in writing, on the site plan, otherwise the site plan shall be deemed void.

M. Site plan approval; maintenance a continuing obligation.

(1) In the event a site plan is approved with conditions, the applicant shall have 180 days from the date of approval to satisfy such conditions. Failure of the applicant to satisfy such conditions within such one-hundred-eighty-day period shall render the site plan approval void. The Planning Board, upon good cause shown, may extend the one-hundred-eighty-day period for one additional one-hundred- eighty-day period.

(2) Site Plan approval shall be effective for a period of two (2) years from the date the resolution of approval is adopted by the Board, notwithstanding any extension granted pursuant to subsection (1) above. If, at the end of the two-year period, the applicant has not commenced construction, site plan approval shall expire automatically and the applicant must reapply for site plan approval pursuant to this Zoning Chapter. If, at the end of three (3) years from the date of approval, construction is not completed and a certificate of occupancy issued, site plan approval shall automatically expire and the applicant must reapply for site plan approval pursuant to this Zoning Chapter.

(3) Site maintenance. It shall be a continuing obligation and requirement to maintain a property in compliance with the approved site plan. Failure to do so shall constitute a violation of this Zoning Chapter.

## § 57-17. Information required on plan.

The site plan shall contain the following information and shall be drawn to scale by a qualified engineer, surveyor, architect, landscape architect licensed by the State of New York. The Planning Board, when reasonable, may waive any submission requirement set forth herein for the approval, approval with modifications or disapproval of site plans. Any such waiver may be exercised in the event any such requirements are found not to be requisite in the interest of the public health, safety or general welfare or inappropriate to a particular site plan.

A. General location. A location map at a minimum scale of one inch equals 2,000 feet to indicate the relationship of the proposed development to existing streets, zoning district boundaries, significant existing community facilities which will serve or influence the layout, such as shopping areas, schools, parks, employment centers, churches, firehouses, etc.; and the relationship of the development to the nearest streams, drainageways or watercourses. This may be a United States Geological Survey quad, zoning map or tax map and shall accompany the site plan.

B. Site plan. The site plan shall be prepared at a scale of one inch equals 50 feet to 1,200 feet or larger showing the following:

    (1) Distance to the nearest existing or proposed street intersection.

    (2) Acreage of the property and each distinct land use and the proposed density or intensity of each (number of dwelling units if residential uses are proposed, or maximum floor area where nonresidential uses are proposed). Where residential uses are proposed, the maximum bedrooms per dwelling unit. A table with an estimate of the water supply demand, and the wastewater generation.

    (3) The Section/Block/Lot number of the property taken from the tax maps of the Town of Monroe. The name and address of the property, the property owner of record, the applicant, and of all owners of record of adjacent property.

    (4) Identification of the existing zoning and special district (fire, lighting, school, sewer, water, and others) boundaries applicable to the site and within 100 feet of the property.

    (5) Boundaries of the property with surveyed dimensions.

    (6) Location of all existing structures on the site as well as structures on adjacent property within 100 feet of any portion of the property which is to be developed or modified in any way, as determined by the Planning Board.

    (7) The proposed location, area, height, spacing, exterior design treatment and use of all proposed and existing buildings, structures and outdoor signs and storage, if any. A bulk table with the dimensional standards applicable to the zoning district in which the property is located, and the table shall indicate the minimum or maximum dimensions of the proposed development. Any existing or proposed nonconforming conditions shall be

noted in the table.

(8) The existing or proposed location of any use not requiring a structure, including walkways, trails, sidewalks, benches, fences and recreational facilities.

(9) Location of existing and proposed usable open spaces and recreational areas and their landscaping.

(10) All existing and proposed means of vehicular access to and egress from the site, and all streets which are either proposed, mapped or built.

(11) Location and design of all driveways, off-street open and enclosed (if any) parking and loading areas, with the number of stalls provided therewith, and curbing provided or to be provided. A table of the parking standards applicable to the use, and a calculation of the number of parking and loading spaces provided.

(12) Location of all existing and proposed wells, waterlines, valves and hydrants, all sewer lines and septic tanks and septic fields and other utilities.

(13) Existing drainage features and water resources (e.g., culverts, marshes, ponds, wetlands, lakes, and streams) of the property and within 100 feet of any portion of the property which is to be developed or modified in any way, as determined by the Planning Board, and the complete proposed stormwater management system designed consistent with the requirements of Chapter 44 of the Town Code.

(14) Existing and proposed fencing, landscaping, buffer strips and screening, where required. Proposed location, direction and type of outdoor lighting.

(15) Existing and proposed contours with intervals of two feet extending 100 feet beyond any portion of the property which is to be developed or modified in any way, as determined by the Planning Board, and the first floor elevations of all buildings. The maximum limits of disturbance shall be outlined on the plan.

(16) Any proposed division of buildings into units of separate occupancy.

(17) Location of any environmentally constrained land as described in §57-21.1, existing rock outcroppings, isolated trees over 10 inches dbh, orchards, wooded areas, stone walls, roads or lanes, power lines, easements and other natural features and improvements thereto on the property within 100 feet of any portion of the property which is to be developed or modified in any way, as determined by the Planning Board, and all active or inactive mine shafts anywhere in the property.

(18) A tree plan, where required in accordance with this Zoning Chapter;

(19) Where the applicant wishes to develop the project in stages, a site plan indicating ultimate development shall be shown.

(20) All proposed public improvements shall be shown and identified on the site plan (See §§ 57-24 and 57-25). A schedule of the completion of all such improvements shall be submitted with the site plan. (See § 57-26.)

(21) The name of the land surveyor, landscape architect, engineer, or other design professional that prepared the site plan. All revisions to the site plan shall be noted by dates shown on the plan.

(22) A signature block for signature of the Planning Board Chairperson.

## § 57-18. Submission of supporting materials.

The Planning Board, in its discretion, may require the following additional data in support of a

development application:

A.  Material data safety sheets.

B.  Floor plans, elevations and renderings.

C.  Visual and noise impact analyses.

D.  Demographic analysis or data, describing the population to be generated by the proposed project, which shall consider among other information, the anticipated household type and household size for residential subdivisions or site plans.

E.  Ecological survey.

F.  Cultural resource survey.

G.  Traffic impact analysis.

H.  Groundwater impact analysis.

I.  Water supply demand and wastewater generation calculations.

J.  Stormwater analysis.

K.  Any other report or study deemed necessary to render a decision on the site plan application.

## § 57-19. Reserved.

## § 57-20. Site plan standards.

A.  In making a decision concerning any site plan, the Planning Board shall consider the site layout and overall appearance of all buildings in the proposed development so that they will have a harmonious relationship with the existing or permitted development of contiguous land and of adjacent neighborhoods; so that any potential material adverse effect upon the desirability of such neighborhoods for the residential uses contemplated by this chapter shall be minimized; and so that the purpose and intent of the Zoning Chapter will be met, to the end that the value of buildings will be conserved and the most appropriate use of land will be encouraged.

B.  The Planning Board shall determine that the site plan conforms in all respects to the requirements of this chapter and that adequate provision has been made for the following:

(1) Adequate space between structures on the lot and of setbacks from private driveways, if any, so as to assure ample light and air and solar access in the interests of the public health, safety and general welfare. In no case shall the distance between any two principal

buildings on a lot be less than the height of the taller of the two structures.

(2) Access facilities adequate for the estimated traffic to and from the site so as to assure the public safety and to avoid traffic congestion. Vehicular entrances and exits shall be clearly visible from the street and not within 75 feet of a street intersection and shall have a minimum sight distance of 500 feet for a state or county road and 300 feet for all other roads. The Planning Board shall be empowered to waive the five-hundred and three-hundred-foot requirements, provided that it is physically impossible to attain such sight distances, that the sight distances attained are the greatest possible under the given conditions and subject to such reasonable conditions that the Planning Board may impose after consultation with appropriate agencies or professionals for all access points.

(3) Safe and convenient pedestrian and vehicular traffic circulation within the site, including provision for the preservation of existing trails, or the proposed inclusion of trail and trail connections.

(4) Safe and adequate off-street parking facilities and, where necessary, provisions shall be made for school bus loading and unloading.

(5) Truck loading and unloading berths, where required, will not interfere with traffic circulation nor be detrimental in appearance to the site or its surrounding area and will be conducive and convenient to safe operation.

(6) Where nonresidential development or residential development at a density in excess of four units per acre will be adjacent to a residential district, there shall be a protective planting strip not less than twenty-five feet wide situated within any required side or rear yard, designed and laid out with suitable evergreen plant material which will attain and shall be maintained at a height of not less than eight feet so as to provide an effective natural screen between the nonresidential and residential districts alongside and rear lot lines and along front property lines when the Planning Board shall deem it necessary. The Planning Board shall also consider public safety in determining the application of this standard.

(7) Adequate collection and disposal of stormwater runoff from the site.

(8) Adequate collection, treatment or disposal of sanitary wastes and sewage by sanitary plant or otherwise.

## C. Standards applicable to the Business Park Overlay.

(1) Site Plan for Integrated Residential uses. Review and approval of a site plan for residential uses in accordance with Article 6 of the Zoning Chapter shall be required prior to approval of any Building Permit for residential uses in a Business Park.

  (a) The Planning Board may permit the site plan to be developed in such phases as may be appropriate to the overall plan of development for the Business Park.

  (b) Until such time after the construction of at least 300,000 square feet of non-residential ratable development occurs within the aggregate area described in the overall development plan for the Business Park, building permits for more than 100 dwelling units shall not be issued pursuant to this section.

  (c) Upon completion of construction of at least 300,000 square feet of non-residential ratable development within the aggregate area described in the overall development

VI-9

plan for the Business Park, building permits for dwelling units in any remaining phase(s) may be issued provided such phase(s) otherwise comply with the site plan requirements set forth in Subsection D3 below.

(d) The Planning Board shall review the site plan and determine that the proposed use conforms to the following standards:

[1] The maximum building height shall not exceed 35 feet or 2 1/2 stories.

[2] The minimum lot area shall be 160,000 square feet.

[3] The density of the residential component of a business park shall be 1.5 dwelling units per acre of land in the Town of Monroe, which shall be the total residential density within the overall development plan. The minimum lot area per dwelling shall be 4,350 square feet in any designated residential site.

[4] The maximum lot coverage of buildings within the area of a site plan for an integrated residential use shall be 50%.

[5] No building shall be erected nearer than 30 feet to any property line of the site, with the of Townhouses or patio homes on individual lots which shall be located at least 25 feet from interior front and rear lot lines and 30 feet from side lot lines. This requirement shall not prevent the common walls of attached dwellings from being located on a property line nor prevent one side wall of a patio home from being located on a lot line.

[6] That prior to occupancy, sufficient central water and sewer service will be available to meet the needs of each phase of the development for which final approval is sought.

[7] There shall be adequate provisions of space between buildings on the lot and of setbacks from driveways, if any, so as to assure ample light, air and privacy in the interest of public health, safety and welfare. The distance between any two buildings shall not be less than the height of the higher of such two buildings.

[8] Any garage area, service or drying yard or recreation area shall be screened so as to adequately protect neighboring properties, as well as to assure an attractive environment within the integrated residential use site.

[9] That sufficient recreational resources are available to serve the needs of the proposed development.

[10] That the proposed development conforms to the applicable minimum habitable floor area and width standards of § 57-45.

[11] The Planning Board may modify the requirements of § 57-51K to reduce the required size of parking spaces to nine feet by 18 feet.

(2) Minimum lot area requirements. As the Business Park has been developed in accordance with a Declaration of Development on file with the Office of the Town Clerk, Section 57-21.1 of the Zoning Chapter shall not apply.

(3) A business park is a principal permitted use in the BP-O zoning district. All uses allowed in the BP-O zoning district are allowed as principal permitted uses.

(4) Special permit uses. Any use allowed by special use permit in the underlying LI zoning district shall be allowed as a permitted use in a business park. However, any conditions applicable to the special use shall still apply to the use in the Business Park, and the Planning Board, in its discretion, may waive any condition upon written findings that

waiving the condition is consistent with the Comprehensive Plan Update, the purposes of this Zoning Chapter, and will not impact the general health, safety, or welfare of the community.

(5) Declaration of development. When a business park has been developed pursuant to a declaration of development, that declaration may be amended from time to time to incorporate uses allowed in the LI or BP-O district.

(6) Pre-existing uses. A use in existence on the effective date of this law and previously established on property located within a business park pursuant to a duly approved site plan and no longer permitted in the BP-O or LI district shall be allowed to continue. Any land or building occupied by a use shall be deemed nonconforming should the use no longer be permitted in the BP-O or LI zoning district, in accordance with § 57-61.

(7) Dimensional requirements. The entire tract of land comprising either a business park or a regional shopping center shall comply with the dimensional requirements of the B-P Overlay District set forth in the BP-O Schedule of District Regulations, including the minimum lot area and required setbacks, which shall be met by the entire tract on which the business park is situated, not individual lots within the overall business park or regional shopping center use.

(8) Change of use. Any change in a tenant or occupancy of an existing building which does not involve a change of use, e.g., a retail use changes to a retail use, does not increase the minimum parking requirements for the use, and does not necessitate or propose any change to the site plan, and does not require an area variance, shall be permitted without the need for site plan approval.

(9) Standards applicable to LI district. Supplemental dimensional and bulk standards set forth in Article XI and applicable to the LI district, which is the base zoning district underlying the BP-O district, shall apply to any lot in the BP-O district.

## Article VII. Environmental and Design Standards

### § 57-21.1    Minimum lot area.

A. Net acreage. Whenever the phrase lot area, minimum lot area, or minimum lot size or similar term appears in this Zoning Chapter, such phrase shall be deemed to be based upon net acreage following the exclusion of the following environmentally constrained lands:

(1) The 100-year floodplain as defined by and illustrated on the Federal Emergency Management Agency (FEMA) Flood Hazard Boundary maps as those maps now exist or as they may be amended from time to time;

(2) Wetlands, including New York State designated wetlands but excluding the 100-foot regulated adjacent area, and wetlands regulated by the U.S. Army Corps of Engineers, as those wetlands now exist or may be found to exist;

(3) Lands under water, and lands covered by natural or constructed water bodies including, without limitation, retention and detention basins.

(4) Steep slopes equal to or greater than 30 percent.

(5) Land encumbered by easements or other restrictions, including utility easements, preventing use of such land for construction of buildings, uses, and/or development.

B. The net lot area, after exclusion of the features set forth in subsection A above, shall be calculated, and any permissible residential density or nonresidential intensity of land shall be calculated on the net lot area. Any fractional dwelling unit shall be rounded to the nearest whole number.

C. Area variance required. A lot shall be deemed conforming as to lot area only if it meets the minimum lot area set forth in Table A or as otherwise required in this Zoning Chapter after subtracting those areas listed in §57-21.1.A above. Any lot area not meeting the minimum requirement shall require an area variance.

D. These provisions shall not apply to any lot occupied by a single family detached dwelling for which a certificate of occupancy had been issued prior to the effective date of this Chapter except that these provisions shall apply to any proposed subdivision of a lot containing a single family detached dwelling.

### § 57-21.2    Ridgeline Protection Overlay (RP-O) District

A. Purpose. Consistent with the Town of Monroe Comprehensive Plan Update, the Town of Monroe seeks to protect its environment, community character and scenic beauty. The Town's prominent ridgelines are within the viewsheds of national and regional trails, including the Appalachian National Scenic Trail. The Town has determined that prominent ridgelines are an integral contributing element to the Town's landscape. The purpose of this section is to minimize the visual and environmental impacts of development located on or within 300 feet of a ridgeline by regulating the placement of buildings and structures and limiting the overall disturbance that occurs within the ridgeline protection overlay district. It is not the intent of this section to regulate or limit development on small hills or rises on parcels within the Town

that are not prominent in the visual landscape and are not identified on the zoning map.

B. Applicability. The Ridgeline Protection Overlay District shall apply to all lands within 300 feet of a ridgeline as shown on the zoning map.

C. Regulated activities.

(1) No approval shall be granted, and no building permit shall be issued for any activities regulated herein without Planning Board review and approval as per the requirements of this Section. The following activities situated within the RP-O district are subject to review and approval by the Planning Board:

(a) Any activity requiring site plan approval from the Planning Board.

(b) Any activity requiring special use permit approval from the Planning Board.

(c) Any construction or use requiring the issuance of a building permit, and where the proposed construction would disturb over 500 square feet of gross lot area or would exceed twenty (20) feet in height as measured from existing ground level within the RP-O district.

(2) Activities that require a building permit on that portion of a property occurring wholly outside of the RP-O District shall not be subject to the following regulations.

D. Procedure.

(1) Building Inspector review. The Building Inspector shall review a building permit application and determine if the activity is located within the RP-O district.  The building permit application shall be referred to the Planning Board and said Board shall determine if it is regulated in accordance with this section.  No building permit shall be issued for any regulated activity unless the Planning Board has issued approval of the activity.

(2) Design review. The Planning Board shall review the application to determine if it complies with the design standards set forth in herein

(3) Decision making. The Planning Board may approve, approve with modifications, or disapprove the proposed activity. In the event that, even with the imposition of conditions, the resource protection objectives of this section cannot be satisfied, the Planning Board shall deny an application for activities regulated herein.

(4) SEQRA. The Planning Board, in its decision making, shall comply with the regulations implementing SEQRA.

(5) Timeframe for decision making. Where the Planning Board is reviewing a site plan or special use permit application, the timeframe within which to make a decision on an application proposed within the RP-O district shall be reviewed concurrently and decided upon with the site plan and special use permit. For any action that does not otherwise require a site plan or special use permit, the Planning Board shall render a decision within 62 days of receiving a complete application, or the close of the public hearing, whichever occurs later. The Planning Board, in its discretion, may hold a public hearing on the application.

(6) The decision of the Planning Board shall be filed with the Building Inspector.

VII-2

E. Submission requirements. The Planning Board shall determine the level and detail of information that shall accompany the site plan, special use or building permit application(s). The information to be submitted shall depend on the nature of the proposed activity, e.g., its scale, height and mass, and the potential for same to be visible from public observation points. Data to be submitted include:

(1) Any material submitted to the Building inspector in conjunction with a building permit, site plan or special use permit application. Said application shall also include an architectural rendering of the proposed structure, indicating the size and shape of the house, its siding color and material, window locations, size and type and roofing color.

(2) Swatches, paint chips, and other samples indicating the materials and colors proposed in the construction of the activity. The applicant shall specify the methods and mechanisms of minimizing visual impacts of existing and proposed structures, roads, driveways and other man-made features.

(3) A plan showing the location of existing and proposed roads, structures, driveways, or other man-made feature. The plan shall indicate the maximum first-floor topographic elevation and the maximum elevation to the highest point of each building and structure. Grading and the limits of disturbance shall be shown.

(4) Visual Assessment Form, indicating the public observation points from which the proposed activity may be visible.

(5) Additional submittals. The Planning Board, in its discretion, may also require submission of the following information:

(a) Soil stability analysis. A soil stability analysis shall be submitted to the approving agency to demonstrate that the construction will not compromise the stability of the terrain (including any man-made structure on site) and certified to that effect by a New York State licensed geotechnical engineer. The Planning Board may waive this requirement if the Village Engineer advises the Planning Board that it is unnecessary owing to the particular conditions of the site and the nature of the requested approval.

(b) Visual impact analysis. A visual impact analysis shall be submitted to the extent and level of detail commensurate with the circumstances of the requested approval, if the Planning Board makes a finding that any structures may have a significant visual impact on the environment. Such visual impact analysis may be required to include a verifiable digital photomontage combining an existing conditions photograph with a three-dimensional computer-aided design ("CAD") model of proposed conditions using match points that are in common in both the three-dimensional model and the photograph to create a verifiable visual simulation of the proposal, during leaf-off - no snow conditions, from distances and vantage points as determined appropriate by the Planning Board. A balloon test may be required to determine whether any proposed structure would be visible from a public road.

(c) Tree survey. A tree survey shall be submitted showing on the site plan the location, type, and diameter of every tree of ten (10) or more inches dbh that is being proposed to be eliminated. The Planning Board may require a photographic record of the

vegetative coverage taken from vantage points determined by it to be appropriate given the particular circumstances of the requested approval. In addition, the Planning Board may require an inventory of shrubs and plants for purposes of identifying species typically found on the property and determining appropriate compensatory coverage.

(d) In consultation with the Planning Board, the applicant shall provide a list of observation points from which the structure may be visible. The applicant shall provide photographs taken from the observation point of the development site with aerials markers (e.g., balloons) if required by the Planning Board.

(e) Any additional information as may be requested by the Planning Board to render its decision.

F. Design standards.

(1) Location outside RP-O district. The Planning Board, in its discretion, may require that activities and structures be located on those portions of a lot outside the ridgeline regulated area. The Planning Board, in reviewing a subdivision plan, shall ensure that proposed lots be platted, and buildings be situated on the landscape so that proposed disturbance areas and building locations are located outside the RP-O district.

(2) The installation of all structures and associated driveways, gardens, terraces, walls, ponds, patios, and utilities shall minimize to the greatest extent practicable all blasting, chipping, cutting, filling, and mechanical recontouring of the natural terrain, and shall take advantage of the screening potential of existing vegetation and land features to screen any activity regulated herein.  All land-disturbing activities, including but not limited to clearing, grading, excavation, building construction, construction of driveways and roads, cutting, and filling, shall be limited to the minimum land area necessary to accommodate the proposed use or activity, and shall in no case be greater than 5,000 square feet plus land necessary for driveway access, unless a larger area is required to accommodate a septic system, in which case that larger area shall be permitted to be disturbed.

(3) If such structures cannot be completely obscured, they shall be made to blend as unobtrusively as possible into the hillside to avoid breaking the natural ridgeline. Structures shall be designed to step with or follow the natural terrain to minimize regrading. Landscaping may be required by the Planning Board as mitigation for negative impacts on the public viewsheds and to minimize the visibility of the proposed improvements.

(4) Natural and historic features that provide scenic importance to the mapped areas of the Ridge Line and Precipice Overlay District areas shall be preserved and remain undisturbed to the greatest extent practicable. These features shall include, but are not limited to, historic buildings and structures, stone walls, steps and paths, boulders, natural rock outcroppings, and streams.

(5) Location below the ridgeline. All structures shall be sited so that the roof or the top of the structure is located below the ridgeline unless the structure is fully screened by existing vegetation and appropriate restrictions are placed on the lot to ensure that said vegetation is not removed.  In no instance shall a structure pierce the skyline as seen from any public

road. Vegetation shall be retained or planted to ensure this requirement is met. The Planning Board may impose conditions or otherwise limit the maximum height of any structure to achieve the objectives of this section.

(6) Proposed building materials (including but not limited to retaining walls and windows) shall be used with dark earth-toned and nonreflective building materials to ensure that the structure blends with the surrounding landscape. Structures shall blend in with natural surroundings through preferred use of stone or natural wood siding and use of roofing materials with dark earthtone colors.

(7) Native vegetation to be preserved. Removal of native vegetation including shrubs and trees shall be minimized to the maximum extent practicable. The Planning Board may impose conditions or otherwise limit the amount of disturbance permitted. The Planning Board may also require landscaping with native non-invasive species to offset potential visual or environmental impacts associated with the proposed disturbance. Clear-cutting of trees in a single contiguous area shall be prohibited, unless expressly permitted by the Planning Board.

(8) Clearcutting prohibited. Notching out trees and clear cutting on the ridgeline shall be prohibited. The continuity of the treeline when viewed from a public observation point shall not be disturbed.

(9) Lighting shall be minimized. The Planning Board may require the use of dark sky compliant fixtures or otherwise limit the amount of lighting associated with a proposed activity to the minimum necessary to protect the health, safety and welfare of occupants.

(10) Colors. The Planning Board may require that a structure be limited to specified dark earthtone colors to limit visibility of the structure.

(11) Building envelopes. To ensure that the placement of structures and other improvements complies with these standards, the Planning Board shall limit permitted development to specified building envelopes showing acceptable building sites and areas of permitted clearing of vegetation and grading of land. Such building envelopes shall:

  (a) Be clearly designated on the approved subdivision plat and/or site plan.
  (b) Be the minimum size necessary to accommodate the approved development and protect the remainder of a site from significant alterations.

(12) Any subdivision showing a potential structure within the RP-O district shall have a note referencing this section of the Zoning Chapter or a note indicating detailed plans and restrictions for specific structures for specific lots that have been approved during the subdivision process along with the restrictions imposed.

(13) The Planning Board shall consider the proximity of any parcel to existing trails and potential trail connections, and endeavor to incorporate existing or proposed routes where necessary.

G. Conditions. The Planning Board shall attach conditions to its approval as it deems necessary to achieve the RP-O district. Such conditions may include the following:

(1) Limiting building to a specified "building envelope" area.

(2) Requiring a conservation easement on land outside a building envelope.

(3) Requiring landscaping to buffer and screen proposed structures.

(4) Reducing the height, footprint, or floor area of a proposed structure.

(5) Modifying the architecture, building materials, or other design features of a structure so that it will blend into the landscape.

(6) Limiting alteration of landforms through grading, cutting, or filling.

(7) Changing the location and siting of structures, including the alignment of roads and driveways and the placement of any other improvements on the property.

(8) Restricting clearing of trees and reduction of tree cover.

(9) Other conditions deemed necessary to achieve the objectives of this section.

H.  Waivers from design standards. The Planning Board, in its discretion, may waive the design standards set forth herein where it determines that the objective of preserving the visual and rural landscape is best achieved by granting the waiver.

### § 57-21.3. Water Supply Protection Overlay District (WSP-O)

A.  Purpose. The purpose of this overlay is to protect the quality of streams and surface waters that contribute to surface water drinking water supplies located within the Town of Monroe. To this end, these regulations apply to all lands within the watersheds that contribute surface water, directly or indirectly, to Mombasha Lake and Walton Lake. These regulations further protect the aquatic ecological systems associated with these lakes. It is well established that impervious surfaces collect and accumulate pollutants deposited from the atmosphere, leaked from vehicles or derived from other sources. During storms, accumulated pollutants are quickly washed off and rapidly delivered to surface water systems through stormwater runoff.  Numerous studies have concluded that it is extremely difficult to maintain predevelopment stream water quality when development within a watershed development exceeds 15 percent lot coverage. In order to protect these water supply resources, the maximum allowable lot coverage of any lot within the Water Supply Protection Overlay District shall be restricted to protect the quality of streams and water that contributes to surface water supplies.

B.  Applicability. These regulations apply to any development application that requires site plan, special use permit, or subdivision approval of the Planning Board.  These regulations shall limit the total maximum lot coverage of any property within the WSP-O District. The total lot coverage shall be the percentage of the lot area that is occupied by the area of buildings, structures and all impermeable and/or compacted surfaces, including but not limited to roads, parking lots, access and circulation drives that may be or are proposed to be located on any lot. The maximum lot coverage shall apply to the cumulative impervious surfaces shown on any site or subdivision plan, including roads.

C.  Limitation on impervious surface coverage: The maximum lot coverage of any property within the WSP-O shall be 15 percent in cases where the proposed development does not integrate stormwater quality controls into the design of the development.

D.  Water quality control structures. Where a proposed development integrates stormwater quality controls, the Planning Board may permit an increase in the total maximum lot

coverage to 35 percent, provided it finds, in consultation with the Town Engineer, that the stormwater quality controls will reduce potential water quality impacts to predevelopment conditions.

E. Conditions. The Planning Board shall attach conditions to its approval as it deems necessary to achieve the RP-O district. It shall require applicable notes on any map, site plan or subdivision plan Such conditions may include the following:

   (1) Limiting the total impervious surface area on any lot.

   (2) Requiring a conservation easement on land outside a building envelope.

   (3) Reducing the footprint of a proposed structure.

   (4) Requiring cluster subdivision development.

   (5) Reducing the total number of buildings, the area dedicated to parking, and limiting the length of driveways.

   (6) Other conditions deemed necessary to achieve the objectives of this section.

F. Waivers. The Planning Board, in its discretion, may allow an increase in the maximum lot coverage, not to exceed that set forth for the applicable use and zoning district set forth in the Schedule of District Regulations, where it determines, based upon the findings of a stormwater study and in consultation with the Town Engineer, that the objective of this section can be accomplished through other accepted mitigative techniques.

## § 57-21.4. Scenic roads.

A. Intent. The scenic beauty of Monroe and its landscape is exceptionally desirable and is an important asset of the community, the Hudson Highlands, and the Hudson River Valley Greenway region. Sensitive planning of all development along the Town's scenic roads, as identified in the Town of Monroe Comprehensive Update, is critical to maintaining the rural woodland and scenic character that lends much importance to Monroe's desirable community character. In furtherance of protecting such scenic and rural woodland quality, a scenic buffer zone is required to be maintained along properties that front to a designated scenic road.

B. Scenic buffer zone established. For purposes of this section, a scenic buffer zone is an area on any lot extending from the road right-of-way line on a designated scenic road into a lot a distance equal to half the depth of the required front yard specified in the Schedule of District Regulations for the applicable use and zoning district in which the lot is located.

C. Buffer maintenance required. Each lot adjacent to a scenic road shall maintain the scenic buffer zone in a condition which preserves the vegetation and structures that render the road scenic. The buffer shall closely resemble the natural appearance of any undeveloped land. Within the scenic buffer zone there shall be no significant disturbance, including, but not limited to, tree removal, clearing, grading and filling, or the building of structures except as approved by the Planning Board.

D.  Exceptions. The following activities within the scenic buffer zone shall not require approval:

   (1) Maintenance of existing landscaping.
   (2) Removal of dangerous dead wood.
   (3) Repair of existing fences, stone walls or retaining walls, provided that original materials
       and building techniques are used.
   (4) Construction of a driveway, where said driveway is shown on an approved subdivision or
       site plan. If the driveway has not been reviewed, its location shall be subject to Planning
       Board review and approval.

E.  Fences. Chain link and stockade fences shall be prohibited within the scenic buffer zone.

F.  Subdivision and site plan review. Where the Planning Board reviews an application subject to
    subdivision or site plan review, the Planning Board shall require that the scenic buffer zone
    mapped on the plan. To the maximum extent practicable:

   (1) Lots shall be designed so as to maximum the number of lots which gain access from a
       road internal to a new subdivision rather than the scenic road. The Planning Board shall
       approve the location of all driveways proposed to access the scenic road, and shall limit
       the clearing of any vegetation within the scenic buffer zone or within the public right-of-
       way to the minimum necessary to assure safe sight distances.
   (2) The Planning Board may require shared entrances of adjoining driveways to minimize the
       number of curb cuts along the scenic road. Where a shared entrance is proposed, the
       Planning Board may allow driveways to be located within required side yards.
   (3) The Planning Board may require supplemental landscaping to screen views into new
       developments or may increase the depth of the scenic buffer zone so as to capture any
       features associated with a scenic road vista.
   (4) Map notes shall be included on a plan which designates the scenic buffer zone and
       requires the maintenance of structures and preservation of vegetation within the scenic
       buffer zone.
   (5) Stormwater ponds, electric utility boxes, and other utility infrastructure shall not be
       located within the scenic buffer zone unless the Planning Board determines there is no
       alternate location for same, and where said infrastructure is screened from view to the
       satisfaction of the Planning Board.
   (6) Existing vegetation, stone walls, mature trees and tree rows within any road right-of-way
       will be retained in its undisturbed state except where the Planning Board requires
       rehabilitation of fences or walls in conjunction with plan review.
   (7) The Planning Board may allow a subdivision identification sign at the entry to a subdivision
       within a scenic buffer zone provided an undisturbed woodland or vegetated backdrop is
       retained and any vegetative removal shall be the minimum necessary. The sign shall be
       subject to architectural review and approval and shall be designed to be permanent,
       require minimal maintenance, be consistent with the materials of any existing stone walls
       or other historic features, and shall not be detrimental to the appearance of the scenic
       road.

(8) The Planning Board may require all utilities to be underground.

(9) The Planning Board may require preservation of existing trail routes, incorporation of a new trail alongside a scenic road, or otherwise incorporate trail connections into the design of a site plan or subdivision.

G. Highway improvements to scenic roads.

(1) Alterations and improvements of designated scenic roads shall be carried out to preserve to the highest degree possible and enhance wherever feasible the scenic characteristics of a designated scenic road.

(2) Routine road maintenance and emergency repairs undertaken by the Highway Superintendent shall not require Town Board approval. Routine road maintenance shall mean: trimming of the tree branches that encroach on the traveled portion of the road below the height needed to allow school buses and emergency vehicles to pass; trimming or removal of brush or other obstacles that encroach on the traveled portion of the road; necessary trimming for utility lines; trimming of brush to enhance and protect scenic views, stone walls, mature trees and other characteristics of the scenic road; correction of drainage problems; and retreatment and repair of existing roadway surfaces.

(3) In the case of a natural disaster in which, in the judgment of the Highway Superintendent, a road or a portion thereof becomes impassable or unsafe for public travel, emergency repairs and reconstruction by the Highway Superintendent may be made as needed to restore the road to its pre-emergency condition and surface. Repair work that would change the condition of the road to other than its state prior to the disaster is subject to procedures required for alterations and improvements not involving routine road maintenance or emergency repairs.

(4) All activities listed herein that occur within the right-of-way of a scenic road are not "emergency repair" or "routine road maintenance" and shall be reviewed by the Town Board. Such activities include, but are not limited to:

(a) Widening of the traveled portion of a scenic road;

(b) Major changes of grade;

(c) Straightening or realignment of scenic roads;

(d) Removal of stone walls or improvements that would damage stone walls;

(e) Removal of mature trees or vegetation.

(5) Any proposal for alteration or improvement of a designated scenic road shall be submitted to the Town Board. Such proposal shall be accompanied by photos, a suitable map showing the location of each proposed improvement or alteration, and, when deemed necessary by the Town Board, a short report describing the proposed alterations, discussing the reasons for the proposed alteration and available alternatives, if any. The Town Board shall review and approve any such alterations and improvements prior to any action.

H. The following standards shall guide Town Highway Department, the Town Board and Planning Board in the review of any action within their jurisdiction requiring improvements to be made to a designated scenic road:

VII-9

(1) Curves. Scenic and historic values correlate with the existence of curves in a roadway which allow a constant unfolding of new and changing views. Curves shall not be eliminated unless they constitute a safety hazard and unless no reasonable economically practicable alternative, such as lower speed limits, could address safety concerns.

(2) Grades. Hills and valleys and corresponding changes in typography and road grades are correlated with scenic and historic values. Changing grades through cuts and fills shall not be undertaken unless necessary for roadway safety.

(3) Widths. Narrow roads correlate with scenic and historic beauty, especially when surrounded by natural vegetation and a canopy of trees. Scenic roads, or portions thereof, shall not be widened unless there are no other reasonable, economically practicable alternatives, such as construction of wide bypasses and turnouts at intervals where they will have the least impact on scenic and historic values.

(4) Side slopes. Existing steepness of side slopes are preferred to reduction of gradient through extensive removal of soil, rock, and slope, particularly where the slope is fully stabilized and has extensive ground cover, shrubs or trees.

(5) Vistas. Roadside views of near and distant scenic and historic landscapes shall be preserved and, where possible, enhanced through vegetative management and selective cutting to maintain or open up such views.

(6) Stone walls. Stone walls should be retained wherever possible. If stone walls or portions thereof must be removed for safety reasons, they should be rebuilt in a comparable manner within the untraveled portion of right-of-way of the scenic and historic road.

(7) Utility lines. Wherever possible, utility lines should be placed underground. Where they are overhead the utility corporations should be encouraged to cooperate by implementing suitable vegetation management techniques which preserve wildflowers and the shrubs.

(8) Vegetation. Vegetation on the side of the road shall be managed in such a way as to preserve flowers, shrubs, wildlife and trees. Overarching isolated trees and the canopy of a closed forest are valuable scenic qualities and should be preserved wherever possible. Maintenance of scenic roads should be done so as to minimize root damage to bordering trees.

(9) Drainage ditches. Drainage swales shall be vegetated or lined with stones in areas subject to erosion.

## § 57-21.5. Landscaping and screening.

A. General. Landscape materials shall be utilized in a positive manner in all developments for purposes of architectural enhancement, space articulation, screening, privacy control, erosion control, noise control, atmospheric purification, traffic control, glare and reflection control, solar radiation control, wind control, precipitation control and temperature control. All areas of a lot not left in a natural state and not developed with buildings, driveways or other impervious surfaces shall be maintained continuously in a dust-free condition by installing suitable landscaping, including trees, shrubs, grass or other ground cover, or by providing a stable pervious surface, such as pervious pavers, gravel, crushed rock or similar material. Landscape treatments shall minimize soil erosion and stormwater runoff and

provide necessary screening as set forth herein.

B. Landscaping standards. A landscape plan shall be submitted in conjunction with any site plan or special use permit application. The following standards shall be met:

(1) Landscaping shall be appropriate to the project, and the natural vegetative cover shall be preserved to the maximum extent practicable. Natural areas shall be protected during construction. A concerted effort shall be made during the design stage to integrate existing natural features of the site into the landscape plan.

(2) A landscape plan shall be prepared by a landscape architect or other NYS-licensed qualified design professional practiced in the profession of landscape design. The Planning Board, as a condition of approval, may require that the landscape consultant periodically inspect the construction and installation of landscape materials.

(3) The landscape plan shall include a planting schedule which indicates the number, planting size, and quantity of each planting material to be installed. Details indicating the planting method for each type of material, e.g., trees or shrubs, shall be provided on the landscaping plan, and shall follow planting details and specifications promulgated by the International Society of Arboriculture, AmericanHort, or similar organization.

(4) A landscape plan shall include plant selection suitable to the conditions of the site. Plant specimens native to the region are to be used to the greatest extent practicable.

(5) Within the area of proposed disturbance, the location of trees with a diameter of ten (10) inches or greater measured at chest height ("dbh") shall be indicated on the plan. The tree specimen and its conditions shall be noted on the plan. Healthy trees twelve (12) inch dbh shall be preserved to the maximum extent practicable.

(6) For landscaped areas near roads, plants shall be selected according to their hardiness and ability to withstand highway salt conditions or snow "throw" compaction.

(7) In parking lots, landscape medians to receive plant materials shall have a minimum inside width of five (5) feet, except that, where vehicle overhang is permitted, an inside width of ten (10) feet shall be required.

(8) Approved mulch shall be spread within a landscaped space at a level not to exceed one and one-half (1½) inches below top-of-curb, and at a depth of not less than three (3) inches. Mulch shall be placed in all planting beds to a minimum three-inch depth. Mulch may consist of clean wood chips, pine bark, peat moss, stone aggregate, or other approved material. As a general guideline, mulch shall be clean, homogeneous, attractive, and self-matting so that it does not blow in the wind.

(9) Areas that will receive continued pedestrian movement shall be paved. Paving can be cast-in-place concrete, impressioned concrete, or precast concrete unit pavers set in an approved setting bed. Bituminous concrete or asphalt walks are not acceptable.

(10) In general, planting designs shall strive for year-round seasonal interest and a natural, yet ornamental, appearance.

(11) Attention to environmental objectives and energy conservation, as well as design value, should be evident in the landscape plan. Environmental applications for plantings can include, among others, air filtration, temperature modification, natural slope stabilization, provision of edible fruit bearing plants, the use of NYSDEC recommended

VII-11

wetland plants in wetland buffer areas, and similar environmental objectives.

(12) Plantings of all types shall be completed only at such times as weather and soil conditions are favorable for seed germination, plant establishment and subsequent growth. Generally, such conditions occur between April 1 and June 1 and between August 20 and October 15; however, conditions vary for different plants and different years. Accepted horticultural practices shall be followed in this regard.

(13) Extreme care and caution shall be exercised in grading operations around existing trees scheduled for preservation. Protective tree fencing shall be placed around the tree(s) at or beyond the dripline(s). Cuts within the dripline, or the addition of 12 inches or more of fill, can result in tree mortality and shall be avoided to the maximum extent.

(14) Tree wells are encouraged where grading necessarily comes in close proximity to trees. In areas of fill, the tree well should be concentric to the dripline, and of a diameter at least half that of the dripline. In areas of cut, the tree well should also be concentric to the dripline but should be of a diameter at least equal to that of the dripline. In cases where grade changes affect only one side of the tree, partial tree wells are acceptable.

(15) The use of earth berms and other grading techniques is allowed, especially on flat sites or in locations where screening is warranted or necessary. The height, size and width of the berm shall be suitable for the intended plantings and shall fit with the character of the overall proposed design of the site.

(16) The use of flowering annuals and perennials is encouraged in areas close to pedestrian movement and shall receive frequent maintenance.

(17) A mix of plant materials, sizes, habits and textures shall be selected for each planting plan. Over-planting of any one species shall be avoided. The use of indigenous species is encouraged. The use of exotic species shall be avoided to the maximum extent.

(18) Construction practice and planting specifications should follow ANSI Z60.1 American Standards for Nursery Stock or equivalent.

(19) All plantings shown on an approved landscape plan shall be maintained throughout the duration of the use, and plants not so maintained shall be replaced in accordance with the specifications of the approved plan.

(20) Erosion and sedimentation controls shall be provided and designed in accordance with the New York State Department of Environmental Conservation Best Management Practices.

C. Screening. As a condition of approval, the Planning Board may require that a screen be established to minimize views of facilities, buildings and parking areas associated with nonresidential uses from adjoining residences and the public right-of-way. Transformers, gas meters, dumpsters and similar appurtenances shall also be screened. Plantings shall be indicated on the site or subdivision plan and shall meet the following standards:

(1) Plant materials shall be no less than four (4) feet in height when planted and shall be spaced to form a continuous, solid screen at maturity. Plant materials shall be spaced at distances no greater than ten (10) feet on center or other suitable distance, based on the specimen to be planted, which will provide adequate screening within five (5) years after installation. Coniferous trees and shrubs shall be used to provide year-round screening.

VII-12

Where necessary, deer resistant species shall be installed.

(2) A wall, fence (finished side out), or earthen berm may be substituted for, or required in conjunction with, planting materials, upon approval of the Planning Board. The Planning Board shall establish conditions on the location, height and design of same.

D. Waivers. Where existing topography or vegetation or other circumstance provides adequate landscaping or screening which warrants an exception to the strict application of standards in this section, the Planning Board may waive the landscaping or screening requirements set forth in this section.

### § 57-21.6. Lighting.

A. Purpose and applicability. It is the purpose of this section to minimize light pollution in the Town of Monroe by:

(1) Using fixtures with optical controls that distribute light in the most effective and efficient manner;

(2) Using full cut off and shielded outdoor light fixtures;

(3) Assuring that the light generated by outdoor fixtures does not extend beyond the property line of the property from which it emanates at levels exceeding the requirements of this section;

(4) Requiring that certain outdoor fixtures be extinguished during nighttime hours as shall be determined by the Planning Board during site plan, special use permit, and subdivision plan review.

(5) This section shall not apply to fixtures for single-family detached dwellings.

B. Lighting plan. As part of any site plan or subdivision plan, the Planning Board may require submission of a lighting plan and supporting data. Said plan and data shall illustrate proposed fixture locations, lighting levels measured in footcandles, details and illustrations of proposed fixtures, glare control devices, lamps, mounting heights, and a description of hours of operations and proposed maintenance. The Planning Board may require illumination intensities to be plotted on a 10-foot by 10-foot grid. The Planning Board, if required in accordance with Article IX, shall approve the architectural style of the fixture(s).

C. Standards. Lighting shall conform to the following standards:

(1) All lighting, including sign lighting, shall be designed and arranged so as to minimize glare and reflection on adjacent properties.

(2) The style of the light, light standard, pole and fixture shall be consistent with the architectural style of the building and its surroundings.

(3) The maximum height of a light fixture shall not exceed twenty (20) feet.

(4) The source of the light shall be fully shielded with full 90 degree cut-off luminaires and so located such that it shall not be visible beyond the property boundary on which it is situated.

(5) All outdoor lighting shall be of such type and location to provide a minimum illumination

of one (1) foot-candle in publicly-accessible areas and shall be shielded so as to prevent the source of the light from being a visual nuisance to any adjoining property.

(6) Illumination from light fixtures shall not exceed 0.05 foot-candle on adjacent residential property, or 0.1 foot-candle on adjacent business property, as measured along the shared property boundary at ground level. A maximum Uniformity Ratio (average to minimum) of 4:1 shall be achieved for all lit areas.

(7) The Planning Board, as a condition of approval, may impose limits on the hours of lighting operation and may require that lights be controlled by automatic timing devices. The Planning Board shall consider the need to provide security in determining the hours of operation.

(8) Light control shall be accomplished primarily through the proper selection and layout of lighting fixtures. The installation of landscaping, fences, walls or similar screening devices may also be considered by the Planning Board to ensure that light spillage onto adjoining properties is minimized.

(9) Mercury vapor lights and quartz lamps are prohibited light sources, except to the extent that the local utility provider utilizes same for street lighting. Energy-efficient light sources are encouraged.

(10) Luminance and uniformity. Light levels shall be designed not to exceed the latest recommended levels for outdoor lighting set by the Illuminating Engineering Society of North America (IESNA) for the type of activity/area being lit, except light levels for ATM machines shall be in accordance with the New York State ATM Safety Act. Where no standard is available from the IESNA, the applicable standard shall be determined taking into account the levels for the closest IESNA activity. Where said standard is inconsistent with the foot-candle requirements set forth herein, the more stringent shall apply.

(11) The Planning Board may impose conditions on any site plan, subdivision plan or special use permit to ensure that the objectives of this section are met.

(12) Waivers. Where site conditions warrant exceptions to the strict application of these lighting standards, the Planning Board may waive the requirements set forth in this section where it determines that the waiver shall not violate the purposes of this section.

**§ 57-21.7. Cluster Development.**

A. Purpose.

(1) Chapter **A65**, Subdivision of Land, of the Code of the Town of Monroe provides for the clustering of proposed developments as authorized under § 278 of the Town Law of the State of New York. The Planning Board may approve cluster developments in all districts according to the procedures and requirements specified below. The purpose of this provision is to allow an alternative permitted method for the layout, configuration and design of lots, buildings and structures, roads, utility lines and other infrastructure, parks, and landscaping in order to preserve the natural and scenic qualities of open lands as described further below.

(2) The provisions of this section shall apply throughout the Town of Monroe where residential uses are allowed.

(3) In order to increase design flexibility, two or more contiguous parcels of land, including parcels separated by a Town, County, State, or private road, may be grouped together as one cluster provided the parcels are in common ownership and are merged into one parent parcel.

(4) The application of these provisions shall be guided by the important physical, cultural and natural features of the particular property under review as follows:

(a) Steep slopes.

(b) Freshwater wetlands under the regulatory jurisdiction of the New York State Department of Environmental Conservation (DEC) and/or the U.S. Army Corps of Engineers.

(c) 100-year floodplains as identified on Federal Emergency Management Agency (FEMA) maps.

(d) Properties listed on the National and/or State Registers of Historic Places or eligible for listing by the New York State Office of Parks, Recreation and Historic Preservation for inclusion on such registers.

(e) Lands containing a farm operation within a New York State Agricultural District or within 500 feet of lands containing a farm operation within a New York State Agricultural District.

(f) Significant viewsheds as determined by the application of the State Environmental Quality Review Act.

(g) Recreational resources and water bodies including lakes, ponds, streams, or other potentially significant recreational resources.

(h) Known habitats containing endangered, threatened, or special concern wildlife species, protected native plants, endangered, threatened, or rare plants, or State identified significant habitats.

(i) Unique or unusual land forms or geological formations.

(j) Existing or potential trails including bikeways, hiking trails or multi-use, non-motorized routes of local, county, state or national significance.

B.  Procedure.

(1) Unless waived as per subsection (2) below, the Planning Board of the Town of Monroe shall require that an applicant for a residential major subdivision submit to the Planning Board a conservation plan, a conventional subdivision plan, and a conceptual cluster plan with the filing of the application for preliminary subdivision approval. The Planning Board shall review the conservation, cluster and conventional plans and shall require such other and further details for each plan that it reasonably believes necessary to evaluate same. Until all requested information is submitted, the application for preliminary subdivision approval shall be deemed incomplete. Nothing herein shall limit an Applicant from requesting a cluster subdivision approval for a minor or major subdivision.

(2) Planning Board waiver of cluster subdivision. Notwithstanding anything set forth in this local law to the contrary, the Planning Board may waive, but shall not be obligated to waive, the requirement of a cluster plan submission for subdivisions involving five (5) acres or less.

(3) Conservation Value Analysis and Plan.

(a)  In order to determine the conservation value of open space on a specific parcel of land, the applicant shall prepare and the Planning Board shall review a "conservation plan" of such parcel. The open space protected pursuant to this Section shall have "conservation value" which may include historic, ecological, agricultural, water resource, scenic, or other natural resource value. Lands with conservation value include scenic view corridors, agricultural land, land with prime farmland soils or soils of statewide importance, aquifers and their recharge areas, ecological habitat for sensitive species, historic buildings or landscapes, large areas or contiguous forest, ridgelines and hillsides visible from public roads or other public areas, state or federal wetlands, lakes, water bodies, and stream corridors. These areas shall be mapped on a separate conservation plan which clearly demarcates these areas.

(b)  The Planning Board shall review the conservation plan, and determine which resources are to be protected as open space. No less than 50 percent of the gross area of the parcel shall be set aside for conservation as part of a cluster layout. The open space is separate and in addition to any land which the Planning Board deems must be set aside for active recreation pursuant to Chapter A65, Subdivision of Land.

(4) Review of conventional plat to determine residential yield.

(a)  The conventional subdivision plan shall be submitted to establish the maximum number of lots or dwellings that shall be permitted on the subject property, referred to as the residential yield. The permitted number of dwelling units in a cluster subdivision shall in no case exceed the number of units that, in the Planning Board's judgment, would be permitted if the land were subdivided into lots conforming to the minimum lot size and density requirements of this chapter, the Subdivision Regulations, the Orange County Department of Health regulations, and all other applicable local, state and federal laws, regulations and standards. The basis for this determination will be a conventional subdivision plat for the subject parcel showing all environmental constraints as per 57-21.1 of this Zoning Chapter, as well as roads (including road grades), stormwater basins, required setbacks for individual wells and

septic systems, and other information as may be required by the Planning Board. The Planning Board shall, by resolution, establish the maximum residential yield upon a review of the conventional plan layout. The Planning Board may waive submission of documentation of the full residential yield where, in the Planning Board's judgment, the number of lots proposed is substantially less than the total allowable residential yield, provided that the plat contains a notation clearly indicating the reduction in the total lot count for the remaining unsubdivided parcel.

(5) Cluster layout.   Using the conservation plan as a basis for determining areas to be protected as open space, the Applicant shall design a cluster plan layout which preserves the natural attributes and resources shown on the conservation plan that have been evaluated by the Planning Board and determined to be areas which shall remain as open space.

6) Resolution to pursue cluster or conventional layout. Upon review of the preliminary conventional and the cluster subdivision plans, the Planning Board shall advise the Applicant as to which plan shall be advanced through the subdivision review process set forth in Chapter A65, Subdivision of Land, and/or the site plan review process as per Article VI of this Zoning Chapter. For purposes of SEQRA review, said resolution shall not be deemed an "action".

C.   Design standards for cluster subdivisions.

(1) Allowable uses.   In the OSR-3, RR-1, and SR-20 zoning districts, the residential uses allowed within a zoning district shall be single family detached dwellings on individual lots. In the SR-15, SR-10, and URM zoning districts, multiple dwelling groups may be allowed at the discretion of the Planning Board, and the maximum density shall be as established in §57-21.6. The total number of dwellings shall not exceed the maximum residential density determined in subsection B.(4) above.

(2) Subdivision of clustered lots. No further subdivision of clustered lots shall be permitted. A map note specifying this restriction shall be included on the final cluster plan.

(3) No buildings may be constructed within the open space area, except that the Planning Board, in its discretion, may allow outbuildings such as barns or sheds associated with agricultural operations to be located in an open space area which is preserved for agricultural uses.

(4) Utilities. A cluster development may be served by individual well, individual septic, or central water and central sewer facilities, each approved by the appropriate agency or other entity having jurisdiction. All water, sewer and gas lines, power, telephone, cable and other communication services shall be installed underground in compliance with state and local regulations.

(5) Arrangement of lots and dwelling units. The following guidelines shall apply:

(a) Retain and reuse existing farm roads, lanes or driveways rather than constructing new roads or driveways. This minimizes clearing and disruption of the landscape and takes advantage of the attractive way that old lanes are often lined with trees and stone walls. (This is not appropriate where reuse of a road would require widening in a manner that destroys trees or stone walls.)

VII-17

(b) Preserve stone walls and hedgerows. These traditional landscape features define outdoor areas in a natural way and create corridors useful for wildlife. Using these features as property lines is often appropriate, as long as setback requirements do not result in constructing buildings in the middle of fields.

(c) Avoid placing buildings in the middle of open fields. Place buildings either at the edge of fields or in the ecologically least significant parts of wooded areas where they will be less intrusive to views from adjacent roads, trails or high viewpoints.

(d) Use existing vegetation and topography to buffer and screen new buildings if possible, unless they are designed and located close to the road in the manner historically found in the Town. Site buildings in groups or tuck them behind tree lines or knolls rather than spreading them out across the landscape in a sprawl pattern.

(e) Minimize clearing of vegetation at the edge of the road, clearing only as much as is necessary to create a driveway entrance with adequate sight distance. Create curves in driveways, with due regard to safety issues, to increase the screening of buildings.

(f) Site buildings so that they do not protrude above ridgelines as seen from public places and roads. Use vegetation as a backdrop to reduce the prominence of the structure. Wherever creating vistas is intended, open up views by selective cutting such as removal of understory vegetation and pruning lower branches of large trees, rather than by clearing large areas or removing large trees.

(g) Minimize crossing of steep slopes with roads and driveways.

(h) The required open space land may not include private yards located within 75 feet of a principal building.

(6) Parcels in more than one district. Density calculations shall be made separately for the portion of the parent parcel in each district. This density may then be combined and distributed anywhere within the parent parcel, provided that the layout and design are consistent with the purposes of each district, the dwelling unit is permitted in the applicable zoning district, and that dwelling units are clustered at higher densities in the higher density district.

(7) Minimum lot area and yard requirements. The Planning Board is allowed to vary the minimum yard and lot area requirements otherwise required in the Schedule of District Regulations as follows:

(a) The minimum lot area for individual lots with single family detached dwellings in a cluster subdivision shall be as follows: The minimum lot size may be reduced by 50 percent of what otherwise would be required for a conventional lot in the district, except that no single lot shall be less than 7,500 square feet, whichever is greater.

(b) The minimum yard requirements shall be established by the Planning Board during cluster review.

(8) Multiple dwellings. The yard requirements shall be established by the Planning Board during cluster plan review, and shall be no less than 50 percent of what otherwise would be required for a conventional lot in the district. The Planning Board shall determine the maximum lot coverage for a cluster development but shall not be increased by more than 50 percent of what is otherwise required for a conventional lot in the district. The Planning Board may require the protection of an undisturbed vegetative buffer along the side and rear property lines for any cluster development where the units are located on

VII-18

common land and the building adjoins a single family detached dwelling, to be no less than twenty-five (25) feet in depth. Where the required open space meets this purpose, no additional buffer is required.   Off-street parking may be permitted in a front yard only in a driveway giving access to a garage, but off-street parking spaces shall otherwise be located behind the front façade of the building.

(9) Building height. The Planning Board is not authorized to vary the maximum height limitation for any buildings or structure within a cluster development.

(10) Permanent open space in cluster developments.

   (a) Open space land. Protected open space may be included as a portion of one or more large building lots, or may be contained in a separate open space lot. Such open space may be owned by a homeowners association, one or more private landowners, a non-profit organization, the Town or another governmental entity, or any other appropriate entity, as long as it is protected from development or encroachments by a conservation easement. The open space area, when located on individual lots to remain in private ownership, shall be demarcated by survey markers in a form to be approved by the Planning Board. A Conservation Easement Baseline Report shall be prepared by the Applicant and submitted to the Planning Department for filing prior to signing the final cluster plan. The Baseline Report is for purposes of documenting the location of the conservation easement area, and ensuring no encroachment occurs to same except to allow those activities permitted within the easement, e.g., agricultural operations. The following documentation shall be included in the Report:

      [1] Location Map: Property shown on the Town zoning map or other parcel-based map with area shown within 1,500 feet of the project site, with the property highlighted.

      [2] A copy of the executed Conservation Easement.

      [3] Metes and bounds description of the Conservation Easement area.

      [4] An 11" x 17" map or larger of the Planning Board approved site plan or subdivision plan illustrating clearly the conservation easement area.  The map shall show parcel boundaries, topography, wetlands, and existing structures, if any.

      [5] An up-to-date aerial map of the property.

      [6] Photo key map, using map described in "iv" above as base, with photos as per "vii" below.

      [7] Photographs of the conservation easement area, keyed to the features shown on the approved cluster plan, shall be submitted after conservation easement markers are installed.  The baseline report shall include compass direction and description of the photo subject.  All existing structures and the existing condition (wetland, forest, etc.) within the conservation easement area shall be described in a narrative referencing the photos taken. Use of GPS for purposes of accurately identifying locations from which photos are taken is recommended especially, where there are few reference points, e.g., middle of woods.  It is preferable for baseline photos to be taken when snow cover is not present.

      [8] The Applicant shall certify (through signature) the Report as being accurate.

   (b) Notations on plat or site plan. Protected open space land shall be clearly delineated and labeled on any final plan as to its use, ownership, management, method of

VII-19

preservation, and the rights, if any, of the owners of other lots in the subdivision to such land. The plat or site plan shall clearly show that the open space land is permanently reserved for open space purposes.

(c) Permanent protection by conservation easement.   A perpetual conservation easement restricting development of the open space land and allowing use only for agriculture, passive recreation, protection of natural resources, or similar conservation purposes, pursuant to Section 247 of the General Municipal Law and/or Sections 49-0301 through 49-0311 of the Environmental Conservation Law, shall be granted to the Town with the approval of the Town Board, or to a qualified not-for-profit conservation organization acceptable to the Town Board upon the recommendations of the Planning Board. Such conservation easement shall be approved by the Planning Board and shall be required as a condition of subdivision plat approval. The Planning Board shall require that the conservation easement be enforceable by the Town if the Town is not the holder of the conservation easement. The conservation easement shall be recorded in the County Clerk's office prior to or simultaneously with the filing of the final subdivision plat in the County Clerk's office or a site plan in the Planning Department.

(11) Ownership of Open Space Land – Homeowners Association (HOA).

(a) If the land is owned in common by a HOA, such HOA shall be established in accordance with the following:

[1] The HOA documentation must be submitted to the Planning Board before the final subdivision plat is approved, and must comply with all applicable provisions of the General Business Law.

[2] Membership must be mandatory for each lot owner, who must be required by recorded covenants and restrictions to pay fees to the HOA for taxes, insurance, and maintenance of common open space, common driveways, and other common facilities.

[3] The open space restrictions must be in perpetuity.

[4] The HOA must be responsible for liability insurance, property taxes, and the maintenance of recreational and other facilities and common driveways.

[5] Property owners must pay their pro rata share of the costs in Subsection (iv) above, and the assessment levied by the HOA must be able to become a lien on the property.

[6] The applicant shall make a conditional offer of dedication to the Town, binding upon the HOA, for all open space to be conveyed to the HOA. Such offer may be accepted by the Town, at the discretion of the Town Board, upon the failure of the HOA to take title to the open space from the applicant or other current owner, upon dissolution of the association at any future time, or upon failure of the HOA to fulfill its maintenance obligations hereunder or to pay its real property taxes.

[7] Ownership shall be structured in such a manner that real property taxing authorities may satisfy property tax claims against the open space lands by proceeding against individual owners in the HOA and the dwelling units they each own.

[8] The attorney for the Planning Board shall find that the HOA documents presented satisfy the conditions above, and such other conditions as the Planning Board shall deem necessary to ensure continuation and protection of the open space lands.

(12) Maintenance standards.

(a) Ongoing maintenance standards shall be established, enforceable by the Town against an owner of open space land as a condition of approval, to ensure that open space land is not used for storage or dumping of refuse, junk, or other offensive or hazardous materials, or in any manner not approved by the Planning Board.

(b) In the event that the maintenance, preservation, and/or use of the open space area(s) ceases to be in compliance with any of the requirements of the Zoning Chapter or any other requirements specified by the Planning Board when approving the cluster subdivision plat or site plan, the Town shall be granted the right to perform such maintenance as may be necessary or to otherwise assure compliance and to charge the cost to the responsible property owner or owners. Such charge, if unpaid for more than sixty (60) days, shall become a lien on the open space area and on the lots of any lot owners who share ownership of the open space area. Notwithstanding, the Town is under no obligation to maintain such open space areas.

**D.    Site plan approval for cluster developments.**

(1) Where a cluster subdivision has been designed with multiple dwellings, a site plan shall be submitted to and approved by the Planning Board prior to the issuance of a building permit in a cluster subdivision development.

(2) The site plan shall include all elements required by Article VI of this Zoning Chapter.

(3) Nothing contained in this article shall relieve the owner or his or her agent or the developer of a proposed cluster development from receiving subdivision plat approval in accordance with Chapter A65, Subdivision of Land.

(4) Prior to site plan approval, the developer shall file with the Planning Board a performance bond to ensure the proper installation of all park and recreation improvements shown on the site plan and a maintenance bond to ensure proper maintenance of all common lands until the homeowners association is established. The amount and period of said bonds shall be determined by the Town Board upon the recommendation of the Planning Board, and the form, sufficiency, manner of execution and surety shall be approved by the Town Attorney and the Town Board.

**§ 57-21.8.  Site plan as part of subdivision review; house relocation and standards note.**

A. The limits of disturbance, location, size (footprint and height), bedroom count, and other physical characteristics of any building or structure on a lot depicted on a subdivision map approved after October 9, 1968, shall be the limit of construction allowed on that lot. No building permit will be issued authorizing construction of buildings, outdoor amenities, accessory structures or outdoor fixtures—including but not limited to exterior walls, mechanical units, dumpsters, etc.—not shown on the approved subdivision map without amended site plan approval from the Planning Board. Building permit applications and plot plans shall carry a certification that what is shown thereon is fully consistent with the

approved subdivision map. Nothing herein shall be construed to require a public hearing as part of this site plan review and approval for an individual lot as may be required for this Section B.

B.  No building permit authorizing construction on a lot depicted on any subdivision map approved before October 9, 1968, may be issued where construction or disturbance of any area of the lot exceeds a slope of thirty percent (30%) without site plan approval from the planning board. Building permit applications and plot plans shall carry a certification that no construction or disturbance on any portion of the lot exceeding a slope of thirty percent (30%) will occur. The location, size (footprint and height), bedroom count, etc. of any building or structure shown on the approved building permit shall be the limit of construction and disturbance allowed without amended site plan approval from the Planning Board. The Planning Board, in reviewing any building located on steep slopes, shall be guided by the same process and standards set forth in Section 57-21.2 of the Zoning Chapter for ridgeline protection. Nothing herein shall be construed to require a public hearing as part of this site plan review and approval for an individual lot as may be required for this Section B.

C.  A house relocation and standards note shall be required to appear on any Site Plan or Subdivision approved by the Planning Board. The Planning Board, in its discretion, may require that a copy of the Note be recorded in the Orange County Clerk's Office so as to appear in the chain of Title. Nothing herein shall be interpreted to limit the Planning Board's ability to require additional map notes applicable and specific to any site plan or subdivision being reviewed. The following notes shall appear on any site plan or subdivision which involves the construction of a dwelling(s):

"The owner/ builder of a lot shall be allowed to relocate a dwelling shown on the approved plan without further Planning Board approval provided that the following requirements are met. If all of these requirements cannot be met, the matter must be referred back to the Planning Board for further review and approval.
   (1) The relocated dwelling remains on twenty percent (20%) of the area of the originally approved dwelling location and meets required dimensional standards.
   (2) Any well shall not be relocated and the sewage disposal system shall not be relocated off the area where approved percolation tests were recorded. If the project was approved by the Orange County Department of Health, relocation of wells and sewage disposal systems are subject to all of the terms and conditions of such approval, including the prohibition of any such relocations, if so stated.
   (3) The driveway meets maximum grade requirements.
   (4) The sewage from the dwelling will discharge by gravity to the sewage disposal field unless a lift or pump station has already been approved for the lot.
   (5) Drainage patterns on the lot shall not be changed so as to adversely impact adjacent properties.
   (6) The driveway curb cut or lot access is not relocated.
   (7) The dwelling location shall not be shifted onto an environmentally sensitive site feature such as a Federal or State Wetland if same was to remain undisturbed.

(8) The dwelling shall not be shifted in a location in which is otherwise in contravention of a requirement of the subdivision regulations, Zoning Law, as may be amended, or of the Findings or Determination under the SEQRA for the subdivision of which the house lot is a part.

(9) There shall be a mapped distance from a property line to 3 sides of the dwelling.

(10) The maximum number of bedrooms is not exceeded.

(11) The maximum building footprint is not exceeded.

(12) The maximum lot coverage evaluated for stormwater control and other purposes does not exceed that shown and evaluated on the plan.

(13) The limits of disturbance shown on the plan are not exceeded."

D. Stormwater analysis. Site plan and subdivision approval relies upon a drainage study or other evaluations by the Planning Board based on dwelling/structure sizes shown on the plan. No building permit for a dwelling/structure larger than as shown on a site plan or subdivision plan will be issued unless a new drainage analysis, satisfactory to the Planning Board engineer, has been submitted and approved, and the change in the dwelling/structure size is approved by the Planning Board in accordance with Subsection B above.

### Article VIII. Public Improvements, Surety and Inspections

**§ 57-22-23. Reserved.**

**§ 57-24. List of mandatory public improvements.**

A. The following improvements will be required except when the Planning Board waives the requirement by specific resolution:

    (1) Paved streets.

    (2) Curbs or gutters.

    (3) Sidewalks.

    (4) Shared water distribution systems and fire hydrants.

    (5) Central or shared sanitary waste disposal facilities or structures.

    (6) Storm drainage facilities, including retention or detention ponds of a permanent and/or temporary nature.

    (7) Construction phase soil erosion and sedimentation control facilities and structures.

    (8) Street signs.

    (9) Streetlighting.

    (10) Street trees.

    (11) Provision of at least two inches of suitable topsoil, seeding or sodding of planting strips with lawn grass and stabilization thereof.

B. Each applicant and developer (including all assignees and successors in interest) shall become and remain responsible for the completion of all public improvements.

**§ 57-25. List of discretionary public improvements.**

A. The following improvements may, where incorporated on a plan and where circumstances dictate that same are necessary for the proper functioning of the site and/or the protection of the public health, safety and welfare, be required by the Planning Board as part of its approval and, when so required, shall be considered public improvements:

    (1) Retaining walls: as may be required with or without fencing in order to safely and properly implement all elements of the proposed site use and access.

    (2) Paved parking lots: as may be required to prevent the degradation of air and water quality by airborne dust and waterborne siltation, to provide safe and reliable routine and emergency access in all seasons and to safely delineate parking lot circulation ways and individual parking spaces and/or as part of a plan to collect and manage stormwater drainage.

    (3) Landscaped areas: as may be required to screen or buffer all or portions of the site from adjoining land uses so as to avoid creating noise and harmful visual effects to the public.

    (4) Site grading and clearing measures: as may be required to convert a given site for use and access as intended in a land use plan approved by the Planning Board in a manner that avoids creating stormwater quality impacts or harmful impacts to reserved vegetation.

    (5) Site distance clearing and/or grading: as may be required to provide safe and adequate

site distance and avoid creating a public safety hazard in both the short and long terms due to approved site use.

(6) Construction and grading easements: as may be needed to enter onto a site and either complete any necessary grading and stabilization work so that the site can be used as intended or, in the alternative, to stabilize the site to avoid creating a public health or safety hazard.

(7) Wetland restoration facilities: as may be needed to mitigate damage or disturbance to a wetland caused by activities related to site development.

(8) Landscaping improvements: as may be required to screen or buffer all or portions of the site from adjoining land uses so as to avoid creating noise and harmful visual effects to the public.

(9) Pedestrian facilities: as may be needed to provide trail or sidewalk connections to parkland, community facilities, neighborhood interconnection, and other locations deemed appropriate by the Planning Board.

(9) Any other public facility or requirement of the Planning Board pursuant to a pending plan and/or pursuant to any local law or ordinance of the Town identified or characterized as a public improvement where the same can be found to be necessary in order to provide for the needs of the proposed site while avoiding harmful public health, safety or welfare impacts.

B. Each applicant and developer, including all assignees and successors in interest, shall become and remain responsible for the completion of all public improvements.

## § 57-26. Scheduling of public improvements.

A. Prior to its approval of any site plan, the Planning Board shall fix a schedule for the completion of all public improvements as defined in this chapter. The schedule shall be a condition of approval and shall be incorporated into a public improvement security agreement to be entered into with the Town Board as called for by the Planning Board.

B. Unless no public improvements are required, no site plan shall be approved and no special permit shall be issued by the Board until the applicant has entered into a public improvement security agreement with the Town. The public improvement security agreement shall include, at a minimum, the following elements:

(1) A schedule for completion of all required public improvements.

(2) An itemization of the financial security required for each public improvement and a schedule for its posting or deposit with the Town or reference to a condition requiring such itemization of financial security and scheduling of posting or deposit prior to final approval.

(3) Provision for maintenance, repair or replacement in kind of any public improvements, including but not limited to landscaping, for an appropriate period of time not to exceed two years.

(4) The amount required to be deposited, in escrow, for use in paying the inspector(s) utilized by the Town to inspect all public improvements in order to determine compliance with

the conditions of subdivision approval.

(5) Contractual authorization for the Town to utilize the financial security posted or deposited by the applicant for the purpose of either completing any public improvement or restoring the site to a safe, secure and stable condition in the event that the developer fails to complete all public improvements or delays unreasonably in his obligation to complete same.

(6) The agreement shall provide that no site plan shall be signed until those conditions mandated by the Planning Board or the Town Board to be completed before signing have been satisfied and approved by the appropriate Town official/agent.

(7) The agreement shall provide that no building permit shall be issued until those conditions mandated to be completed before such issuance have been satisfied and approved by the appropriate Town official/agent.

(8) The agreement shall provide that no certificate of occupancy shall be issued until those conditions mandated to be completed before such issuance have been satisfied and approved by the appropriate Town official/agent.

## § 57-27. Performance, restoration and maintenance bonds.

A. Performance bonds. In all cases where site improvements are not constructed prior to the signing of the approved site plan by the Planning Board Chairman, a performance bond shall be posted by the developer to guarantee to the Town that he will faithfully construct, or cause to be constructed, the required public improvements and utilities which were an integral part of his approved final plan.

B. Restoration bonds. In appropriate cases where large areas of a site will be disturbed by earth-moving or other related activities for extended periods of time, a restoration bond shall be posted by the developer to guarantee to the Town that he will diligently restore and stabilize the site and will faithfully construct, or cause to be constructed, the required public improvements and utilities which were an integral part of his approved final plan within a reasonable period of time.

C. Maintenance Bonds. In appropriate cases where public improvements are dedicated to the Town, a maintenance bond may be required by the Planning Board to assure the maintenance of required public improvements for such period as required by the Planning Board.

D. Application, approval and release procedure.

(1) Performance and restoration bond estimates will be prepared by the Town Engineer or Superintendent of Highways On forms to be provided by the Town and such bonds shall be satisfactory in form to the Town Attorney

(2) The Planning Board will pass a resolution either approving or adjusting the performance and restoration bond estimates and will provide four copies signed by the Chairman for the use of the developer in obtaining and posting financial security as required by Chapter 36.

(3) The developer shall present his performance and restoration bonds executed on the standard forms, three copies, with signed copies of the performance and restoration bond estimates attached, to the Town Attorney at least one week prior to any Town Board

meeting, for approval as to form and sufficiency by the Town Board at such meeting.

(4) The Town Attorney shall notify the Town Clerk prior to the Town Board meeting that the performance and restoration bond can be added to the agenda.

(5) The Town Board shall approve or disapprove the performance and/or restoration bond as presented by the Town Attorney. If those bonds are approved, one copy of each will be forwarded to the Town Clerk for his/her records. The Town Clerk shall send official notice to the Chairman of the Planning Board indicating the Town Board's approval. Simultaneously with approval of the bonds the Town Board shall, when so required by the Planning Board, enter into a public improvement security agreement with the developer.

(6) After completing the construction of the public improvements covered by the performance and restoration bonds and prior to the termination of the bond period, the developer shall prepare a set of the approved public improvement and utilities plan and profiles (litho prints on vellum), amended to indicate "as constructed" information, and shall apply to the Town Engineer, Town Inspector or Superintendent of Highways for a final inspection of the work. The Town Engineer, Town Inspector or Superintendent of Highways shall report to the Planning Board on the condition of the work and recommend that the performance bond be released, extended or declared in default. The Town Engineer, Town Inspector or Superintendent of Highways shall also report on the desirability of the Town's accepting the dedication of streets and offers of cession of other lands designated for public use.

(7) The Planning Board shall by resolution release or declare in default each performance and restoration bond. The Planning Board can act to extend the term of the bond in appropriate cases where such action would not be contrary to the intent of this regulation.

(8) The Planning Board shall determine which bonds are required for applications pending before the Planning Board. In addition to the provisions herein that delegate responsibility for bond estimates to the Town Engineer, the Planning Board may, by Resolution, delegate responsibility, as the Board determines appropriate, for all estimates of the amounts of any required bonds to the Town Engineer for applications that come before the Planning Board. Where such estimate amounts have not been sufficiently included in a Public Improvement Security Agreement or Resolution of Approval, the Planning Board shall include a condition in any such Agreement or Resolution indicating that such approval is subject to posting of the required restoration or performance bond in an amount recommended by the Town Engineer and acceptable in form to the Town Attorney.

E. Terms of bonds; extensions.

(1) Performance bonds shall have a maximum term of two years.

(2) The term of a previously approved performance bond may be extended by petition to the Planning Board. When deemed appropriate by the Town Board, a performance bond, or any portion thereof, may be transferred for use as a maintenance bond.

(3) Maintenance bonds shall have a minimum term of one year.

VIII-4

### § 57-28. Required inspections.

A. All public improvements and utilities shall be inspected by the Town Engineer, the Town Inspector retained for such purpose or the Superintendent of Highways to ensure satisfactory completion.

B. In no case shall any public improvement be constructed without permission from the Town Engineer, Town Inspector or Superintendent of Highways. At least three days' notice shall be given to the Town Engineer, Town Inspector or Superintendent of Highways prior to any such construction, so that a representative of the Town may be present at the time the work is to be done.

C. The Town Engineer, Town Inspector or Superintendent of Highways shall be notified after each public improvement identified in the resolution of approval and/or public improvement security agreement has been completed, so that he or his representative may inspect the work.

D. Whenever work on any public improvement appears, in the opinion of the Town Engineer, Town Inspector or Superintendent of Highways, to be in need of alteration in order to properly protect the public safety, health or welfare, then the Town Engineer, Town Inspector or Superintendent of Highways shall have the authority to modify the approved plans, by way of authorizing a field change, so as to properly protect the public safety, health or welfare.

E. Whenever the Town Engineer, Town Inspector or Superintendent of Highways determines that any change any of them deems necessary to properly protect the public safety, health or welfare is of such magnitude or so different from the approved plan in terms of concept or design, he or she may seek the advice and guidance of the Planning Board as to how to implement such a change.

F. A final inspection of all public improvements and utilities will be made to determine whether the work is satisfactory and in substantial agreement with the approved final plat drawings and the Town specifications. If any field changes have been authorized and/or deemed necessary by the Town Engineer, a certified as-built plan must be submitted for review and approval as well. The general condition of the site shall also be considered. Upon a satisfactory final inspection report, action will be taken to release the performance bond covering such improvements and utilities.

### § 57-29. Public improvement inspection fee.

Any applicant who has received site plan approval shall, prior to signing of the plans (unless another time shall be fixed pursuant to a Public Improvement Security Agreement entered into with the Town), deliver to the Town a certified or cashier's check to the order of the Town in the amount of five percent (5%) of the amount of the performance bond or five percent (5%) of the estimated cost of required improvements  unless estimated otherwise in writing by the Town Engineer, in order to cover the expense of the Town inspecting the various public improvements proposed on the site plan. Said amount shall be deposited in an escrow account from which the

expenses of the aforesaid inspections shall be deducted. If, after the developer has satisfied all of the terms of the Public Improvement Security Agreement, there is money remaining in the inspection fee escrow account, the same shall be remitted to the developer. The amount so deposited may, from time to time, be increased or reduced as circumstances dictate.

**§ 57-30. Reserved.**

## Article IX. Architectural and Historic Review

### § 57-31. Architectural review.

A. Findings and purpose. The Town Board hereby finds that excessive uniformity, dissimilarity, inappropriate or poor quality of design in the exterior appearance of buildings or other structures erected or altered can adversely affect the desirability of the immediate and neighboring areas and, by doing so, impair the benefits of occupancy of existing property in such areas, impair the stability in value of both improved and unimproved properties in such areas, prevent the most appropriate development and use of such areas. It is the purpose of this section to prevent these and other potentially harmful effects resulting from unattractive exterior appearance of buildings and other structures erected or altered and thus to promote the public health, safety and welfare, to conserve the value of buildings, to encourage the most appropriate use of land and to protect and improve the physical and visual appearance of the Town of Monroe. It is further the purpose of this section to allow a variety of architectural styles and character while discouraging excessive dissimilarity, inappropriateness or poor quality of design in the exterior appearance of buildings erected or altered.

B. Planning Board review.

   (1) In order to eliminate inappropriate and poor quality design in the exterior appearance of structures erected, reconstructed or altered in any zoning district in the Town, the Planning Board shall have the powers of architectural review for any site plan, special use permit, or subdivision application subject to Planning Board review and approval, other than for a single-family detached dwelling or uses accessory thereto. In any site plan or special use permit, the Planning Board shall review all buildings, structures, landscaping, lighting, solid waste areas, and materials and design associated with same. In any subdivision, the Planning Board shall review all common building or structural elements of a plan, including common landscaping, signage, lighting, fences, and structures including but not limited to stormwater management facilities.

   (2) Any modification, renovation or restoration of a facade, including the lighting of any existing or proposed building other than a single family detached dwelling, shall hereby be subject to architectural review by the Planning Board if it is or was the subject of a site plan, special use permit, or subdivision review. Minor revisions or alterations to existing facades may be waived by the Planning Board.

   (3) An applicant seeking architectural approval for a new construction project, or a rehabilitation project of an existing building, shall include all proposed wall-mounted and freestanding signs with the application. No application for architectural approval shall be deemed complete, and no approval shall be granted, where said application does not include all exterior signage.

C. Advisory consultants; responsibilities. The Planning Board is hereby authorized and empowered to retain as an advisor an architect, landscape architect, or other such expert as it deems desirable or necessary to advise on specific applications. The Board shall restrict its

considerations to a reasonable and professional review of the proposal and plans, leaving full responsibility for the design and development to the applicant. The Board shall not design or assist in the design of any buildings or structures submitted for recommendations.

D. Procedure for review of plan.
  (1) Submission. Upon the filing of a site plan, special use permit or subdivision application, the applicant shall also submit the information set forth herein, and such information that the Planning Board deems necessary to render a decision on the architectural review of the building or structure:
    (a) Any plan submitted to the Planning Board in connection with the application;
    (b) Building permits, renderings, elevations or other information applicable to existing on-site or adjacent buildings, if applicable;
    (c) Architectural data, including plans and elevations, full narrative description of materials, samples, color swatches of all exterior materials - including roofing, trim, siding, windows, doors, lighting fixtures, sidewalk and paving materials to be used; gross building area; height, width and depth;
    (d) Three-dimensional sketch or rendering illustrating significant aspects of construction and exterior design, when deemed necessary and requested by the Planning Board, at a scale deemed appropriate for review by same;
    (e) Any other pertinent details that the Planning Board determines are relevant to the review of the application.

E. Application completeness. An application shall be deemed incomplete until such time as the applicant has submitted all data required by the Planning Board to render a decision. The Planning Board, at the request of the applicant, may waive any of the required submissions, where said submission is deemed unnecessary in order for the Planning Board to render a decision.

F. Site visits. The Planning Board is granted authority to visit the site which is the subject of the application.

G. Submission of preliminary design plans. In connection with the submission of an application, an applicant is encouraged to first submit preliminary designs to the Planning Board for review and comment prior to final design preparation, in order to preclude the burden of submitting multiple revisions of drawings or other materials that are submitted for review.

H. SEQRA. Actions subject to Planning Board review and decision making shall comply with the regulations implementing the New York State Environmental Quality Review Act.

I. Timeframe and decision. All timeframes for a decision shall run concurrent with the decision timeframes for any site plan, subdivision or special use permit. The Planning Board may approve; conditionally approve subject to specific modifications; or disapprove any application, where the Board finds that the building for which the permit is applied would, if constructed, be so detrimental to the desirability, property values or development of the

surrounding area or region as to provoke one or more of the harmful effects set forth in subsection A above.

J.  Standards. In reviewing the plan, the Board shall give consideration to:

(1) The architectural value and significance of the structure and its relationship to the surrounding area.

(2) The general appropriateness of the exterior design, arrangement, texture and materials proposed to be used.

(3) Where new construction, alterations, repairs or additions are undertaken, they shall be consistent with the architectural style of existing buildings or the architectural style of the surrounding area, if deemed appropriate by the Planning Board. The Planning Board shall specifically consider whether on-site or adjacent buildings are historic, and whether the above shall be consistent with same.

(4) Excessive dissimilarity or inappropriateness in relation to any other structure, existing or for which a permit has been issued, in respect to one or more of the following features: cubical content, gross floor area, building area or height of roof or other significant design features, such as materials or style of architectural design.

(5) Excessive similarity to any other structure existing, or for which a permit has been issued, in respect to one or more of the following features of exterior design and appearance: apparently identical front, side or other elevations visible from the street, substantially identical size and arrangement of either doors, windows, porticoes or other openings or breaks in the elevation facing the street, including reverse arrangement; or other significant identical features of design, such as, but not limited to, material, roof line, height or other design elements.

(6) New structures should be constructed to a height visually compatible with the buildings and environment to which they are visually related.

(7) The gross volume of any new structure should be visually compatible with the buildings and environment to which it is visually related.

(8) In the elevations of a building, the proportion between the width and height in the facades should be visually compatible with the buildings and environment to which they are visually related.

(9) The proportions and relationships between doors and windows in the facades should be visually compatible with the buildings and environment to which they are visually related.

(10) The rhythm of solids to voids, created by openings in the facade, should be visually compatible with the buildings and environment to which it is visually related.

(11) The existing rhythm created by existing building masses and spaces between them should be preserved, insofar as practicable.

(12) The materials used in the facades should be visually compatible with the buildings and environment to which they are visually related.

(13) The texture inherent in the facades should be visually compatible with the buildings and environment to which they are visually related.

(14) Colors and patterns used on the facades should be visually compatible with the buildings and environment to which they are visually related.

(15) The design of the roof should be visually compatible with the buildings and environment to which it is visually related.

(16) The landscape plan should be sensitive to the individual building and to its occupants and their needs. Further, the landscape treatment should be visually compatible with the buildings and environment to which it is visually related.

(17) All facades should blend with other buildings via directional expression. When adjacent buildings have a dominant horizontal or vertical expression, this expression should be carried over and reflected.

(18) Architectural details should be incorporated as necessary to relate the new with the old and to preserve and enhance the inherent characteristics of the area.

(19) The setback of the buildings from the street or property line and the other yard setbacks should be visually compatible with the buildings and environment to which they are visually related.

(20) Signs should be of a size, scale, style, materials and illumination that are visually compatible with the building to which they relate and should further be visually compatible with the buildings and environment to which they are visually related.

(21) Any of the factors, including aesthetics, which it deems pertinent.

K.  Design guidelines. The Planning Board, in furtherance of the requirements of the purposes of this section, shall be empowered to enact and adopt by resolution and amend, modify or supplement written rules and regulations constituting specific criteria for consideration under its architectural review powers herein granted. Rules and regulations specifying architectural review criteria shall be available to the public for review. In the absence of any design guidelines, the Planning Board may be guided by applicable standards set forth in the Orange County Design Manual (May 2011).

L.  Substantial change of approved plans. Any substantial change in siting or in the exterior appearance of any approved project may be subject to review and reconsideration by the Planning Board at the discretion of the appropriate referring agency or the Planning Board.

## § 57-32. Historic review.

A. Purpose. It is hereby declared that the preservation of historic sites, areas, buildings and landmarks located in the Town of Monroe is essential to the general welfare of the community, and the purpose of this section is to:

    (1) Safeguard the heritage of the Town of Monroe by preserving sites and districts in the Town which reflect its mining, agricultural, cultural, social, economic, political and architectural history.

    (2) Protect buildings, structures, and areas in the Town which are recognized as architecturally historic sites and landmarks.

    (3) Ensure that new development considers any potential impact on adjoining historic buildings or structures.

    (4) Stabilize and improve property values.

    (5) Foster civic beauty.

    (6) Strengthen the local economy.

B. Applicability. This section shall apply to any building, structure or property within the Town of Monroe that is: listed on the National or State Register of Historic Places; eligible for listing on the National or State Register of Historic Places; any building or structure identified in the Town of Monroe Comprehensive Plan Update in the historic resources section; or, any building, structure, or property identified by the Town of Monroe Historian as a historic property. Listing or eligibility for listing of a property on the National Register of Historic Places or the State Register of Historic Places shall create a presumption of the historic significance of a property. However, other properties not so listed or documented as eligible for listing may still be considered historic under the provisions of this section. The Building Inspector shall not issue a building permit or demolition permit until a certificate of approval of the plans has been issued by the Planning Board. No property, building, or structure shall be constructed, altered, repaired, moved or demolished unless such action complies with the requirements hereinafter set forth.

C. Procedure. Prior to the issuance of a building permit, all plans for the construction, alteration, repair, or demolition of a property, building, or structure regulated by this section shall first be submitted to the Planning Board, which shall have the power to pass upon such plans before a permit shall be granted; provided, however, that the Planning Board shall pass only on such exterior features and shall not consider interior arrangements. In reviewing the plans, the Board shall give consideration to:

    (1) The historic or architectural value and significance of the property, building or structure and its relationship to the historic value of the surrounding area.

    (2) General appropriateness of the exterior design arrangement, texture and materials proposed to be used.

    (3) The scale of proposed alteration or new construction in relation to the property itself, and surrounding properties.

    (4) Texture and materials and their relation to similar features of other historic properties which may adjoin the property or structure under review.

(5) Visual compatibility with surrounding properties, including proportion of the property's front facade, proportion and arrangement of windows and other openings within the front facade, roof shape, and the rhythm of spacing of properties on streets, including setback.

(6) The importance of historic, architectural or other features to the significance of the property.

(7) Any other factor, including aesthetics, which it deems pertinent.

(8) Alterations, repairs and additions to existing buildings shall either be made consistent with the spirit of their architectural style.

(9) New construction shall be consistent with the architectural style of the historic property.

(10) Demolition shall be prohibited if the Planning Board shall determine it to be of a particular architectural or historical significance.

(11) The moving of structures of historic and architectural value may be permitted by the Planning Board as an alternative to demolition.

D. Procedure for review of plan.

(1) Application for a building permit to construct, alter, repair, move or demolish any property, building, or structure regulated herein shall be made to the Building Inspector.

(2) Upon the filing of such application, the Building Inspector shall immediately notify the Planning Board and shall transmit to such Board the application and any supporting plans or documents. The Planning Board shall consider such application and shall approve, approve with modifications, or disapprove the plans and, if it shall approve such plans, shall issue a certificate of approval and transmit the same to the Building Inspector.

(3) If the Planning Board shall disapprove the plans, it shall so notify the Building Inspector, who shall thereupon deny the application for a permit.

(4) Nothing in this chapter shall be construed to prevent ordinary maintenance or repair of any property, building or structure.

E. Advisory review. The Planning Board of the Town of Monroe is hereby authorized and empowered to retain, as an Historical Advisory Board, the Town Historian, architects and other such experts as it deems desirable or necessary, to advise on specific applications. The Planning Board may also refer any application under this section to the Monroe Historical Society, the Orange County Historical Society, and/or the New York State Historic Preservation Office for an opinion as to the historic significance of the structure and recommendations on appropriate restrictions on construction or alteration.

F. Certificate of appropriateness.

(1) No person shall carry out any alteration, demolition, or new construction of a regulated structure until the Planning Board has issued a certificate of appropriateness or a resolution deeming such certificate is not required and, when required, a building or demolition permit from the Building Inspector. The certificate of appropriateness required by this section shall be in addition to, and not in lieu of, any building permit or

IX-6

other approval required by the Town of Red Hook Code.

(2) The Building Inspector shall not issue a building or demolition permit for any activity regulated by this section, other than in the case of an emergency demolition as defined in this Zoning Chapter, until the Planning Board has issued a certificate of appropriateness or a resolution deeming such certificate is not required or, subsequently, upon request for review of the disapproval of such certificate of appropriateness, a certificate of hardship.

G. Application procedure.  Every sketch phase application for a certificate of appropriateness shall be forwarded by the Building Inspector to the Planning Board. The applicant shall provide the Building Inspector with the name, address, and telephone number of the owner and applicant, if different, the property location and tax map number(s), photograph(s), and a sketch or description of the proposed alteration, demolition or new construction.

H. Application requirements for certificate of appropriateness.

(1) Sketch phase. The sketch application shall include the name, address, and telephone number of the owner and applicant, if different, the property location and tax map number(s), photograph(s), and a sketch or description of the proposed alteration, demolition or new construction.

(2) Complete application. The following information is required unless waived by the Planning Board in its discretion:

(a) Photographs and a brief description of any structure proposed to be altered or demolished, including approximate date of construction, name of architect if known, historic and/or architectural significance, and a description of the setting, including related grounds, accessory buildings and structures and property boundaries.

(b) Past 10 years' chronology of the use, occupancy and ownership of the property.

(c) A complete description of the proposed work adequate to provide a full understanding of the work to be done.

(d) Construction drawings and materials lists.

(e) Any other information specific to the proposed alteration, demolition, or new construction required by the Planning Board to make a determination on the application for a certificate of appropriateness, including data to demonstrate compliance with the criteria for approval set forth below.

(f) For a proposed demolition, plans for the redevelopment of the property, including at least one of the following:

[1] A redevelopment plan for the property that provides for a replacement or rebuilt structure for the regulated structure being demolished or relocated, indicating in sufficient detail the nature, appearance and location of all replacement or rebuilt structures; or

[2] For property to remain vacant, a restoration plan for the property following demolition, including a description of the materials, grading, landscaping, and maintenance procedures to be utilized to ensure that the restoration conforms to the approved plan and that landscaping survives in a healthy condition; and/or

IX-7

      [3] A treatment plan for any walls of adjacent buildings exposed as a result of the demolition.

   (g) An environmental assessment form (EAF), when applicable. If demolition is proposed in conjunction with the alteration or new construction of a regulated structure, the EAF shall consider both actions.

I.   Criteria for approval of a certificate of appropriateness.

   (1) Alteration. In reviewing an application for a certificate of appropriateness for the alteration of a regulated structure, the Planning Board shall determine whether the proposed alteration is appropriate, based on the following standards:

      (a) Insofar as possible, the proposed alteration shall retain exterior architectural features of the regulated structure which contribute to its historic character

      (b) Alteration of the regulated structure shall be compatible with its historic character. The Planning Board shall be guided, where appropriate, by the Secretary of the Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings.

      (d) In applying the principle of compatibility, the Planning Board shall consider the following factors:

        [1] The general design, character and appropriateness of the proposed alteration to the regulated structure;

        [2] The scale of proposed alteration in relation to the regulated structure and the applicable district;

        [3] Texture and materials, and their relation to similar features of the regulated structure and similar structures of the same historic period and style;

        [4] Visual compatibility, including proportion of the property's front facade, proportion and arrangement of windows and other openings within the facade, roof shape and the rhythm or spacing of properties along the street or roadway, including consideration of setback and the treatment of yard areas; and

        [5] The importance of the regulated structure and its architectural or other features to the historic significance of the Town or other regulated structures on the lot.

        [6] The history, use, occupancy and ownership of the property.

        [7] Information and/or testimony as to the appropriateness or inappropriateness of the proposed alteration.

   (2) Demolition. In reviewing an application for a certificate of appropriateness for the demolition of all or a portion of a regulated structure, the Planning Board shall consider whether:

      (a) The structure is of such architectural or historic significance that its demolition would be to the detriment of the public interest;

      (b) Retention of the structure in its current form and/or at its present location is important to the Town's history or character;

      (c) The structure is of such old and unusual or uncommon design, texture and material that it could be reproduced only with great difficulty, or not at all;

      (d) Retention of the structure would help preserve and protect an historic place or area

of historic interest in the Town;

(e) Retention of the structure would promote the general welfare by maintaining real estate values and encouraging interest in American history and architecture;

(f) Whether throughout the review process the applicant has consulted cooperatively with the Planning Board, local preservation groups and other identified interested parties in a diligent effort to seek an alternative that would result in preservation of the regulated structure;

(g) In order to approve an application for a certificate of appropriateness for demolition, the Planning Board shall find that the demolition will not result in a significant avoidable diminution of the historic character of the neighborhood and that one or more of the following additional criteria have been met:

[1] The structure or portion of the structure to be demolished is in such condition that its preservation or restoration would not be feasible.

[2] In the case of removal or demolition of a portion of a structure, the historic characteristics of the remaining portion of the structure will remain intact.

[3] After considering the interests of the public and the owner, the benefits of demolition outweigh any reasonable interest in preserving the building.

(3) New construction. Criteria for approval of a certificate of appropriateness for new construction of a regulated property, building or structure.

(a) New construction shall not detract from the historic significance of the property, district or adjacent regulated structures or from the community character. Review of new construction shall be limited to visual compatibility and minimizing impacts to any adjacent regulated structures. In applying the principle of compatibility, the Planning Board shall consider the following factors:

[1] The scale of proposed new construction in relation to adjacent regulated structures and the neighborhood.

[2] The proposed texture and materials, and their relation to similar features of adjacent regulated structures.

[3] The visibility of the property from regulated structures.

[4] Information and/or testimony as to the appropriateness or inappropriateness of the proposed structure in connection with the purpose and intent of this section.

(b) Nothing herein shall prohibit the Planning Board from granting a certificate of appropriateness for a structure of exceptional architectural merit if the Planning Board finds, in writing, that the exceptional architectural merit of the new structure outweighs any visual impacts on nearby regulated structures.

J. Planning Board review procedure.

(1) Upon receipt of a complete application, the Planning Board shall refer the submission to the Orange County Department of Planning and Development pursuant to Section 239-m of the General Municipal Law, when required.

(2) The Planning Board shall hold a public hearing within 62 calendar days after receipt of a complete application. Notice of the public hearing shall be mailed to all property owners within 200 feet of the boundaries of the lot on which the regulated structure for which

the certificate of appropriateness is requested is located and published at least once in the Town's official newspaper at least 10 calendar days prior to the public hearing.

(3) The Planning Board shall render its written decision and findings within 62 calendar days after the conclusion of the public hearing.

(4) Conditions. The Planning Board, in granting any approval, shall have the authority to impose such reasonable conditions and restrictions as necessary.

(5) The Board's decision shall be filed with the Town Clerk and Building Inspector and mailed to the owner and applicant within five (5) business days. If the Planning Board denies approval of the application for a certificate of appropriateness, the applicant may apply for relief, in accordance with the procedures set forth in Subsection L below, on the grounds that the determination results in an economic hardship.

K. Waivers. The Planning Board may waive the requirement for a public hearing, in its discretion, upon a finding that the alteration, demolition or new construction will not result in a significant avoidable diminution of the historic character of the regulated structure or property, and that the alteration, demolition or new construction would be appropriate in relation to any other regulated structure existing or proposed within 300 feet after applying the standards set forth in this section.

L. Certificate of hardship. An applicant whose certificate of appropriateness has been denied by the Planning Board may apply to the Planning Board for relief on the grounds of hardship.

(1) No person who has been denied a certificate of appropriateness shall carry out any alteration, demolition or new construction of a regulated structure without obtaining both a certificate of hardship from the Planning Board and a building or demolition permit from the Building Inspector.

(2) Procedure.

(a) A public hearing shall be held on the hardship application within 62 days of receipt of a complete application by the Planning Board. Notice of the public hearing shall be published in the official newspaper of the Town at least 10 days prior to the hearing.

(b) The Planning Board shall make a decision within 62 days of the close of the public hearing.

(c) The decision of the Planning Board shall be in writing and shall state the reasons for granting or denying the hardship application. If the application is granted, the Planning Board shall approve only such work as is necessary to alleviate the hardship. In granting any approval, the Planning Board shall have the authority to impose such reasonable conditions and restrictions as necessary.

(3) In order to prove the existence of hardship, the Planning Board must find that:

(a) In the absence of the requested hardship determination, the property is incapable of earning a reasonable return, regardless of whether that return represents the most profitable return possible;

(b) In the case of a proposed demolition, the applicant shall establish that:

[1] The property cannot be adapted for any other use, whether by the current owner or by a purchaser, which would result in a reasonable return; and

[2] Efforts to find a purchaser interested in acquiring the property and preserving it have failed.

(4) The applicant shall consult in good faith with the Planning Board, the New York State Historic Preservation Office, preservation groups and interested parties in a diligent effort to seek an alternative that will result in preservation of the property.

(5) The Planning Board shall take into consideration the economic feasibility of alternatives to alteration, demolition, or new construction and balance the interest of the public in preserving the regulated structure or portion thereof and the interest of the owner in alteration, demolition or new construction.

(6) The Planning Board may require that the applicant make submissions concerning any or all of the following information before it makes a determination of hardship:

   (a) Estimate of the cost of the proposed alteration, demolition or new construction, and an estimate of any additional cost that would be incurred to comply with the recommendation of the Planning Board for changes necessary for the issuance of a certificate of appropriateness;

   (b) A report from a licensed engineer or architect, with demonstrated qualifications and experience in rehabilitation, regarding the structural condition of any structures on the property and their suitability for rehabilitation;

   (c) Estimated market value by a licensed appraiser of the property in its current condition; after completion of the proposed alteration, demolition, or new construction; after any changes recommended by the Planning Board; and, in the case of a proposed demolition, after renovation of the existing property for continued use;

   (d) In the case of a proposed demolition, an estimate from an architect, developer, real estate consultant, appraiser, or other real estate professional experienced in rehabilitation, regarding the economic feasibility of rehabilitation or renovation for reuse of a structure proposed for demolition;

   (e) Amount paid for the property, deed, the date of purchase, and the party from whom purchased, and a description of the relationship, if any, between the owner of record or applicant and the person from whom the property was purchased, and any terms of financing between the seller and buyer;

   (f) If the property is income-producing, the annual gross income from the property for the previous two years; itemized operating and maintenance expenses for the previous two years; and depreciation and annual cash flow before and after debt service, if any, during the same period;

   (g) Remaining balance on any mortgage or other financing secured by the property and annual debt service, if any, for the previous two years;

   (h) All appraisals obtained within the previous two years by the owner or applicant in connection with purchase, financing, or ownership of the property;

   (i) Any listing of the property for sale or rent, price asked and offers received, if any, within the previous two years;

   (j) Assessed value of the property according to the two most recent assessments;

   (k) Real estate taxes for the previous two years;

   (l) Form of ownership or operation of the property, whether sole proprietorship, for profit or not-for-profit corporation, limited partnership, joint venture, or other; and

IX-11

(m) Any other information deemed necessary by the Planning Board to make a determination of economic hardship.

(7) Upon a finding by the Planning Board that without the issuance of a certificate of appropriateness all reasonable use of, or return from, the property will be denied a property owner, then the Planning Board shall issue a certificate of hardship approving the proposed work.

M. Expiration.

(1) Certificates of appropriateness and of hardship for demolition shall expire one year from the date of approval. Certificates of appropriateness and hardship for alteration and new construction shall expire if any of the following circumstances occur: work authorized under the Certificate is not commenced and diligently pursued through the completion of substantial construction within 30 months of the date of approval by the Planning Board or within 30 months of the stamping and signing of a related site plan, whichever is later.

(2) Upon prior written request to the Planning Board at least 21 days before expiration, including a statement of justification for the requested time extension, the time in which to exercise the permit may be extended by the Planning Board for a maximum period of six calendar months and one calendar year, respectively.

N. Emergency demolition. Nothing in this section shall prevent the emergency demolition of a regulated structure.

## § 57-33. Required dissimilarity of single-family dwellings.

A. No building permit shall be issued in any district for the erection of any building for occupancy as a single-family dwelling if it is like or substantially like any neighboring building, as hereinafter defined, then in existence or for which a building permit has been issued in more than three of the following six respects:

(1) As to height above natural grade surrounding the building of the main roof ridge or, in the case of a building with a flat roof, the highest point of the roof beams above the elevation of the first floor.

(2) As to height of the main roof ridge above the top of the plate. (All flat roofs shall be deemed identical in this dimension.)

(3) As to length of the main roof ridge or, in the case of a building with a flat roof, length of the main roof.

(4) As to width between outside walls at the ends of the building, measured under the main roof at right angles to the length thereof.

(5) As to relative location of windows in the front elevation or in each of both side elevations with respect to each other, and with respect to any door, chimney, porch or attached garage in the same elevation.

(6) In the front elevation, as to both:

    (a) Relative location with respect to each other of garage, if attached, porch, if any, and the remainder of the building; and

    (b) Either:

        [1] Height of any portion of the building located outside the limits of the main roof, measured from the elevation of the first floor to the roof ridge or, in the case of a flat roof, the highest point of the roof beams; or

        [2] Width of said portion of the building, if it has a gable in the front elevation, otherwise length of said roof ridge or said flat roof in the front elevation.

B. Buildings shall be deemed to be like each other in any dimension with respect to which the difference between them is not more than two feet.

C. Buildings between which the only difference in relative location of elements is end-to-end or side-to-side reversal of elements shall be deemed to be like each other in relative location of such elements.

D. In relation to the premises with respect to which the permit is sought, a building shall be deemed to be a neighboring building if the lot upon which it or any part of it has been or will be erected is a lot in any one of the following locations:

    (1) Abutting a lot occupied by an existing building.

    (2) Across a street from an existing building, with overlapping of the respective lot lines as projected to the street center line.

**§ 57-34 – 36. Reserved.**

## Article X. Prohibited Uses

**§ 57-37. Uses prohibited in all districts.**
In any district the following uses shall be prohibited:

A.  Any trade, industry or use which is noxious or offensive by reason of the emission of smoke, noise, gas, odor, dust, vibration or excessive light beyond the limits of its lot, so as to be dangerous or prejudicial to the public health, safety or general welfare.

B.  Camp, other than a child daycare camp.

C.  Dump or junkyard.

D.  Manufacture or commercial storage of explosive fireworks.

E.  Open-air retail sales establishments, other than those for permitted automotive fuels and accessories, building materials, coal or other heating fuels, farm, garden and nursery produce, equipment, tools and supplies.

F.  Open-front store arranged and designed for the purpose of making sales to persons on the public street or sidewalk.

G.  Rear dwelling, i.e., a dwelling situated behind another dwelling that fronts to the street, unless the Planning Board has approved this type of layout as part of a cluster subdivision.

H.  Rendering plant for animal products.

I.  Shooting galleries and sky rides, Ferris wheels, roller coasters and similar outdoor recreational devices.

J.  Summer cottage development, except as provided in § 57-62.

K.  Temporary seasonal residence on the same lot as the principal use or building.

L.  Vending machines not located entirely within or attached to a principal building.

M. Subterranean basements.

X-1

## Article XI. Supplemental Use and Bulk Requirements

### § 57-38. Accessory buildings and uses.

In any district, the placement of private garages and other accessory buildings shall be subject to the following requirements:

A. No accessory building shall be constructed within five feet of any rear and/or side lot line.

B. Nothing contained herein shall prevent the construction of a private garage as a structural part of a main dwelling, provided that when so constructed, the garage walls shall be regarded as the walls of the main dwelling in applying the front, rear and side yard regulations of this chapter.

C. In any district, no private garage or other accessory building or parking area shall be within a required front yard, except as provided for in §§ 57-38H and 57-51P.

D. No private garage or other accessory building in any district, if detached, shall be placed within 10 feet of the main building.

E. In any OSR-3 or RR-1 District, no private garage or other accessory building shall exceed 35 feet in height; and in any SR-20, SR-15, SR-10 or UR-M District, no private garage or other accessory building shall exceed 15 feet in height.

F. In all residential districts, the aggregate area of all private garages and other accessory buildings shall not occupy more than 40% of the rear yard area.

G. The quartering of domestic animals as pets shall be limited to the customary house pets, except that stables for horses and kennels for dog breeding may be considered accessory uses, provided that such uses shall be at least 150 feet from any property line.

H. In a business park, parking areas may be located within 10 feet of any property line within the business park. In such event, the Planning Board shall ensure that the protective planting required pursuant to § 57-20B(6) will be sufficient to screen the parking area from adjacent uses.

I. Temporary trailers in advance of site plan approval. No temporary trailers shall be permitted or occupied except in accordance with these provisions. Where a site plan application has been submitted to the Planning Board for expansion of an existing nonresidential use permitted in the zoning district in which the use is to be located, the Building Inspector may issue a temporary permit for no more than (5) trailers for a period not to exceed a total period of three (3) years, subject to Planning Board review and approval of the proposed location of said temporary trailers. No single trailer shall exceed 24 feet in width by 36 feet in length. Depending on the number of trailers proposed and the use which will temporarily occupy same, the Planning Board, in its discretion, may require the submission of a site plan in

connection with the review and approval of the temporary permit. Trailer(s) shall be located in a place which is easily accessible to emergency service vehicles, connected to sewer and water service as may be required by applicable health department regulations, and shall not require the removal or result in any damage to existing on-site trees. Said trailers may be occupied during the term of the temporary permit only upon the property for which a site plan application has been submitted. The Planning Board may attach to its approval whatever conditions are deemed necessary to carry out the intent of this section. The maximum occupancy of each trailer shall be established by the Planning Board, and shall be duly noted on the temporary permit which shall be posted on each trailer. Each trailer shall meet all other applicable building code or relevant regulatory requirements. Temporary trailers are not permitted in conjunction with any residential use, or the construction of a new use, building or structure on a lot without existing improvements.

J. Construction office trailer. Where a building permit has been issued for the construction or alteration of a nonresidential development or a residential subdivision, the Building Inspector may issue a temporary permit for one (1) construction office trailer for a period not to exceed six (6) months. Said temporary permit may be extended for additional periods of six (6) months where the Building Inspector finds that construction has been diligently pursued and that justifiable circumstances require such an extension. In no event shall the total period of the temporary permit and extensions exceed three (3) years. Said trailer may be occupied during the term of the temporary permit and shall be situated upon the lot for which the building permit has been issued. Prior to the issuance of the temporary permit, the Planning Board shall have approve the location of the trailer on the lot. The Planning Board may attach to its approval whatever conditions are deemed necessary to carry out the intent of this section.

## § 57-39. Supplemental bulk requirements.

A. Undersized lots.

(1) Notwithstanding the lot area, lot width and lot coverage requirements of the Schedule of District Regulations, a single-family dwelling may be erected on any lot separately owned and not adjacent to any lot in the same ownership at the effective date of this chapter, provided that the aggregate width of the side yards shall not be less than 25% of the lot width, and that the narrower side yard shall not be less than six feet in width. [For lots which cannot conform to these standards, see § 57-65C(7).]

(2) Anything to the contrary notwithstanding, no lot width shall be less than 50 feet, and the width of a lot at any point between front lot line and building setback line shall not be less than this dimension.

B. All yards on corner lots and existing through lots abutting any street shall meet the requirements for front yard setbacks for the district in which the lot is located. On the effective date of this Zoning Chapter, through lots are not permitted.

**§ 57-40. Heights; additional restrictions.**
A.  Height exceptions.

(1) Nothing contained shall restrict the height of a church spire, cupola, dome, mast, belfry, clock tower, radio or television antenna, radio or transmission tower, flagpole, chimney, water tank, elevator or stair bulkhead, stage tower, scenery loft or similar structure.
(2) No structure erected pursuant to § 57-40A(1) shall:
    (a) Have a lot of coverage in excess of 10% of the lot area.
    (b) Be used for residence or tenancy purposes.
    (c) Have any sign, nameplate display or advertising device of any kind whatsoever inscribed upon or attached to such structure.

B.  Additional height limitations.

(1) The purpose of this section is to ensure that the building mass of a new single family detached dwelling, especially when located within a neighborhood of existing single family detached dwellings or when located on an undersized lot in a developed neighborhood, does not dominate the lot in a manner that is inconsistent with the existing massing of dwellings within the neighborhood. In addition, these provisions ensure there is ample yard space between adjoining lots and single family detached dwellings. The Town of Monroe discourages the proliferation of new dwellings that are at variance with the scale of the lot, streetscape and neighborhood due to incongruence of the size, scale, and placement of the new dwelling on its lot.
(2) These requirements shall apply to any lot which is one (1) acre or less in size, and proposed to be constructed with a single-family detached dwelling, whether said lot conforms or does not conform to the dimensional requirements contained in the Schedule of District Regulations applicable to the zoning district in which it is located. The more restrictive height limitation shall apply.
(3) Any single family detached dwelling must be set back from all property lines so that the height of any point of the building or structure is not greater than the horizontal distance of the point from an imaginary vertical line (the "measurement line") drawn upwards from the nearest property line to the building at that location. The height of each point shall be measured from the elevation of the natural grade at the measurement line. Notwithstanding any language in this subsection, the maximum height limitation for a building hereof shall not be exceeded at any point unless the building or structure is exempted from such maximum height limit by Section 57-40.A.
(4) Any single family detached dwelling that does not meet these requirements shall be required to obtain an area variance.

**§ 57-41. Yards, courts and density requirements.**
A.  The space in a required front yard shall be open and unobstructed, except for:

(1) An unroofed balcony or terrace, projecting not more than eight feet.
(2) Steps giving access to a porch or first-floor entry door.

(3) Other projections as specifically authorized in § 57-41C and D.

B.  Every part of a required yard shall be open to the sky, unobstructed, except for retaining walls and for accessory buildings in a rear yard and except for the ordinary projection of sills and belt courses and for ornamental features projecting not to exceed six inches. Cornices and eaves shall not project more than 30 inches.

C.  Open or lattice-enclosed fireproof fire escapes or stairways, required by law, projecting into a yard not more than four feet and the ordinary projections of chimneys and pilasters, shall be permitted by the Building Inspector when placed so as not to obstruct light and ventilation.

D.  In any NB, GB, LI or HI District, every nonresidential building or structure on a lot with a side lot line abutting any residence district shall have a side yard with a minimum width of 50 feet along such abutting side lot line.

F.  In any NB, GB, LI or HI District, every nonresidential building or structure on a lot with a rear lot line abutting any residence district shall have a rear yard with a minimum depth of 50 feet along such abutting rear lot line.

G.  In any NB, GB, LI or HI District, every nonresidential building or structure shall have a planting strip adjacent to every side and rear lot line abutting any residence district. Such planting strip shall be not less than six feet wide, situated within the required side and rear yards, and shall be designed and laid out with suitable evergreen plant material, which will attain and shall be maintained at a height of not less than eight feet so as to provide an effective natural screen between the NB, GB, LI or HI District and the abutting residence district along side and rear lot lines.

H.  In SR-20, SR-15, SR-10 and UR-M Districts, a public or private school approved by the New York State Board of Regents shall have one side yard with a minimum width of 30 feet, and the sum of the widths of the two side yards shall not be less than 65 feet.

I.  In all districts where a public or private school approved by the State Board of Regents is a permitted use, there shall be a planting strip adjacent to every side and rear lot line. Such planting strip shall be not less than 25 feet wide, situated within the required side and rear yards, and shall be designed and laid out with suitable evergreen plant material, which will attain and shall be maintained at a height of not less than 8 feet so as to provide an effective natural screen between the school and the abutting properties along side and rear lot lines.

J.  Corner clearance. On a corner lot, within the triangular area determined as provided in this subsection, no wall or fence or other structure shall be erected to a height in excess of two feet; and no vehicle, object or any other obstruction of a height in excess of two feet shall be parked or placed; and no hedge, shrub or other growth shall be maintained at a height in excess of two feet, except that trees whose branches are trimmed away to a height of at least 10 feet shall be permitted. All such heights shall be measured from the level of the nearest

curb. Such triangular area shall be determined by the intersecting street lines and a diagonal connecting two points, one on each street line, each of which points is 15 feet from the intersection of such street lines.

K.  Where a lot extends through from street to street, the applicable front yard regulations shall apply on both frontages.

L.  Courts.

(1) In all districts the least horizontal dimension of an inner court at its lowest level shall not be less than the larger of the following two dimensions:
   (a) One-third of the maximum height above such lowest level of the building walls erected on the same lot and bounding such court.
   (b) Fifteen feet.
(2) In all districts, the least width of an outer court at its lowest level shall not be less than the largest of the following three dimensions:
   (a) One-third of the maximum height above such lowest level of the building walls erected on the same lot and bounding such court.
   (b) Two-thirds of the horizontal extent of such court. Fifteen feet.
(3) In all districts, the horizontal depth of an outer court shall not exceed 1 1/2 times its least width.

## § 57-42. Commercial and noncommercial swimming pools.

A.  Neither a commercial nor a noncommercial swimming pool shall be located, constructed or maintained on any lot or land area, except in conformity with the following requirements:

(1) The entire portion of the premises upon which such pool is located shall be entirely enclosed with a good quality protective fence of not less than four feet in height.
(2) Every gate or other opening in the fence enclosing such pool shall be kept securely closed and locked at all times when said pool is not in use.
(3) Such pool shall be not less than 15 feet from side and rear lot lines and 15 feet from the main building.
(4) If the water for such pool is supplied from a private well, there shall be no cross-connection with the public water supply system.
(5) If the water for such pool is supplied from the public water supply system, the inlet shall be above the overflow level of said pool.
(6) Such pool shall be chemically treated in a manner sufficient to maintain the bacterial standards established by the provisions of the New York State Sanitary Code relating to public swimming pools.
(7) No permit shall be granted for the installation or construction of said swimming pool unless the plans of said pool shall meet minimum construction requirements of the Building Department of the Town, and unless the Town Engineer or a licensed professional engineer of New York State has certified that the drainage of such pool is adequate and will not interfere with the public water supply system, with existing sanitary

facilities or with public streets.

(8) No loudspeaker or amplifying device shall be permitted which can be heard beyond the bounds of the property or lot where said pool is located.

(9) No lighting or spotlighting shall be permitted which will project light rays beyond the bounds of the property or lot where said pool is located.

B. A commercial swimming pool or a noncommercial swimming pool accessory to a membership club shall also be subject to the following requirements:

(1) Adjacent to every side and rear lot line, there shall be a protective planting strip not less than six feet wide, situated within the required side and rear yards, which shall be designed and laid out with suitable plant material, which will attain and shall be maintained at a height of not less than eight feet so as to provide an effective natural screen alongside and rear lot lines.

C. A noncommercial swimming pool not accessory to a membership club shall also be subject to the following requirements:

(1) Such pool shall be located in a rear yard or side yard only, but not within a minimum required side yard.

(2) Such pool shall not occupy more than 25% of the rear yard area, excluding all private garages or other accessory buildings or structures.

(3) Adjacent to every side and rear lot line within the rear yard area, there shall be a protective strip not less than six feet wide, situated within the required side and rear yards, which shall be designed and laid out with suitable plant material, which will attain and shall be maintained at a height of not less than eight feet so as to provide an effective natural screen alongside and rear lot lines.

## § 57-43. Lots abutting a lake or stream.

A. A building setback line is hereby established in all districts, parallel to and 50 feet distant from the present normal shoreline or bank of every lake or other body of water or ever flowing watercourse or stream in the Town. No main building or accessory building shall be constructed between said setback line and the said shoreline or bank. The location of said shoreline or bank shall be determined by the Town Engineer on the basis of a period of normal water level.

B. No septic tank, sanitary plant, leaching field or other sewage disposal facility shall be constructed or located in any district within 100 feet of the present normal shoreline or bank of any lake or reservoir or other body of water, or watercourse or stream tributary to a reservoir in the Town. The location of said shoreline or bank shall be determined by the Town Engineer on the basis of a period of normal water level.

C. No more than fifty percent (50%) of the total linear feet of shoreline shall be disturbed or cleared within 25 feet of the shoreline, and existing vegetation shall be retained to the

maximum extent.

D. Nothing herein shall be interpreted as requiring less buffer width than what would apply to any wetland as may be regulated in Chapter 56, Wetlands, of the Code of the Town of Monroe. The more restrictive provision shall prevail.

## § 57-44. Supplementary standards for certain uses.

A. Accessory apartments.

(1) It is the purpose and intent of this Section to allow the establishment of one accessory apartment located entirely within a single-family dwelling in order to: provide an opportunity for the development of small rental housing units designed to meet the special housing needs of senior citizens, single persons and small households; to ensure the retention of single-family neighborhood character; allow the more efficient use of the Town's housing stock with minimal impact on community character and resources; and provide economic support for existing resident families. Consistent with the intent of this section, any owner occupying a single-family dwelling may apply to [the Planning Board] for approval for an Accessory Apartment permit to seek the establishment of one accessory apartment. The Planning Board shall review such application, without requiring a public hearing, and strictly apply the standards herein.

(2) Any application for an Accessory Apartment shall require submission of a plan showing the proposed accessory apartment and parcel survey. The Planning Board is not granted the authority to waive any of the standards set forth below except as specifically provided herein:

(a) Accessory to the single-family detached dwelling. Subject to the review and approvals set forth herein, an accessory apartment is allowed in any zoning district that permits a single-family detached dwelling as a permitted use.

(b) Compliance with district regulations. The lot on which the accessory apartment is to be located shall meet all bulk requirements applicable to a single-family detached dwelling as set forth in the Schedule of District Regulations, for the zoning district in which it is located.

(c) Dwelling size. The minimum habitable floor area for an accessory apartment shall be 450 square feet, but in no case shall such accessory apartment exceed 30% of the gross floor area of the single-family detached dwelling in which it is located or 750 square feet of gross floor area, whichever is less. Any building which proposes an accessory apartment that exceeds the maximum habitable floor area requirement shall be deemed a two-family dwelling. An accessory apartment is allowed only entirely within a single-family detached dwelling that complies at the time of application with Section 57-45A of this Zoning Law. The applicant shall submit a floor plan to scale of the single-family detached dwelling that illustrates the interior space within which the accessory apartment will be created. No accessory apartment shall be considered "accessory" where such apartment requires a greater area of a lot or larger setbacks or yards or for which greater

restrictions than for the principal use on the lot are imposed by this Section.

(d) Existing single-family detached dwelling. The principal single-family detached dwelling shall have been lawfully constructed and used as a single-family detached dwelling for at least ten (10) years prior to the date that an application is made for the creation of an accessory apartment. Evidence of such use shall include the date of a duly issued certificate of occupancy for the single-family detached dwelling or other evidence of use that the Planning Board finds adequate to establish that the single-family detached dwelling has been lawfully established and maintained for at least ten (10) years. The Planning Board may waive the ten (10) year requirement upon an evidentiary showing by the applicant establishing that the accessory apartment will enable the owner occupying the principal dwelling to provide care for an elderly or disabled relative residing in the accessory apartment.

(e) Owner occupancy required. The principal single-family detached dwelling wherein the accessory apartment is to be located must be occupied, at the time of application and at all times thereafter while the accessory apartment is established and maintained, as the principal domicile of the record owner of title. Ownership shall be evidenced by the last deed recorded in the office of the Clerk of the County of Orange. Evidence that the dwelling is occupied as the principal domicile of the record owner may be established by an affidavit of the record owner, supported by voting records or such competent evidence as would be sufficient to establish domicile for purposes of voting. It shall be a condition of every certificate of occupancy issued for an accessory apartment that occupancy of such dwelling unit is valid only if the unit is located in an owner-occupied single-family dwelling, and the certificate of occupancy shall prominently display in bold print a statement that occupancy of such accessory apartment is not lawful and valid unless the single-family dwelling is owner-occupied. In the event a certificate of occupancy is issued without such statement, it shall not prevent enforcement of the condition. Nothing herein shall permit the establishment of separate ownership, e.g., condominium, of either dwelling unit.

(f) Maximum number of accessory apartments. There shall be no more than one accessory apartment in any single-family detached dwelling.

(g) The accessory apartment shall comply with all applicable requirements of the New York State Uniform Fire Prevention and Building Code and shall be maintained in a neat and orderly manner.

(h) Off-street parking shall be provided on the following basis: two parking spaces per unit. The parking spaces shall be provided with a backup or turnaround area so that cars which park in the parking spaces are not required to back out into the street. The backup or turnaround area shall not be construed as nor used as a legal parking space.

(i) No use shall be permitted accessory to an accessory apartment.

(j) Each dwelling unit in the structure shall contain its own separate and independent bathroom and kitchen entirely located within each dwelling unit. The accessory apartment shall contain no more than one bedroom and no other space shall, in

XI-8

the determination of the Planning Board, be so configured that it could be used as a second bedroom (e.g., a den, a sewing room, etc.).

(k) No exterior changes or expansion, which may alter its existing foundation, existing roofline, or existing façade, may be made to the principal single-family detached dwelling except for the installation of an entrance to serve the accessory apartment. The structure in which the accessory apartment is located shall have only one front entrance and only one entrance from any other facade of the structure. An exterior entrance leading to a foyer with interior entrances leading from the foyer to the dwelling units will be acceptable pursuant to this requirement.

(l) Lot coverage. The Planning Board may allow an increase in lot coverage to create the required parking spaces pursuant to 57-21 H of this Section, or to construct a sidewalk to the entrance of the accessory apartment. The maximum lot coverage for the single-family detached dwelling applicable to the zoning district within which it is located shall not be exceeded.

(m) The accessory apartment may be in a zone that is serviced by either an on-site septic system or central sewage facility, by a well or central water facility. Adequate water supply and sewage disposal facilities shall be available as certified by a New York State licensed professional engineer, except such certification is not required if the building is connected to public water and sewer services. The adequacy of the water and sewer facilities must be demonstrated to the satisfaction of the Town Engineer during Accessory Apartment permit review.

(3) Detached accessory dwelling.

(a) An accessory apartment within a building detached from the single family detached dwelling located on the same lot is allowed in the OSR-3 zoning district only, and any accessory apartment in a detached building in any other zoning district shall require a use variance.

(b) A detached accessory dwelling shall meet all requirements set forth in this Section 57-44.A., including size relative to single family detached dwelling, and the detached building shall have been in existence for ten (10) years or more.

(c) Nothing herein shall permit any landowner from subdividing the lot so as to place the accessory apartment on an individual lot.

(d) The detached accessory dwelling shall be required to meet the same dimensional standards as the single family detached dwelling applicable to the zoning district in which it is located, regardless of whether the apartment is associated with an accessory detached garage or other building.

(e) There shall be no more than one accessory apartment dwelling on any lot, whether within the single family detached dwelling or in a building detached from same.

(4) Conditions of approval.

(a) In addition to the above standards, the Planning Board shall grant such application and issue the required Accessory Apartment permit only after determining that the issuance of such Accessory Apartment permit will not adversely affect adjoining properties and the general surrounding neighborhood where the

accessory apartment is proposed to be located. In the event that the Planning Board determines a proposed accessory apartment may adversely affect adjoining properties or the surrounding neighborhood, it may, as a condition of approving a permit, require that the applicant establishes and maintains landscaping or fencing, or other mitigation measures, where necessary, to avoid such adverse effects.

(b) It shall be a condition of the accessory apartment permit, whether or not specifically incorporated therein, that:

[1] The owner shall maintain the accessory apartment use in conformance with the requirements of this Section and all applicable provisions of the Uniform Fire Prevention and Building Code, including, but not limited to, the Property Maintenance Code of New York State; and

[2] The accessory apartment permit shall be valid for a period of one year from the date that a certificate of occupancy is issued for the accessory apartment, and that it shall be automatically renewed annually by the Building Inspector upon submission by the record owner of an annual certification for renewal to be provided by the Town, attesting that the principal single-family dwelling is maintained as the owner's domicile; and payment of a renewal fee, in such amount as established by resolution of the Town Board, provided the Building Inspector determines such use has been maintained in accordance with all requirements herein and any applicable conditions of approval.

(c) If the Building Inspector determines at any time prior to renewal that the use has not been maintained in accordance with the requirements herein or any applicable conditions of approval, the Building Inspector shall give notice of such determination to the record owner and the Planning Board shall approve, disapprove, or approve with conditions the Accessory Apartment permit subject to renewal. The Planning Board shall consider the Building Inspector's findings in evaluating whether to renew the Accessory Apartment permit; and if it determines that it intends to deny such renewal or to impose additional conditions on such renewal, the Planning Board shall give written notice of its intent to the record owner at the most-recent address shown on the tax roll of the Town, and provide an opportunity for the record owner to be heard on the matter, and shall consider any evidence submitted by the record owner in support of the renewal of the Accessory Apartment permit. The Planning Board shall thereafter approve, approve with conditions or deny the Accessory Apartment permit, stating the reasons for its decision.

(5) Transfer of title. Within 60 days after the record owner transfers title to premises for which an Accessory Apartment permit has been granted for an accessory apartment, the new record owner shall provide such evidence to the Building Inspector as may be necessary to demonstrate that the principal residential structure is occupied by the new record owner in accordance with § 57-21E of this Section. In the event that the new record owner fails to do so, the Building Inspector shall serve a written notice upon the owner or occupant to do so by a date certain. In the event that the record owner fails to do so, the Building Inspector shall give notice of such noncompliance to

the record owner and the Planning Board, and the Planning Board shall consider the Building Inspector's findings in considering whether to renew the Accessory Apartment permit; and if it determines that it intends to deny such renewal or to impose additional conditions on such renewal, the Planning Board shall give written notice of its intention to the record owner at the most-recent address shown on the tax roll of the Town, and provide an opportunity for the record owner to be heard on the matter, and shall consider any evidence submitted by the record owner in support of the renewal of the Accessory Apartment permit. The failure of the Planning Board to take any action required by this section shall not constitute a waiver of such requirement. The Planning Board shall thereafter approve, approve with conditions or deny the Accessory Apartment permit, stating the reasons for its decision.

(6) Effect of denial of renewal. The Planning Board shall direct that the accessory apartment created pursuant to this Section be vacated, its use as an accessory apartment created pursuant to this Section be discontinued, and that all improvements installed to allow its use as an accessory apartment be removed.

(7) Inspections. The applicant shall agree and acknowledge, in writing, to the Town of Monroe the understanding that, should the parcel be sold, the Building Inspector is authorized to conduct a site visit to verify that the accessory apartment is in compliance with the conditions of the Accessory Apartment permit issued for the property. The Building Inspector, or a duly authorized designee of the Building Inspector, may perform a fire, safety and property maintenance inspection of the accessory apartment upon the request of the owner of the property to be inspected or an authorized agent of such owner or the occupant. In the event that the Building Inspector has a reasonable basis to believe that the accessory apartment or principal structure does not comply with applicable provisions of the Accessory Apartment permit, Chapter 57 or the Uniform Fire Prevention and Building Code, and the owner or an authorized agent or occupant does not consent to such inspection, the Building Inspector may apply for a warrant to permit such inspection. Nothing in this subsection shall permit such inspection in such circumstances unless such warrant has been obtained.

B. Home occupation.

(1). A home occupation may be conducted only within a dwelling which is a bona fide residence of the principal practitioner of the occupation. A home occupation shall fall within one of the following three categories:

(a) Exempt home occupation. A home occupation in compliance with the criteria and standards for "Exempt Home Occupations" in the table below and the general standards set forth in this Section 57-44.B shall be permitted as an accessory use and shall not require registration or special use permit approval.

(b) Minor home occupation. A home occupation in compliance with the criteria and standards set forth for "Minor Home Occupation" in the table below and the general standards set forth in this Section 57-44.B shall be permitted as an accessory use upon registration with the Building Inspector and shall not require special use permit

approval. A home occupation shall be deemed a major home occupation where it exceeds any one of the operational or site criteria for an exempt or minor home occupation set forth below.

(c) Major home occupation. A home occupation in compliance with the criteria and standards set forth for "Major Home Occupation" in the table below and the general standards set forth in this Section 57-44.B shall be allowed only upon receipt of special use permit approval from the Planning Board. The Planning Board is permitted to waive the requirements for site plan submission where same is determined not to be requisite in the Planning Board's determination. The Planning Board may impose conditions necessary to protect the health, safety and welfare of adjoining properties and the Town.

(2) Table of Operational and Site Criteria Defining Home Occupation Types:

| | Exempt Home Occupation | Minor Home Occupation | Major Home Occupation |
|---|---|---|---|
| Where Permitted | Permitted in an existing single-family detached dwelling or two family dwelling. | Permitted in an existing single-family detached dwelling. | Permitted in an existing single-family detached dwelling or building accessory thereto. |
| Maximum Size | Total gross floor area devoted to the home occupation shall not exceed 150 square feet, or 30 percent of the dwelling, whichever is less. | Total gross floor area devoted to the home occupation shall not exceed 250 square feet, or 30 percent of the dwelling, whichever is less. | Total gross floor area devoted to the home occupation exceeds 250 square feet, but shall not exceed 450 square feet, or 30 percent of the dwelling, whichever is less. |
| Maximum Number of Employees | On-site nonresident employees are not permitted. | Maximum of one (1) on-site nonresident employee is permitted. | Maximum of two (2) on-site nonresident employees is permitted. |
| Maximum Number of Visitors/ Customers | There shall not be any visitors/customers of the home occupation. | There shall not be any visitors/customers of the home occupation. | The home occupation may include up to a total number of four (4) visitors/customers per day. The Planning Board may further limit the maximum number of visitors/customers as a condition of approval. |
| Maximum Number of Deliveries | Only deliveries made by U.S. Mail, or by package carrier (e.g., United Parcel Service or FedEx). No more than one (1) package carrier delivery per day. | Only deliveries made by U.S. Mail, or by package carrier (e.g., United Parcel Service or FedEx). No more than one (1) package carrier delivery | The Planning Board may establish conditions on the maximum number of deliveries or pick-ups to and from the dwelling based on a consideration on the potential |

XI-12

| | Exempt Home Occupation | Minor Home Occupation | Major Home Occupation |
|---|---|---|---|
| | | per day. | effect on adjoining properties. |
| **Required Off-Street Parking** | No additional parking required. | A maximum of one (1) off-street parking space for the nonresident employee shall be provided. | A home occupation requiring two (2) or more parking spaces for nonresident employees and visitors/customers. Total minimum number of parking spaces to serve the home occupation shall be determined by the Planning Board. |
| **Maximum Number of Commercial Vehicles** | As regulated in §57-51.D. | As regulated in §57-51.D. | As regulated in §57-51.D. |
| **Permitted Signs.** | As regulated in §57-56.A. | As regulated in §57-56.A. | As regulated in §57-56.A. |
| **Conditions of Approval** | None | Registration with the Building Inspector. | The Planning Board may impose conditions on the operation of the home occupation, including but not limited to: maximum number of employees, maximum size of home occupation, maximum number of commercial vehicles, hours of operation including for visitations and deliveries, screening, lighting, and other requirements necessary to protect the health, safety and welfare of the occupants or the residential neighborhood in which said home occupation shall be located. |

(3) General Standards applicable to all home occupations. The following criteria and standards apply to exempt, minor and major home occupations.
   (a) It shall be carried on by a member of the family residing in the dwelling unit.
   (b) Exterior Appearance of Principal Dwelling. In no manner shall the appearance of the existing principal dwelling be altered, nor shall the occupation within the dwelling be conducted in a manner that would cause the premises to lose its residential character, either by the use of colors, materials, construction or lighting.

XI-13

(c) It shall be clearly incidental and secondary to the use of the dwelling unit for residential purposes and shall not occupy more than the equivalent of one-half of the gross floor area of the story on which it is to be located and conducted.

(d) Performance Standards. No home occupation shall create noise, dust, vibration, odor, smoke, electrical interference, fire hazard or any other nuisance that is perceptible beyond the lot lines. No toxic, explosive, flammable, combustible, corrosive, disease carrying, radioactive, or other restricted materials shall be used in the operation of a home occupation.

(e) Prohibited Uses. In addition to uses that are prohibited by regulations elsewhere in this Zoning Law, nothing herein shall be constructed to allow the following uses as home occupations: adult entertainment or sexually-oriented businesses, animal hospitals, the commercial boarding of animals, clinics or hospitals, dancing schools, mortuaries, nursery schools, any automotive-related repair or retail sales, restaurants, taxi operators or dispatchers, tow-truck services, tattoo parlors, therapists not licensed by the State of New York, bed and breakfasts, rooming houses or boardinghouses, on-site storage of construction vehicles or equipment, beauty parlor, barbershops and hairdressing and manicuring establishments.

(f) Except for articles produced on the premises, and other articles customarily associated with the product made or the service provided on the premises, no stock-in-trade shall be displayed or sold on the premises, as would be the case of a retail store or a specialty shop, nor shall any item be available for rental. No display of products shall be conducted exterior to the dwelling.

(g) Storage. There shall be no exterior storage of materials, equipment, or vehicles or other supplies used in conjunction with the home occupation except as may be allowed elsewhere in this Zoning Law or by approval of the Planning Board as a condition of a major home occupation. It shall not require storage or standing of any construction equipment. In addition, there shall be no use of any chemical, mechanical or electrical equipment which is not a customary household appliance or light office equipment unless approved by the Planning Board in conjunction with a major home occupation.

(h) All home occupations shall meet all requirements set forth in the New York State Uniform Fire Prevention and Building Code.

(i) Deliveries. The Planning Board may impose restrictions on the number of deliveries per day in connection with a special use permit.

(j) There shall be no sharing, letting or subletting of space for use by others in the conduct of their profession, trade, or business.

(k) Parking shall be located on the property as required by the Zoning Law. The parking requirements shall not be met by use of off-premise parking. Parking for the home occupation shall be in addition to the minimum number of parking spaces otherwise required for the single-family detached dwelling. For major home occupations, the Planning Board may impose restrictions on the location of parking required in conjunction with the use.

(l) In no case shall a home occupation be open to the public earlier than 9:00 a.m. or later than 8:00 p.m. unless modified by the Planning Board.

(m)The special permit or registration shall expire upon sale, transfer, or lease of the property. In no event shall a special permit be issued for a time period greater than three (3) years without renewal by the Planning Board.

(n) For purposes of this section, the term employee shall mean any person performing services in connection with the home occupation business and on the premises where the home occupation is being operated whether considered as an employee or an independent contractor.

C. Indoor and outdoor sports facilities. Site plan approval pursuant to Article VI of this chapter shall be required for indoor and outdoor sports facility uses. Indoor and outdoor sports facilities shall satisfy the following requirements:

(1) Suitable outdoor trash receptacles shall be provided in sufficient number to service all outdoor sports facilities. Outdoor trash receptacles shall be emptied frequently enough to avoid overflow and litter and to avoid creating insect nuisances and other unsightly or malodorous conditions.

(2) All outdoor playing fields shall be set back by at least 50 feet from buildings, business park property lines, drives, vehicular access ways and public and private roads so as to avoid creating a hazard to public health and safety. Chain link fences of appropriate heights may be used to help prevent balls from leaving the playing fields, but such fences shall be adequately constructed and maintained so as to fulfill their intended function.

(3) Outdoor fields may be equipped with lights to permit evening play, provided that lights shall be directed so as to avoid creating a traffic hazard, excessive glare or nuisance to adjoining residential land uses.

(4) Toilet and lavatory facilities shall be provided accessible to indoor and outdoor sports facilities. Sanitary facilities, sewage disposal and water supply shall be adequate and in compliance with applicable state and local regulations.

(5) Parking for outdoor sports facility: Parking for outdoor sports facilities shall be improved with a dustless surface such as Item 4 and/or oil and chip and shall be properly drained but need not be paved due to the seasonal nature of its use. A minimum number of parking spaces equal to 2.5 times the number of players required for the sports field in question shall be provided. Parking areas for outdoor sports facilities shall be convenient to the playing fields to which they are accessory but may be centrally located so that several fields have access to the same parking area.

(6) Parking for indoor sports facility: five paved parking spaces per 1,000 square feet of gross leasable area.

## § 57-45. Minimum habitable floor area and width.

A. Dwelling units in single- and two-family detached dwellings shall have a minimum habitable floor area of not less than 900 square feet.

B. A single-family detached dwelling shall have a minimum width of 20 feet.

C. Minimum habitable floor area requirements for individual dwelling units within multiple dwelling groups shall be 600 square feet for efficiency units, 750 square feet for one-bedroom units, 900 square feet for two-bedroom units and 1,000 square feet for two-bedroom-and-den or three-or-more- bedroom units.

D. Minimum habitable floor area requirements for individual dwelling units within multiple dwelling groups devoted to and constructed specifically for senior citizens shall be 450 square feet for efficiency units, 600 square feet for one-bedroom units and 750 square feet for two-bedroom units. All other units shall exceed 1,000 square feet in area.

E. The provisions of this section shall not apply to mobile home parks.

## Article XII. Parking and Loading Space Requirements; Garages and Service Stations

### § 57-46. Provision for off-street parking required.

Off-street parking spaces for the storage or parking of passenger vehicles of occupants, employees and patrons of main buildings and structures hereafter erected or enlarged shall be provided and kept available in accessory private garages or in accessory private parking areas in amounts not less than specified in this article.

### § 57-47. Method of determining off-street parking requirements.

A.  The requirements for a simple use (e.g., a single-family residence or a retail store) shall be determined directly from the related provision of this section.

B.  The requirements for a use made up of several component uses (e.g., a bowling alley with auditorium seating and a restaurant and bar or a retail store and office building) shall be determined by establishing the requirements for each component use and adding them together.

C.  When the required number of spaces is determined to be a fraction, it shall be increased to the next highest whole number.

D.  If a use is not specifically listed in this article, the requirements shall be the same as for the most similarly listed use.

E.  At the time of individual site plan approval for uses located within a business park, the adequacy of accessory parking areas and truck loading spaces for that use shall be subject to review and determination by the Planning Board. After consideration of an appropriate parking needs study for the proposed use and the overall business park, the Board may reduce the actual parking area and/or loading spaces that would otherwise be required by this article by up to 25% in instances where it is demonstrated to the satisfaction of the Board that the combination of uses within the business park will generate parking needs that do not overlap or will not occur simultaneously or that the actual parking requirements of the proposed use are less than would otherwise be required by this article.

F.  In appropriate cases, the Planning Board may reduce the number of parking spaces to be constructed prior to issuance of a certificate of occupancy. As a condition of such reduction the applicant shall demonstrate that an appropriate area is available to meet the parking area requirements of this article, and such area shall be identified and reserved for parking purposes on the site plan for three years following approval of the site plan. The Planning Board may require the applicant to provide a sufficient bond to allow construction of the improvements in such parking area as a condition of site plan approval, and may require construction of the improvements at any time during that three-year period on its finding that the additional parking area is necessary to accommodate the actual parking requirements of the occupied site.

XII-1

G. At the time of individual site plan approval for uses located in the GB District, the adequacy of accessory parking and truck loading spaces shall be subject to review and determination by the Planning Board. After consideration of an appropriate parking needs analysis for the proposed site use, the Board may reduce the actual number of parking spaces and, if applicable, loading spaces that would otherwise be required by this article by up to 75% in instances where it is demonstrated to the satisfaction of the Planning Board that the specific use or combination of uses on the site will be less than otherwise required by this article. Reference to this finding shall be included on the plan as well as in the Planning Board's approval resolution and filed with the Building Inspector. The Planning Board may require, at its option, that the site be capable of accommodating any portion of this reduced number of parking spaces and be bonded pursuant to § 57-47F.

## § 57-48. (Reserved)

## § 57-49. Parking area requirements for nonresidential uses; off-street parking requirements for residential uses.

A. In all districts, the minimum required number of parking spaces to be provided in private garages or private parking areas accessory to main buildings or structures or uses of land permitted in any given district shall be in accordance with the following regulations:

(1) Auditorium, convention hall, stadium, theater, dance instruction studio or other place of public assembly not otherwise classified: one parking space for each three fixed seats of capacity, or one parking space for each 40 square feet of floor area available to patrons in cases where the capacity is not determined by the number of fixed seats. Benches shall be deemed to have a capacity of one person for each 20 inches of length.

(2) Bank or savings and loan association: one parking space for each 200 square feet of gross floor area of all stories of the building.

(3) Billiard parlor: two parking spaces for each table.

(4) Bowling alley: four parking spaces for each alley.

(5) Building construction, involving 10 or more employees at one time: one parking space for each person customarily employed at any one period of time. Such parking spaces will not be required to be paved.

(6) Charitable institution: one parking space for each 150 square feet of floor area devoted to office or administrative use.

(7) Club or lodge for social or civic purposes or community center building: one parking space for each 150 square feet of floor area available to patrons.

(8) Commercial swimming pool: one parking space for each 25 square feet of water surface area, exclusive of the water surface of wading pools.

(9) Drive-through restaurant or refreshment stand or outdoor retail establishment: one parking space for each 40 square feet of building area devoted to retail sales and the display of goods for sale.

(10) Automotive filling station, public garage or service station: sufficient parking spaces for all vehicles being serviced at one time and a minimum of five parking spaces.

(11) Funeral home: one parking space for each 40 square feet of floor area devoted to assembly rooms for services.

(12) Hospital: for in-patient uses, one parking space for each bed plus two parking spaces for each three persons customarily employed at any one period of time; for out-patient uses, including but not limited to emergency room, immediate care and any other outpatient clinical, testing or therapeutic uses, one parking space for each 150 square feet of floor area used for such purposes.

(13) Manufacturing or industrial establishment, wholesale establishment or distribution center: two parking spaces for each three employees customarily employed at one time.

(14) Membership club: one parking space for each 150 square feet of floor area available to patrons.

(15) Offices and office buildings: one parking space for each 200 square feet of floor area or two parking spaces for each three employees customarily employed at one time, whichever is greater.

(16) Neighborhood shopping center: one parking space for each 150 square feet of floor area available to patrons.

(17) Public library, art gallery or museum: one parking space for each 200 square feet of floor area available to patrons.

(18) Research institute or laboratory: two parking spaces for each three employees customarily employed at one time.

(19) Restaurant or tavern: one parking space for each 45 square feet of floor area.

(20) Retail store, personal service store or studio or shop for custom work: one parking space for each 150 square feet of floor area available to patrons.

(21) School: one parking space for each employee, or such number of parking spaces as are required for an auditorium, computed pursuant to Subsection A(1), whichever is the greater.

(22) Wholesale warehouse and storage: one parking space for each 2,000 square feet of gross floor area or two spaces for each three persons customarily employed at any one time period of time.

(23) Veterinarian's establishment or animal hospital: one parking space for each 200 square feet of the facility area devoted to such use.

(24) Medical office/arts building: one parking space for each 100 square feet of floor area or five parking spaces per licensed medical professional or per examination room, whichever is greater.

(26) Hotel: one parking space for each guest unit plus one parking space for each employee customarily employed at one time.

B. Off-street parking requirements for residential uses shall be as follows:

(1) One-family dwelling, attached or detached: two per unit.

(2) Dwelling unit in a two-family building: two per unit.

(3) Efficiency dwelling in a multiple dwelling group structure: 1.5 per unit and 1.0 per unit for senior citizens residences.

(4) One-bedroom dwellings in a multiple dwelling group structure: 2.0 per unit and 1.5 per

unit for senior citizen residences.

(5) Two-bedroom dwellings in a multiple dwelling group structure: 2.5 per unit and 2.0 per unit for senior citizen residences.

(6) Three-bedroom dwellings in a multiple dwelling group structure: 2.75 per unit.

## § 57-50. Required off-street truck-loading spaces.

Every building or structure, lot or land hereafter put into use for business or industrial purposes or for a hospital, which has an aggregate floor area of 4,800 square feet or more in an LI or HI District or of 15,000 square feet or more in any other district where such uses are permitted shall be provided with off-street truck-loading spaces in accordance with the following schedule:

| Square Feet of Aggregate Floor Area Devoted to Such Use | Required Number of Off-Street Truck- Loading Spaces |
|---|---|
| 4,800 to 25,000 in any LI or HI District | 1 |
| 15,000 to 25,000 in other districts | 1 |
| 25,001 to 40,000 in all districts | 2 |
| 40,001 to 100,000 in all districts | 3 |
| Each additional 60,000 in all districts | 1 additional |

## § 57-51. Supplemental regulations.

A. In all districts, an accessory garage or accessory parking area shall be subject to the applicable regulations for accessory buildings and uses prescribed in § 57-38.

B. In all districts, an access drive to an accessory garage, parking area or truck-loading space may be located within a required side yard.

C. In any residence district, a private garage or private parking area may be utilized only as an accessory to the main building, except that one parking space in a private garage accessory to a one-family or two-family dwelling may be rented to a person who is not a resident of the main building.

D. In any residence district, not more than one commercial vehicle, with a gross weight limited to 3/4 of one ton, may be housed on any lot, and then only in a private garage, except that motorized equipment properly accessory to garden apartments or multiple dwellings may be housed, but only within a roofed enclosure.

E. In any residence district, not more than 50% of the area of a minimum required rear yard shall be used as a parking area.

F. In all districts, required garages or parking areas accessory to any permitted residence use shall be on the same lot with the main building or buildings or on an immediately adjacent lot in the same ownership.

G. In all districts, required garages or parking areas accessory to any permitted nonresidential

use shall be on the same lot or parcel of land with the main building, buildings or use, except that where there are practical difficulties or unnecessary hardships, the Board of Appeals may grant a permit for a required parking area to be located on other property, subject to appropriate safeguards, within 500 feet of the property to which it is accessory, measured in a straight line between the nearest point of the property to be served. Such permit shall be subject to safeguards and conditions designed to assure the continuing availability of such parking area to serve the use to which it is accessory for a minimum term of 20 years; provided, however, that a different parking area may be substituted therefor at any time within such twenty-year period, on approval of the Board of Appeals and subject to similar safeguards and conditions.

H. In all districts, required accessory parking areas and truck-loading spaces shall have safe and adequate access to a public street, either by a driveway on the same lot or by means of a permanent easement across an adjoining lot.

I. In any nonresidential district, except in the LI District, an accessory parking area may be situated in whole or in part on the roof of the main building to which it is accessory.

J. The adequacy of accessory parking areas and truck-loading spaces for special uses shall be subject to review and determination as an integral part of the review of the site plan by the Planning Board, as provided in the applicable provisions of this chapter.

K. Accessory parking areas shall be marked off into parking spaces, each with a minimum width of nine feet and a minimum length of 18 feet, exclusive of access driveways and turning areas. The left and right sides of parking spaces shall be delineated by two four-inch-wide painted lines running the length of the parking space and separated by eight inches.

L. An off-street truck-loading space shall have a minimum width of 10 feet, a minimum length of 25 feet and minimum clear height of 14 feet, including its access from the street.

M. Accessory nonresidential parking areas and off-street truck-loading spaces shall be suitably paved, drained and lighted and appropriately planted and fenced for the protection of adjacent residential properties, in accordance with specifications of the Town. Driveways and turning areas shall be of adequate width and radii to assure ease of mobility, ample clearance and convenient access, egress and safety of vehicles and pedestrians. Such facilities shall be maintained in good condition by the owner.

N. No required accessory parking area nor off-street truck-loading space shall be encroached upon by buildings, open storage or any other use.

O. Accessory private garages may be constructed within or under any portion of a main building, provided that the access driveway does not at any point have a grade in excess of 10%.

P. In all residence districts, wherever the average level of the ground within 10 feet of the street

line at the front of the lot is eight feet or more above the curb level, an accessory private garage for not more than two cars may be located not less than 10 feet from such street line.

Q. In private garages accessory to garden apartments, no repairing of cars shall be done, but washing of tenants' cars shall be permitted, if done without the aid of washing machinery.

R. Private garages accessory to garden apartments shall conform in exterior architectural style and treatment to the architecture of the main building or buildings and shall be of similar materials.

S. No manufacturing or industrial building or use of land and no wholesale business shall have any truck- loading space or spaces or access driveway for trucks within 30 feet of any residence district.

T. Parking lots with more than 30 spaces shall devote at least 5% of the parking lot area to landscaping within the interior of the parking lot. Such landscaping shall be in addition to that which may be required along the property line and, at the Planning Board's option, shall include at least one tree for every eight parking spaces. Such landscaping shall be maintained in perpetuity by the site owner, his lessees or assigns.

### § 57-52. Access driveways.

All access driveways for a public garage, public parking area, filling station or service station may have separate or combined entrances and exits. Every separate-entrance or exit-access driveway shall have a minimum unobstructed width of 10 feet. Every combined entrance and exit-access driveway shall have a minimum total unobstructed width of 20 feet.

### § 57-53. Additional requirements for garages and automotive filling (gasoline) stations.

A. No public or private garage accommodating more than five vehicles and no automotive service or filling station shall be located or shall have an entrance or exit within 150 feet of the entrance to a public or a parochial school, private school, public library, theater, assembly hall, church, hospital, semipublic institution, public park, playground or fire station.

B. All public garages and automotive service and filling stations shall be so arranged and all gasoline pumps shall be so placed as to permit all services to be rendered entirely within the lot lines. No gasoline or oil pump shall be placed within 10 feet of any street line or side lot line nor within 20 feet of any residence district boundary line.

### § 57-54. Exceptions and waivers.

A. Nonapplicability to existing buildings and uses. The provisions of §§ 57-47 to 57-50, inclusive, shall not apply to any building, structure or use lawfully in existence at the effective date of this chapter, whether continued as a permitted or a nonconforming use or thereafter converted or changed without enlargement to a different lawful use.

B. General waiver of requirements for nonresidential uses. The Zoning Board of Appeals, subject

to the applicable provisions of § 57-65, may waive the requirements, in whole or in part, for accessory parking areas stipulated in §§ 57-49 and 57-51.

## Article XIII. Signs

### § 57-55. Maximum permitted sizes.

In all districts, maximum permitted sizes of signs of each listed type shall be in accordance with the regulations contained in the following schedule:

### § 57-56. Supplementary regulations.

| Zoning District | Professional or Announcement Sign on Residence Building (square feet) | Business Signs Identification of Business or Industrial Building or Use (square feet) | Real Estate "For Sale" or "For Rent" sign or Construction Sign (square feet) | Advertising Signs (square feet) |
|---|---|---|---|---|
| OSR-3 RR-1 SR-20 SR-15 SR-10 UR-M | 2 | Prohibited, except where specifically permitted under special exception provision | 12 | Prohibited |
| NB | 3 | 2 for each one- foot width of building facade | 12 | Prohibited |
| GB; BP-O; HI | 3 | 2 for each one- foot width of building facade | 12 | 300 |
| LI | Prohibited | 2 for each one- foot width of building facade | 12 | Prohibited |

A.  A professional or announcement sign of a home occupation on a residence building shall be fixed flat on the main wall of such building and shall not project more than six inches. Such sign may be interiorly lighted in the cases of the office of a physician or dentist only.

B.  A name or announcement sign, not over six square feet in area, fixed to the main wall of a place of worship, club, school or public or semipublic building shall be permitted in any district. Such sign may be interiorly lighted. Not more than three such signs shall be permitted on a lot.

C.  No business or advertising sign shall project more than 12 inches from the building facade to which it is attached.

D.  No business or advertising sign that is part of or is supported by a building shall be erected upon the roof of such building, nor shall such sign extend above the height of the building.

E.  No business or advertising sign structure that is not a part of or supported by a building shall be more than 18 feet in height above the average ground level at the base of such sign.

F.   No business or advertising sign structure erected directly upon the ground shall have less than three feet of clear space between such sign and the ground, provided that necessary supports may extend through such open spaces.

G.  No business or advertising sign structure erected directly upon the ground shall have an unbroken length of more than 25 feet.

H.  No business or advertising sign structure erected directly upon the ground shall be within five feet of any other such sign structure.

I.   No advertising sign shall be erected, attached or displayed within 25 feet of the point of intersection of the street lines at a street corner.

J.   Business and advertising signs may be interiorly lighted with nonglaring lights or may be illuminated by shielded floodlights; provided, however, that no red or green lights shall be permitted within 75 feet of the point of intersection of the street lines at a street corner. No lights of the intermittent flashing type shall be permitted.

K.  No business or advertising sign shall be permitted upon any lot or building in any district, unless it is a structure or a part of a structure, or is attached to or displayed upon a structure, as defined in § 57-3 under "structure."

L.   A real estate "for sale" or "for rent" sign or a construction sign shall apply only to the property upon which the sign is placed. It shall not be erected within a minimum required front yard, nor nearer to the street line than the front wall of the main building on the property, if any, whichever dimension is the greater. Not more than three such signs shall be permitted on any one property or premises.

M.  No business sign other than a professional or announcement sign, and no advertising sign, as such terms are defined in § 57-3 under "sign, business" and under "sign, advertising," respectively, shall be erected, hung, attached or displayed until written application has been made to the Building Inspector and a permit therefor has been duly issued by him or her, upon payment of the established fee.

XIII-2

### Article XIV. Nonconforming Uses, Buildings or Structures

**§ 57-57. Unlawful uses; establishment of nonconforming uses.**

A. No unlawful building or structure or unlawful use of a building or structure, lot or land, existing at the effective date of this chapter, shall be deemed to be a nonconforming building, structure or use.

B. All buildings or structures or uses of a building or structure, lot or land, lawfully existing prior to the effective date of this chapter, or of subsequent amendments of it, which do not conform to the provisions of this chapter, shall be the subject of an application filed within six months in the office of the Building Inspector so that their status as legal nonconforming uses may be established.

**§ 57-58. Continuance of nonconforming uses.**

A. Any lawful use occupying any building, structure, lot or land at the time of the effective date of this chapter or any amendment thereto, which does not comply, after the effective date of this chapter or any amendment thereto, with the use regulations of the district in which it is situated, may be continued in the building or structure or upon the lot or land so occupied.

B. A building or structure used by a nonconforming use at the effective date of this chapter may not be reconstructed, structurally altered, restored or repaired to an extent exceeding in aggregate cost 75% of the fair market value of such building or structure, unless the use of such building or structure is changed to a conforming use. The Board of Appeals may grant a variance, in accordance with the provisions of § 57-65C(3) for a reconstruction, structural alteration, restoration or repair exceeding such 75% of the fair market value of such building or structure.

C. A nonconforming building or structure that is not devoted to a nonconforming use may be reconstructed, structurally altered, restored or repaired in whole or part, and the provisions of Subsection B above shall not apply.

**§ 57-59. Extension of nonconforming uses.**
A nonconforming use shall not be enlarged or extended, except as provided in § 57-65C(2).

**§ 57-60. Changes of nonconforming uses.**
A nonconforming use shall be changed only to a conforming use, except as provided in § 57-65C(4).

**§ 57-61. Abandonment of nonconforming uses.**

A. A nonconforming use shall be deemed to have been abandoned:

(1) When it is changed to a conforming use.
(2) In cases where such nonconforming use is of a building or structure designed for such use, or when it has been voluntarily discontinued for a period of 12 consecutive months.

(3) In cases where such nonconforming use is of a building or structure not designed for such use or is of a lot or land whereon there is no consequential building or structure devoted to such use, when it has been voluntarily discontinued for a period of 12 consecutive months.

B.  A nonconforming use that has been abandoned shall not thereafter be reinstated.

### § 57-62. Nonconforming summer cottage developments.

A.  Any property lawfully used on or before the third day of September 1954 for the purpose of a rental summer cottage development or bungalow colony shall be considered a lawful nonconforming use and may be continued.

### Article XV. Zoning Board of Appeals

**§ 57-63. Establishment, organization, procedures and records.**

A. Establishment. Pursuant to the Town Law of the State of New York, Article 16, § 267, Chapter 62 of the Consolidated Laws, there shall be a Zoning Board of Appeals (also referred to as "Board of Appeals" or ZBA in this Chapter).

B. Zoning Board of Appeals heretofore established. The Board of Appeals heretofore established shall continue to function under the provisions of this chapter, and the members thereof may continue in office until their respective terms expire.

C. Secretary. The Board is authorized to employ a Secretary or Clerk, who is not a member of the Board, at a salary to be fixed by the Town Board.

D. General grant of power. The Board of Appeals shall perform all the duties and have all the powers as prescribed by the Town Law and as herein more particularly provided.

E. Rules of procedure. The Board shall adopt and file in the Town Clerk's office such rules of procedure, not inconsistent with the provisions of Town Law and local ordinance, as it may deem necessary to the proper performance of its duties and the proper exercise of its powers. The existing rules and regulations of the Board of Appeals heretofore established, insofar as not inconsistent with this chapter, are hereby continued in force and effect, until amended or repealed by the Board.

F. Meetings. Meetings of the Board shall be held at the call of the Chairman and at such other times as the Board may determine. All meetings shall be open to the public.

G. Public hearings.

    (1) Prior to taking any action on any application before it, the Zoning Board of Appeals shall advertise a public hearing in a newspaper of general circulation within the Town at least five days prior to the date of the hearing.

    (2) In addition, the applicant shall send a copy of the notice of public hearing by certified mail, return receipt requested, to the owners of all property within 300 feet of the property which is the subject of the variance application or zoning interpretation as the names and addresses of said owners appear on the latest assessment roll of the Town. Such notice shall be mailed at least five days prior to the hearing. Proof of such mailings and receipts for same shall be filed with the Zoning Board prior to, or at the time of, said hearing.

H. Property near municipal boundary. In any matter which relates to a property which lies within 500 feet of the boundary of another municipality, the Secretary of the Board of Appeals shall transmit to the Municipal Clerk of such other municipality a copy of the official notice of the public hearing on such matter, not later than one day after publication thereof. Such other municipality shall have the right to appear and to be heard at such public hearing.

I.  Minutes and records. The Secretary shall keep minutes of the Board's proceedings showing the vote of each member upon every question or, if absent or failing to vote, indicating such fact. The Secretary shall keep records of the Board's examinations and official actions, all of which shall be immediately filed in the office of the Board and shall be a public record. A card index record of all variances and special uses granted pursuant to action of the Board under this chapter shall be maintained in an alphabetical street file, and the location of such variances and special uses shall be marked upon a copy of the Zoning Map. Said file and said map shall be available for public inspection.

### § 57-63.1. Alternate members

A.  Short title and applicability. This section 57-63.1 shall be known and may be cited as the "Alternate Zoning Board of Appeals Members Act." This section shall apply to the appointment, term, functions, and powers of alternate members to serve on the Zoning Board of Appeals in and of the Town of Monroe.

B.  Policy. It is sometimes difficult to maintain a quorum of the Zoning Board of Appeals because members are ill, on vacation, or find they have a conflict of interest on a specific matter before such Board. In such instances, official business cannot be conducted, which may delay or impede adherence to required timelines. The use of alternate members in such instances is hereby authorized pursuant to the provisions of this section.

C.  Definitions. As used in this section, the following terms shall have the following meanings indicated:

**ALTERNATE MEMBER** - An individual appointed by the Town Board to serve on the Town of Monroe Zoning Board of Appeals when a regular member is absent or otherwise unable to participate on an application matter before the Zoning Board of Appeals as provided for in the policy herein.

**MEMBER** - An individual appointed by the Town Board to serve on the Town of Monroe Zoning Board of Appeals pursuant to the provisions of the Town of Monroe Town Code.

**ZONING BOARD OF APPEALS** - The Zoning Board of Appeals of the Town of Monroe as established by the Town Board of the Town of Monroe by local law, pursuant to the provisions of § 267 of the Town Law.

D.  Authorization/effect. The Town Board of the Town of Monroe hereby enacts this section to provide a process for appointing two alternate members (Alternate A and Alternate B).

E.  Alternate members of the Zoning Board of Appeals shall be appointed by the Town Board of the Town of Monroe for a term of five years. The first such persons appointed to each be an alternate member of the Zoning Board of Appeals shall have a term which expires on December 31, 2014. Any vacancy created by the resignation, death, or disqualification of an alternate member shall be for the remainder of the term of which the prior alternate member

was appointed for.

F.  The Chairperson of the Zoning Board of Appeals shall designate an alternate to substitute for a member when such member is unable to participate on an application or matter before the Board or otherwise absent pursuant to the policy set forth in this section. The Chairperson shall, provided both alternates are present, alternate the assignment of the alternate members so each serves in such capacity, with Alternate A serving on the first occasion that an alternate member for the Zoning Board of Appeals is required. When so designated, the alternate member shall possess all the powers and responsibilities of such member of the Board. Such designation of the alternate member shall be entered into the minutes of the initial Zoning Board of Appeals meeting at which the substitute is made.

G.  All provisions of state law relating to the Zoning Board of Appeals member eligibility, vacancy in office, removal, compatibility of office and service on other boards, as well as any provision of any state and local law/ordinance relating to training, continuing education, compensation and attendance, shall also apply to alternate members; provided, however, that no compensation shall be paid for the year 2010 to any alternate member.

H.  Supersession of Town Law. This section is hereby adopted pursuant to the provisions of § 10 of the Municipal Home Rule Law and § 10 of the Statute of Local Governments. It is the intent of the Town Board of the Town of Monroe, pursuant to § 10 of the Municipal Home Rule Law, to supersede the provisions of § 267 of the Town Law relating to appointment of members of the Town of Monroe Zoning Board of Appeals.

### § 57-64. Appeals.

The Board of Appeals is hereby authorized, upon an appeal, to hear and decide:

A.  Any matter where an appellant alleges that the Building Inspector was in error in refusing to issue a building permit or certificate of occupancy as a result of misinterpreting the meaning, intent or application of any section or part of this chapter.

B.  Any matter where an appellant alleges that the Building Inspector was in error in his determination as to the exact location of a district boundary line on the Zoning Map that forms a part of this chapter.

C.  Any other matter relating to this chapter, where an appellant seeks a review of any decision, order or ruling made by the Building Inspector.

D.  Any matter which the Building Inspector appeals on grounds of doubt as to the meaning or intent of any provision of this chapter or as to the location of a district boundary line on the Zoning Map.

### § 57-65. Variances.

A.  General delegation of power. The Board of Appeals, pursuant to § 267-a and 267-b of Article

16 of the New York State Town Law, shall have power in passing on appeals, where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of this chapter, to do the following:

(1) Vary or modify the application of any of the regulations or provisions of this chapter relating to the use, construction or structural changes in equipment or alteration of buildings or structures or the use of land, so that the spirit of this chapter shall be observed, public safety and welfare secured and substantial justice done.

(2) Any variance granted by the Board of Appeals pursuant to the provisions of this section shall be construed to be a nonconforming use or building.

B. Guiding principles.

(1) Every variance granted by the Board of Appeals shall be based upon and accompanied by a specific finding or findings, supported by evidence produced at a public hearing in the manner provided by law, to the effect that the al circumstances of the particular case are such as to constitute practical difficulties or unnecessary hardships in the way of carrying out the strict application of the regulations of this chapter. Notice of such public hearing shall be given as provided by law.

(2) Every variance granted by the Board of Appeals shall be designed by the Board to safeguard the public health, safety, morals and general welfare and shall be further designed to provide reasonable consideration, among other things, to the character of the neighborhood or district, the conservation of property values and the direction of building development in accordance with a comprehensive plan and shall not involve substantial detriment to the public good nor substantially impair the intent and purpose of the zone plan and of this chapter.

(3) Every variance granted by the Board of Appeals shall, in appropriate cases, be made subject to such conditions and safeguards as the said Board shall deem to be applicable to the particular case.

C. Specific types of variances. In conformity with its general power to vary or modify the provisions of this chapter, as provided in § 57-65A and pursuant to the guiding principles stated in § 57-65B, the Board of Appeals is hereby specifically empowered to do the following:

(1) Grant a permit, in appropriate cases, where a lot of the appellant, as such lot existed at the time of the effective date of this chapter, lies across the boundary of two districts, for the extension into the more restricted district of a lawful conforming use permitted in the less restricted district, but for a distance not exceeding 50 feet measured at right angles to such district boundary.

(2) Grant a permit for the enlargement or extension of a nonconforming use or building on the lot occupied by such use or building at the effective date of this chapter, provided that such enlargement or extension was arranged, intended or designed for such nonconforming use at the effective date of this chapter and further provided that such enlargement or extension shall not exceed in all 75% of the fair market value of such use

XV-4

or existing building at the effective date of this chapter.

(3) Grant a permit for the reconstruction, structural alteration, restoration or repair of a building or structure used for a nonconforming use, to an extent exceeding in aggregate cost 75% of the fair market value of each such building or structure.

(4) Grant a certificate of occupancy for a change in a nonconforming use, provided that the Board shall have made a determination that such change will be beneficial to the general neighborhood and further provided that such change be made subject to such reasonable conditions and safeguards as the Board may stipulate.

(5) Grant variances to exempt a building, in whole or part, from the front yard requirement of the district in which such building is situated, in cases where such building is adjacent to an existing building or buildings which have nonconforming front yards; provided, however, that such buildings shall not be permitted to have a front yard of a depth less than that of the average of the two immediately adjoining buildings or than that of the only adjoining building when only one exists.

(6) Grant a variance modifying the side yard requirements on the side street frontage of a corner lot, in cases where such requirements would unduly reduce the buildable width of such corner lot.

(7) Grant a variance modifying the yard requirements of a nonconforming lot beyond the automatic modifications provided under the terms of § 57-39A and B.

(8) Waive the requirements of § 57-49 for accessory parking areas, in whole or in part, in a case involving lack of need for such parking areas, where the lot is within 500 feet of a municipal parking area owned or operated by the Town, measured in a straight line between the nearest point of such parking area and the nearest point of such lot.

(9) Waive the requirements of § 57-49 for accessory parking areas, in whole or in part, after making a finding that the normal application of such requirements is infeasible because:
   (a) The lot has too restricted an area, unusual dimensions, shape or topographical character; and
   (b) No other suitable and adequate lot can reasonably be put to such use within the limits specified in § 57-49A(7) for the applicable use.

(10) Permit a reduction in the number of parking spaces in accessory garages or parking areas originally provided and installed pursuant to the requirements of § 57-48 or 57-49 in cases where proof is furnished to the Board that by reason of diminution in number of dwelling units or residents or in floor area, which are factors determining the demand for parking spaces, the proposed reduction will be consistent with the requirements of said §§ 57-48 and 57-49.

(11) Grant a temporary building permit for a period not to exceed one year for a nonconforming building, structure or use incidental to a building or other construction project, including such uses as the storage of building supplies and machinery and a real estate office located on a tract of land where individual properties are being offered for sale, provided that such temporary permit shall be issued only upon written agreement by the owner or his agent to remove such building or structure upon expiration of such permit and further provided that such permit shall be subject to such reasonable conditions as the Board shall determine to be necessary to protect the public health, safety and general welfare. Such permit may be renewed annually, at the discretion of

the Board, over a period not to exceed three years.

(12) Any area or use variance granted by the Zoning Board of Appeals, or any variance granted under Subsection C(2), (3), (6) or (7), shall be deemed expired if the physical improvements associated with that variance are not completed by the recipient of the variance, and a certificate of occupancy or certificate of completion issued by the appropriate Town official, within two years of the filing of the variance with the Town Clerk, unless a longer period is specified in the decision of the Zoning Board of Appeals. Nothing shall preclude the applicant who receives a variance from seeking a rehearing on the decision granted to seek an extended period of time to complete the improvements and receive the certificate of occupancy or certificate of completion for the improvement which is enabled in part or in all by the variance which was granted.

## Article XVI. Administration and Enforcement

### § 57-66. Interpretation of provisions; minimum requirements.

In applying and interpreting the provisions of this chapter, said provisions shall be held to be minimum requirements adopted for the promotion of the public health, safety, morals, comfort, convenience and general welfare. The following specific regulations shall apply:

A. A minimum required lot or yard size for one building or structure shall not be used as any part of a required lot or yard for a second structure.

B. The required lot or yard for an existing building or structure shall not be diminished below the minimum requirements of this chapter.

C. The parking spaces required for one building or structure or use shall not be included in the computation of required parking spaces for a second building or structure or use.

### § 57-67. Effect on other regulations and agreements.

A. Nothing contained in this chapter shall be taken to repeal, abrogate, annul or in any way impair or interfere with any provisions of law or ordinance or regulations existing or as may be adopted in the future, nor is it intended by this chapter to interfere with or abrogate or annul any easements, covenants or other agreements between parties; provided, however, that where this chapter imposes a greater restriction upon the use of buildings or structures or requires larger lots, yards, courts or other open spaces than imposed or required by such other provisions of law, ordinance or regulation or by such easements, covenants or agreements, the provisions of this chapter shall control.

B. Wherever the provisions of any other law or ordinance or regulations impose a restriction greater than this chapter, the provisions of such other law or ordinance or regulations shall control.

C. No provision contained in this chapter shall be construed as justifying the encroachment of any building or structure within any street lines now or hereafter laid down.

### § 57-68. Enforcement.

A. It shall be the duty of the Building Inspector to administer and enforce the provisions of Article 16 of the Town Law and the provisions of this chapter. Should the said Building Inspector be in doubt as to the meaning or intent of any provision of this chapter, or as to the location of any district boundary line on the Zoning Map, or as to the propriety of issuing a building permit or a certificate of occupancy in a particular case related to the provisions of this chapter, he shall appeal the matter to the Board of Appeals for interpretation and decision. The Building Inspector shall adopt rules of procedure consistent with this chapter for the purpose of assuring efficient and uniform administration of its provisions.

B. The Building Inspector shall submit a written report each month to the Town Board,

enumerating the building permit applications received and stating the actions taken. Such report shall also enumerate violations of this chapter and actions taken with respect thereto.

### § 57-69. Right of entry for inspections.

The Building Inspector and his deputies and assistants and the Town Engineer, Chief of Police and Fire Chief and their authorized agents shall have the right and authority, at any reasonable hour, to enter any building, structure, premises, lot or land, whether already erected or put into use or in the course of being erected and put into use, for the purpose of determining whether or not the provisions of this chapter are being complied with.

### § 57-70. Building permits; formation of new lots.

A. All procedure with respect to applications for and issuance of building permits shall be in conformity with the provisions of the Building Code. All such applications shall be accompanied by such other information as may be necessary to determine and provide for the enforcement of this chapter.

B. The plot plan shall show a separate lot for each main building; provided, however, that where a development consists of an integrated arrangement of dwellings, garden apartments or other buildings designed and intended to be maintained in a single ownership, the Building Inspector may waive the requirements of showing separate lots for each separate main building.

C. No building permit shall be issued for erection, construction, reconstruction, structural alteration or moving of any building or structure or part thereof, unless the plans and intended use indicate that such building or structure is designed and intended to conform in all respects to the provisions of this chapter.

D. Where a lot is formed from part of a lot already improved, the separation must be effective in such manner as not to impair any of the provisions of this chapter, whether related to the then existing improvements or to a proposed or future new improvement on the lot so formed and in such manner that both the remainder of the former lot and the new lot so formed shall comply with the lot area and lot width provisions of this chapter.

### § 57-71. Completion of buildings for which permits have been issued.

A. Nothing in this chapter shall require any change in the plans, construction or designated use of a building or structure for which a lawful building permit has been issued prior to the effective date of this chapter or any amendment thereto affecting such building or structure or the use thereof, provided that:

   (1) The construction of such building or structure shall have been begun and diligently prosecuted within three months from the date of such permit.
   (2) The ground story framework, including the second tier of beams, shall have been completed within six months from the date of such permit.
   (3) The entire building or structure shall be completed to such filed and approved plans upon

XVI-2

which the issuance of such permit was based within one year from the effective date of this chapter or any such amendment thereto.

B. In the event that any one of the conditions of § 57-71A is not complied with, such building permit shall be revoked by the Building Inspector.

### § 57-72. Certificates of occupancy.

A. It shall be unlawful to use or to permit the use of any building, structure, premises, lot or land or part thereof hereafter erected or altered, enlarged or moved, in whole or part, after the effective date or this chapter or any building, structure, premises, lot or land or part thereof of which the use is changed, until the certificate of occupancy has been obtained by the owner.

B. No certificate of occupancy shall be issued for any building, structure, premises, lot or land unless the erection, construction, reconstruction, structural alteration or moving of such building or structure or part thereof and the intended use thereof are in conformity in all respects with the provisions of this chapter.

C. The Building Inspector shall obtain a written order from the Planning Board before issuing a certificate of occupancy in a case involving a special use, pursuant to Article V or from the Board of Appeals in the case of a variance from the provisions of this chapter pursuant to § 57-65.

D. Upon written application by the owner or his authorized agent, the Building Inspector shall issue a certificate of occupancy for any building or structure, lot or land existing and in use at the effective date of this chapter, provided that said Building Inspector shall find that such building or structure, lot or land is in conformity with the applicable provisions of this chapter or is a nonconforming structure as defined in § 57-3 under "nonconforming structure" and under "nonconforming use."

E. Any certificate of occupancy, if not available from existing Town records, shall be limited to a statement by the Building Inspector that the structure in question complies with the area and use regulations of this chapter or is legally nonconforming as to such regulations and, if constructed on or after November 7, 1962, that the same is in compliance with the applicable provisions of Chapter 23.

### § 57-73. Filing of nonconformance statements by property owners.

Owners of property which is occupied by nonconforming uses, buildings or structures may file a statement of such nonconformity with the Building Inspector so as to assure recognition of their status.

### § 57-74. Fees.

Fees for building permit applications and for issuance of building permits and certificates of occupancy shall be as provided in the Town Building Ordinance.

### § 57-75. Penalties for offenses.

For any and every violation of any provisions of this chapter and upon failure to comply with written notice thereof or order to remove such violation within five days after serving of such notice or order, the owner, agent or contractor of a building, structure, premises, lot or land where such violation has been committed or shall exist, and the lessee or tenant of an entire building, structure, premises, lot or land where such violation has been committed or shall exist, and the owner, agent or contractor, lessee or tenant of any part of a building, structure, premises, lot or land, in which part such violation has been committed or shall exist, and the agent, architect, builder or contractor or any other person who commits, takes part or assists in such violation, or who maintains any building, structure, premises, lot or land in which any such violation shall exist shall be subject to a fine not exceeding $50 or to imprisonment for not more than 10 days, or both, and each and every day the violation continues, after the owner, agent or contractor of the building, structure, premises, lot or land where such violation occurred has been notified thereof, shall be deemed a separate and distinct violation.

## Article XVII. Public Records

### § 57-76.  Copies of regulations and map to be open to public inspection.

Duly certified copies of this chapter and of the Zoning Map and the Schedule of District Regulations which forms a part hereof, together with copies of all amendments hereto, shall be filed in the Building Inspector's office and shall be open to public inspection.

## Article XVIII. Amendments

### § 57-77. Required information.

Any request for a change of Zoning District shall include a map, accurately drawn to an appropriate scale, showing the area of land included in the proposed change, the streets in the immediate vicinity and the land or lands and the name of the owner or owners thereof immediately adjacent to the extending within 100 feet of all boundaries of said property.

## Article XIX. Violations of Previous Law

### § 57-78. Violations not affected.

Nothing in this chapter shall be deemed to affect any violation, liability, penalty, course of action or special proceedings arising under the provisions of the Zoning Chapter on or before the effective date of this chapter.

### § 57-79. Reserved.

### Article XX. Tree Preservation

**§ 57-80. Legislative intent.**

The Town Board declares the intent of this Article is to regulate the preservation, installation, removal, and long-term management of trees in the Town of Monroe in order to protect the environment for the use of present and future generations. Specifically, the Town Board further declares the intent of this Article is to:

A. Ensure that the greatest number of trees are preserved and protected before, during and after subdivision, site plan, special use permit, building permit, and/or residential or commercial or industrial construction process, and in cases where subdivision and site plan approval is not required.

B. Where it is not possible to preserve them, the Town Board intends to ensure, wherever possible, that trees removed be replaced with a like number and species of newly planted trees. If not on the site where the trees are removed, then such trees shall be replanted primarily on public lands or another site in the Town of Monroe, or alternatively, pay a fee per tree to fund the replanting and re-establishment of trees and preserve forests in the Town of Monroe, as established in this Zoning Chapter. The Monroe Conservation Commission shall make a recommendation on the disposition of funds collected when administering these fines to the Town Board.

C. Encourage the proper protection and maintenance of existing trees as herein described in the Town of Monroe, and provides penalties for non-compliance therewith.

D. Ensure that as long as the health, safety, or welfare of the public is not potentially negatively impacted, projects provide for trees along existing and new roads, screen parking areas in order to reduce noise from vehicular traffic, and screen accessory structures and ensure that the development blends with the existing environment. Additionally, the intent of this Article is to also enhance and improve sites through the establishment of increased green space and/or appropriate tree plantings.

E. Encourage the proper protection and maintenance of trees located within wetlands and watershed land and associated buffers.

F. Generally prohibit, except as provided for herein, removal of, cutting down or causing injury to trees growing on slopes with a grade of thirty percent (30%) or greater.

G. Charge the Town of Monroe Conservation Commission with developing a list, subject to amendment, as provided for herein of landmark, native, protected and specimen trees and procedures for the preservation thereof. To the extent identifying information is needed in relation to defining particular types of trees, including landmark and specimen trees, no penalty may be imposed until such trees are identified by Resolution of the Town Board, and

made an appendix to the Town Code after filing such Resolution with the Town Clerk.  The Town Board and the Conservation Commission shall establish a budget for the Conservation Commission to obtain the services of arborists, landscape architects and/or foresters as well as for the purchase of tools, computer software and training and the digital archiving of data in furtherance of this Chapter.

H. Encourage the establishment and continuation of tree species compatible with the natural environment as defined by the New York State Department of Environmental Conservation.

I. Establish penalties and fines for violation of its provisions, including fees for the tree protection and replacement fund.

### § 57-81. Legislative findings.
The Town Board hereby finds that:

A. The trees and forest lands in the Town of Monroe are important natural resources that benefit the Town and make it a desirable place for both residents and visitors.  Trees and other landscape elements help to naturally control flooding, filter pollutants and prevent soil erosion, protect watershed areas, enhance air quality, provide a natural noise barrier, provide habitat for wildlife, and yield advantageous micro-climates thereby reducing energy consumption.  The removal of trees can cause deprivation of these benefits and change the ecological and rural character of the community.

B. Properly located and planted trees are an effective means of providing sight and noise barriers around accessory buildings, mechanical devices, parking lots and other structures.

C. A responsible community recognizes that a prohibition against the use of invasive plant species is necessary to preserve and manage trees and forestlands on both public and private property in order to protect the health, safety, and welfare of citizens in the Town of Monroe.

D. Replacing trees removed during construction is necessary to assist in soil conservation and establishing and maintaining suitable and acceptable drainage, since development usually creates new drainage patterns, and the growth of trees and their roots are integral to these new drainage patterns and their stability.

### § 57-82. Reserved.

### § 57-83. General regulations.
A. Tree plan required for subdivision, site plan, special permit approval.

   (1) A Tree plan shall be required and approved by the Town of Monroe Planning Board as part of a site plan, special permit, or subdivision application pursuant to the provisions of this Article prior to clearance of land, cutting down, killing, or otherwise destroying or committing any act which will lead to the eventual destruction of trees, including, but not

XX-2

limited to use of invasive plant species, poisoning, tree topping, and damage including filling to the critical root zone of six (6) or more trees with a Diameter at Breast Height (DBH) of six inches (6") or greater, or destruction of a cluster of four (4) or more trees with a DBH of eight inches (8") each within a five hundred (500) square foot area, or treed areas of any DBH on slopes of greater than thirty percent (30%); also see 57-83.G. Said trees shall be located on the same Lot or Lots that are sharing one or more boundary lines and are owned or controlled by a common Person. The terms "Person" and "Lot" are defined herein by Section 57-3 of this Code. The clearance of land includes but is not limited to the clear cutting of access roads and/or rights-of-way to be used for the movement of construction vehicles in anticipation of site or subdivision plan approval, except as necessary to gain limited access for deep pit and percolation tests and/or well drilling and only upon consent of the Planning Board to conduct such activities.

(2) The Planning Board, in its discretion, may waive the submission of a tree plan where it determines that the proposed subdivision, site plan or special permit application will not involve the removal of any trees regulated in accordance with Section 57-83.A(1) above.

(3) Prior to approval of any tree plan by the Town of Monroe Planning Board, the Planning Board shall refer the tree plan to the Monroe Conservation Commission for advisory comments as related to the development's impacts on trees or other natural features on the property in accordance with 57-84.N below.

B. Tree plan required for building permit.

(1) When site plan, special permit, or subdivision approval is not required and an applicant is seeking a building permit, a permit pursuant to a tree plan shall be required from the Town of Monroe Building Inspector prior to cutting down, tree topping, killing or otherwise destroying or committing of any act which will lead to the eventual destruction of six (6) or more trees with a DBH of six (6) inches or greater per 12 month period, on the same Lot or Lots that are sharing one or more boundary lines and are owned or controlled by a common Person. The terms "Person" and "Lot" are defined herein by Section 57-3 of this Code.

(2) Tree plan for disturbance to landmark, native, protected and specimen trees. There shall under no circumstance be use of invasive plant species, disturbance of or fill placed within critical root zones of landmark, native, protected and specimen trees as defined in this Chapter without a permit issued by the Building Inspector after review by the Monroe Conservation Commission. Such permit shall be granted after evaluation of a tree plan with sufficient detail as to reasonably demonstrate to the Building Inspector the number of trees expected to be cleared, and the necessity therefore. Prior to issuance of such permit, the Building Inspector will provide a duplicate copy of all application materials to the Monroe Conservation Commission whereupon it shall recommend approval or denial of the application within thirty (30) calendar days of receipt of the application. A permit may be issued by the Building Inspector following the referral period. The Commission may request an extension of the review period, not to exceed an additional thirty (30) calendar days.

XX-3

(3) No native tree shall be removed from slopes with grades of thirty percent (30%) or greater except with a permit from the Town of Monroe Building Inspector after the Inspector determines that such tree is dead or hazardous or otherwise poses a health or safety hazard. The Building Inspector may solicit and accept an opinion letter from a landscape architect, arborist or forester of the status of such tree in terms of the criteria provide for herein, if the applicant who wishes to cut down a tree disagrees with the finding of the Building Inspector on whether the tree is dead or hazardous; whereupon the opinion letter or a report to the Building Inspector shall be forwarded to the Conservation Commission for pre- and post-tree removal inspection. The Monroe Conservation Commission shall be authorized to review and comment on opinions or reports within thirty (30) calendar days. (See Article I, Section 57-3 for definition of a "Dead Tree" and "Hazardous Tree" for the purpose of this Chapter.)

(4) Prior to approval of any tree plan by the Building Inspector, the Building Inspector shall refer the plan to the Monroe Conservation Commission. The Monroe Conservation Commission shall be authorized to review and comment on opinions or reports in accordance with Section 57-85 below.

C. Fines. Tree clear cutting or selective species cutting as defined in Section 57-3 or tree topping as defined in Section 57-3 in advance of subdivision, site plan approval, or permit approval for the purposes of circumventing the regulations found in this Article shall be subject to fines as defined in Section 57-90 and no application for subdivision or site plan approval shall be accepted for a period of three (3) years as measured from the date of the clearing of the trees or the date of clearing as estimated by the Building Inspector.

D. Signs. No sign shall be placed, affixed, or attached to any tree, except for signs commonly known as "no trespassing" signs or "no hunting" signs, or signs warning of a dangerous condition.

## § 57-84. Tree plan and the subdivision, site plan and special use permit review process

A.   All applicants shall be required to submit a tree plan prior to or simultaneously with preliminary subdivision, special permit or site plan application. Where an applicant has been required to submit a Draft Environmental Impact Statement (D.E.I.S.) as part of any land use approval, a tree plan shall be part of said submission. Where an applicant is not required to submit a D.E.I.S., a tree plan will be submitted as part of the preliminary subdivision plat, special permit or site plan application. All applications that require a tree plan shall be submitted for review and comment to the Monroe Conservation Commission as described in Section 57-82.H.

B. The Planning Board, with or without modifications, shall render a decision on the tree plan, as part of the subdivision, site plan or special permit application. Any approval shall be conditioned upon compliance with the tree plan approved by the Planning Board.

C. The tree plan shall be included in the proposed development plans and shall include maps prepared with sufficient detail to illustrate the location and general characteristics of the

existing vegetation before requested development and of re-vegetated areas after completion of the development as follows:

(1) A developer shall submit a tree plan in a scale and number consistent with the rules governing the submission of plat plans described in Article VI and Chapter A65: Subdivision Regulations.

(2) Detail the location of orchards, tree stands, rock outcroppings, stone walls, streams, lakes, ponds, wetlands and other water bodies, all specimen, landmark or protected trees as defined in this Article, and all other natural features throughout the entire parcel(s) to be subdivided.

(3) Delineate an "envelope" on each parcel(s) or portion of property anticipated to become separate tax map parcel where disturbance is planned, outside of which will be considered an area of non-disturbance by development and construction activities.

(4) Detail, within the proposed area of disturbance, tree stands as to density and general genus (i.e., Oak, Pine, etc.) and identify the number and species of individual trees having six (6) inches caliper at DBH.

(5) All trees that are identified and described above that are proposed to be removed shall be clearly detailed on such map.

(6) Such tree plan shall demonstrate how required buffers, open space and trees to be saved will be protected during construction, whether with safety fencing or other approved alternative, the sequence of which is approved by the Planning Board or its designee who shall be an Engineer, an Arborist, Forester, registered Landscape Architect or similarly qualified individual.

(7) Such maps should be overlaid on the detailed subdivision plan and/or site plan so that the roads, main and accessory structures, rights-of-way, easements and utility lines are clearly shown in order to be able to evaluate the impact of development on trees. Clustering in accordance with NYS Town Law Section 278 may be considered when it is deemed a viable option for protecting trees on the property.

(8) The tree plan shall designate buffer zones of at least fifteen feet (15') along all perimeters of the tree stands to be protected, as well as critical root zones around existing trees, where trees will not be removed or disturbed except as permitted herein.

D. All trees to be preserved during construction shall be conspicuously marked on all sides. Conspicuous marking of the width of the tree canopy shall be required to satisfactorily achieve the goals of protection for groupings of trees, prior to construction beginning in that area.

E. Detail the number and type of trees, on a one-to-one basis or on a basis acceptable to the Planning Board, added to the property (or added elsewhere in the Town of Monroe) as requested by the applicant and approved by the Planning Board and the Monroe Conservation Commission, to replace those taken down. In lieu of replacing all trees taken down, the Planning Board may, upon the request of the applicant, authorize the applicant whose Tree Plan is being considered, to pay to the Town Parkland Account, a fee of $750 per tree which is being removed and not replaced, and a fee of $350 per tree of six (6) DBH inches

or more that is being replaced on another site. These fees shall be increased upon certified evaluation by an arborist, forester or landscape architect of the current value of each removed or replaced tree. These funds will be earmarked for the protection of forests and parklands or public property in the Town of Monroe and for replanting as recommended by the Monroe Conservation Commission.

F. The applicant shall provide any and all additional information required by the Planning Board with respect to trees for the purpose of fulfilling the intent of this Article.

G. Trees and their critical root zones shall be protected in areas of concentrated construction, storage of soil stockpiles or other equipment or material, parking, movement of construction equipment, or parking thereof, or similar activity.

H. The tree plan shall be noted on all filed maps, and deeds must have a reference to restrictive covenants as per the site plan.

I. The tree plan shall designate penalties and shall require performance bonding (letters of credit and/or cash bond) to ensure compliance with the approved tree plan.

J. As part of any application to the Planning Board, the applicant shall sign a statement as follows: "I HAVE READ OR AM OTHERWISE HEREBY BEING DIRECTED TO A COPY OF THE TOWN OF MONROE TREE PRESERVATION ARTICLE – ARTICLE XX OF CHAPTER 57 OF THE TOWN CODE OF THE TOWN OF MONROE. I UNDERSTAND A COPY OF SUCH ARTICLE IS AVAILABLE ON THE TOWN OF MONROE'S INTERNET WEBSITE, WWW.MONROENY.ORG. I UNDERSTAND GENERALLY THAT THE TREE PRESERVATION ARTICLE RELATES TO MY RESPONSIBILITIES WHEN IT COMES TO TREE REMOVAL AND TREE PLANTING AND AGREE TO FOLLOW SUCH ARTICLE."

SIGNED: _____      DATE: _____
PRINT NAME: _____
PLANNING BOARD APPLICATION FOR: _____

K. The tree plan shall be noted on all filed maps, and deeds must have a reference to restrictive covenants as per site and tree plans.

L. The tree plan shall designate penalties and may require performance bonding to ensure compliance with the approved Tree Plan.

M. All development activities on a site, including installation of public and private utilities shall be indicated on and conform to the provisions of the approved tree plan as described in Section 57-83. In addition, Stormwater Management Plans, prepared in accordance with Chapters 44 and 46, shall be incorporated into the tree plan.

N. Prior to approval of any tree plan authorized for approval by the Planning Board of a

XX-6

subdivision, special permit or site plan application, the Planning Board shall refer the application to the Town of Monroe Conservation Commission in order to obtain advisory comments on the tree plan, the site plan or subdivision plans as related to its impact on trees or other natural features and vegetative growth on the property. Such referral will allow the Conservation Commission thirty (30) calendar days to comment on the tree plan prior to any final decision of the Planning Board. Subdivision, special permit or site plan approval may be granted by the Planning Board following the thirty (30) day review period whether comment is received or not received from the Town of Monroe Conservation Commission. The Conservation Commission is directed to address the following as it relates to tree plans that are submitted by applicants during the subdivision and site plan approval process:

(1) The tree plan is representative of the forested areas on the site;
(2) The tree plan avoids development disturbance of heavily treed areas and sensitive ecological areas to the greatest extent possible;
(3) The presence of landmark, specimen and protected trees that have been identified by the Conservation Commission;
(4) Professional fees assessed to the application for tree permit resulting from the cost to the Town of Monroe when an independent report from a landscape architect, arborist or forester is required by the Conservation Commission in the performance of its duties under this Chapter.

## § 57-85. Tree plan and the building permit process.

A. Prior to approval of any permit which requires submission of a tree plan to the Building Inspector in accordance with Section 57-83, the Building Inspector shall refer the tree plan to the Monroe Conservation Commission, who shall review it for consistency with the intent of this Article and the following conditions:

(1) The approval of such tree plan shall not be detrimental to the sustainability of the surrounding forests, water resources, native animals and vegetative growth;
(2) The approval of such tree plan advances the needs of the applicant in a way that represents the removal of the fewest trees possible from the site;
(3) The Monroe Conservation Commission shall consider the impact on landmark, native, protected and specimen trees; and
(4) The Monroe Conservation Commission is authorized to seek the professional advice of a landscape architect or arborist. Where professional advice is obtained, such cost of the professional advice shall be borne by the applicant as it directly relates to the application.

B. Where an applicant wishes to remove more than six (6) trees per acre, or any species of a native, landmark, protected or specimen tree from his or her property in any twelve month period, he or she shall submit a tree plan to the Town of Monroe Building Inspector. Such plan shall:

(1) state specifically how many trees the property owner wishes to take or cause to be removed;

XX-7

(2) State specifically where in the Town of Monroe the property owner proposes to plant replacement trees for those trees beyond six (6) trees which are to be taken or removed in that twelve month period (the consent of the property owner where the trees are to be planted must be demonstrated to the satisfaction of the Building Inspector if it is not on the same property);

(3) State the genus and species of the tree to be planted (such genus and species must be to the reasonable satisfaction of the Building Inspector to address trees which are appropriate for the climate and soils of the Town of Monroe. A list of such trees shall be provided to the Building Inspector by the Conservation Commission.

(4) If the property owner is unable to have replacement trees planted, the property owner shall contribute to the Town of Monroe's parkland fund for the enhancement of the Town of Monroe's parklands, which generally enhances the health of the people of the Town of Monroe by ensuring trees are planted and growing, thereby producing oxygen and better air quality, in the amount of seven hundred fifty dollars ($750.00) per tree, in excess of six (6) or more trees to be taken during the twelve (12) month period.

C. The Building Inspector, in consultation with the Monroe Conservation Commission, is authorized and directed to develop a tree plan application which shall contain information required by the Building Inspector to fulfill the requirements of this Article with regard to tree removal and replacement. The tree plan application shall contain authorization for Town of Monroe employees to have access to the property upon notification to the applicant. In addition, property liability coverage shall be provided naming the Town of Monroe an additional insured for purposes of carrying out the provisions of this Chapter.

D. The Building Inspector shall maintain a "tree bank" which shall be a list of people in the Town of Monroe who wish to have native trees planted on their property. Such list shall state the minimum number and genus/specie of tree each property owner on the tree bank list desires. Merely being listed in the tree bank does not constitute consent under any circumstances for the trees to actually be planted. The trees shall be offered under the tree bank on a first come first serve basis or in a manner otherwise approved in a random process by the town board via resolution.

E. All trees planted as replacement trees shall be no less than two and one half (2 ½) inches caliper at DBH.

F. The fee for review of the tree plan application unrelated to subdivisions shall be established by resolution of the Monroe Town Board.

§ 57-86. Activities permitted by right.

A. Nothing in this Article shall be construed herein to diminish the rights of the Superintendent of Highways of the Town of Monroe or appropriate highway management authorities from the County of Orange or the State of New York.

XX-8

B. Nothing in this Article shall be construed herein to diminish the rights of Certified Nurseries and Greenhouses from tree topping and tree removal conducted in the performance of trade or professional activities on property owned by the Certified Nurseries and Greenhouses. A Certified Nurseries and Greenhouse shall be licensed by the Division of Plant Industry of the New York State Department of Agriculture and Markets and shall be on the current Division of Plant Industry's New York State Certified Nurseries and Greenhouses List.

C. Removal of any tree under an actual or ongoing emergency condition when such tree removal is necessary for the protection and preservation of life or property is permitted. Within one (1) week of said removal, notice by the property owner of such removal under emergency circumstances, shall be provided in writing (including regular mail or express mail or electronic mail or facsimile or hand delivered notice) to the Town of Monroe Building Inspector.

D. Removal of any tree, other than those trees within a property's landscape buffer zone or regulated setback zone, by any cemetery.

E. Removal of dead trees permitted. The removal of dead trees is permitted in any amount and shall not count against any tree removal limitation provided such trees are determined to be dead by an Arborist, Forester or Landscape Architect prior to their being removed. Dead trees need not be replaced once removed except upon the direction of the Planning Board as part of any subdivision or site plan approval. Trees shall not be purposely killed in order to justify removal.

### § 57-87. Removal of trees on public land.

Any department, agency, commission of the Town of Monroe, employee of the Town of Monroe, or any firm or individual retained by the Town of Monroe to cut down, or cause to be cut down, any native tree of six (6) inches or more DBH, with the exception of the Town of Monroe Highway Department for right of way maintenance, must also be in compliance with all provisions of this Article.

### § 57-88. Trees and public utilities.

A. No street trees, other than those species listed as small trees suitable for planting near utility wires by any utility company may be planted under or within ten feet (10') of any overhead utility wires.

B. Tree limbs that have grown near high voltage electrical conductors shall be maintained clear of such conductors by the electric utility company in compliance with any applicable franchise agreements.

C. Any utility company having control over transmission or distribution lines along a public highway, street, or road within the Town of Monroe shall at all times protect the trees within its easement against any injury.

XX-9

D. The Town of Monroe Building Inspector must be notified by any utility company desiring to undertake trimming of trees within the Town. Trimming is to occur under the following guidelines:

   (1) In general, trees will be permitted to grow naturally except where branches are growing ten feet (10') from wires or utility poles.
   (2) Overhead clearance of at least ten feet (10') will be permitted where tree limbs cross over wires.
   (3) All debris from trimming operations must be cleaned up as work progresses by the utility company or its agent.
   (4) Upon completion of trimming operations within the Town of Monroe, notice of completion must be given to the Town of Monroe Building Inspector within two weeks.

## § 57-89. Timber harvesting.

A. Removal of timber in quantities greater than three (3) standard cords of wood from any parcel of land within any twelve (12) month period shall require a timber-harvesting permit. Such permit may only be granted by the Planning Board upon review and recommendation for approval by a Cooperating Consulting Forester of the New York Institute of Consulting Foresters hired by the Town of Monroe. The Costs of any consulting forester reviewing the Timber Harvest application (or Harvest itself), or other professional including the Town Engineer, or Town Attorney (or Planning Board Attorney), shall be payable to the Town of Monroe by the applicant. All applications for timber harvesting shall be referred to the Town of Monroe Conservation Commission which shall review and comment upon the timber harvesting application to the Planning Board Chairman within thirty (30) calendar days.

B. Application Requirements. The following shall be provided as part of the application for a timber harvesting permit:

   (1) Name, address and phone number of the property owner and harvester (if different from property owner).
   (2) Location map and tax parcel number of the property where the timber harvesting operation is to take place.
   (3) The commencement and end dates between which the proposed harvesting activity is to take place. Such permit shall expire at the conclusion of such end date. Such end date shall not be longer than twelve months from the date of the permit's issuance.
   (4) Evidence of no unpaid taxes or assessments affecting or constituting a lien on the premises described in the application.
   (5) Identify all landmark, specimen and protected trees. The Planning Board in considering the Timber Harvest application is expressly authorized, in addition to all other authority, to limit the removal of landmark, specimen, or protected trees.
   (6) Plan of Operation. A plan of operation shall be presented as part of the Application for timber harvesting. The plan shall show compliance with the following elements of the timber harvesting operation:
       (a) That the property owner or timber harvester shall have retained a Cooperating Consulting Forester to conduct or oversee the Timber Harvest. Such Cooperating

Consulting Forester shall follow the practices of the New York Institute of Consulting Foresters.

(b) Timber harvesting shall be conducted so that the operation does not interfere with any natural watercourse or the natural drainage of the property

(c) No timber within fifty feet (50') of a public roadway shall be cut.

(d) No timber within fifty feet (50') of any property line less than one hundred fifty feet (150') long shall be cut.

(e) No timber within thirty feet (30') of any property line longer than one hundred fifty feet (150') shall be cut.

(f) Soil erosion control measures to be in place at the commencement of the timber harvesting operation.

(g) Location of road access and curb cuts (driveways) necessary to conduct timber-harvesting plan of operation.

(h) All timber-harvesting operations shall be conducted in compliance with the Town of Monroe noise ordinance.

(i) Best management practices shall be observed for all aspects of timber harvesting. Selective harvesting, erosion, sedimentation controls and removal of invasive plant species are considered a best management practice.

(j) Slash shall not be burned; but shall be chipped or stacked according to best management practices. Slash consists of the debris that remains after the Timber is harvested.

(k) A replanting plan for trees taken as part of the Timber Harvest shall be required.

(7) The fee established by resolution of the Town Board, for the review of the Timber Harvesting Permit Application.

C. Planning Board Review. The Planning Board shall, as part of its consideration of the issuance of the Timber Harvest permit conduct a public hearing, make such additional permit requirements as it believes are necessary to ensure the purposes of the comprehensive plan of the Town of Monroe and all other applicable laws are carried out. The Public Hearing Notice shall be sent by the applicant by first class, return receipt requested mail, at least fourteen (14) calendar days before the public hearing to owners of record of all adjacent parcels of land as well as to owners of record of land within seven hundred fifty feet (750') from the trees that are to be removed. In addition, notice of the public hearing shall be published at least fourteen (14) calendar days in the official paper of the Town of Monroe.

D. Term of Permit. Any permit granted pursuant to the terms herein shall be for a period not to exceed one (1) year. The granting of a permit shall not be held to supersede any other state, county or federal laws, requirements or regulations affecting land use.

E. Completion of Operation. At the termination of the permit approval period, any structure, improvement, equipment or machinery erected, placed or maintained upon the premises in accordance with the permit shall be removed, unless such structure, improvement, equipment, or machinery shall be approved to stay on the premises by Town Board Resolution.

XX-11

F.  Penalties.  Any person, firm or corporation, or individual connected with such firm or corporation who violates any provision of this Article shall be guilty of a violation, the fine for which shall not exceed one thousand dollars ($1,000.00) for a first offense. For a second and further offense within a three (3) year period, the violator shall be guilty of a violation punishable by a fine of not more than three thousand dollars ($3,000.00) for each offense. Persons, firms or corporations, or individual connected with such firm or corporation, found in violation of the provisions of this Article shall be required to replant trees in the locations from which they were improperly removed or destroyed in order to return the property or site to its original condition; or, if that is not practicable, in such locations as the Building Inspector shall authorize elsewhere in the Town of Monroe, or shall otherwise pay an additional fee to the Town of Monroe Parkland account of Seven Hundred Fifty Dollars ($750.00) per tree improperly removed or taken when such tree cannot be replanted at the location it was removed from or destroyed at.  These penalties shall be increased upon certified evaluation by an Arborist, Forester or Landscape Architect of the current value of each removed or replaced tree.

### §57-90.  Enforcement and administration.

The Building Inspector of the Town of Monroe shall enforce this Article. Any site, for which a permit application has been submitted, pursuant to the provisions of the Town of Monroe Code, shall be subject to inspection by the Building Inspector or Town Engineer upon notice to the property owner and/or applicant at any reasonable time, including weekends and holidays, by the approving authority or its designated representative. The applicant, by making application, shall be deemed to have given consent to such inspection. If any tree(s) subject to the provisions of this Article, buffer zone and/or critical root zones are damaged, the Building Inspector has the authority to issue a "Stop Work Order" to be valid until such time as violations are deemed remedied by the Town Engineer or Building Inspector and all penalties levied pursuant to this article have been paid.

### § 57-91.  Penalties.

Any person, firm or corporation, or individual connected with such firm or corporation who violates any provision of this Article shall be guilty of a violation, the fine for which shall not exceed One Thousand Dollars ($1,000.00) for a first offense. For a second and further offense within a one-year period, the violator shall be guilty of a violation punishable by a fine of not more than Three Thousand Dollars ($3,000.00) for each offense. Persons, firms or corporations, or individual connected with such firm or corporation, found in violation of the provisions of this Article shall be required to remove, if applicable, invasive plant species; replant trees in the locations from which they were improperly removed or destroyed; and pay an additional fee to the Town of Monroe Parkland account of Seven Hundred Fifty Dollars ($750.00) per tree improperly removed or destroyed.

### § 57-92.  Bonds.

At the time of public improvement bonding (which shall be via a Letter of Credit, Cash deposit or other form approved by the Town), the cost of complying with the provisions of this Article, shall

be estimated and included in the bond amount in a Public Improvement Security Agreement or Interim Developers Agreement (See Chapter 36) approved by the Town Engineer, Town Attorney, and Town Board.

### § 57-93.  Landmark, native, protected and specimen tree list.

The Conservation Commission shall compile the Town's Lists of landmark, native, protected and specimen trees, as defined in Section 57-3, upon enactment of this Article and through nomination from tree owners, interested parties within the community, and the Town and Village Historians.  Such list shall be, after approval or modification by the Town Board, appended to this Law and may be updated by Resolution of the Town Board as an Appendix to the Town Code of the Town of Monroe.

ATTACHMENT A:  TOWN OF MONROE - SCHEDULE OF DISTRICT REGULATIONS
Open Space Residential - 3 Acre District
Town of Monroe Zoning Chapter 57

| 1 District | 2 Principal Permitted Uses | 3 Accessory Uses | 4 Special Uses Subject to Authorization and Site Plan Approval by the Planning Board | 5 Minimum Lot Area | 6 Minimum Lot Width (feet) | 7 Minimum Front Yard (feet) | 8 Minimum Side Yard One | 8 Minimum Side Yard Total | 9 Minimum Rear Yard (feet) | 10 Maximum Lot Coverage | 11 Maximum Building Height Feet | 11 Maximum Building Height Stories |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OSR 3 ac. | 1) Agriculture or horticulture 2) Single-family detached dwelling 3) Municipal park | 1) Customary accessory uses and structures 2) Home occupation (§57-44B) 3) Gathering place (§57-13B) 4) Accessory apartment dwelling (§57-44A) 5) Noncommercial swimming pool 6) Signs, pursuant to Article XII 7) Parking pursuant to Article XII | 1) Bus passenger waiting shelter (open) (§57-13F) 2) Cemetery (§57-13G) 3) Membership club (§57-13N) 4) Public utility building or structure (§57-13S) 5) Bed and breakfast (§54B) 6) Child day camp (§57-13I) 7) Place of worship (§57-13Q) 8) Public or private school (§57-13R) 9) Adaptive reuse of a historic building(§57-13A) | 3 acres | 200 | 60 | 50 | 100 | 60 | 10% | 35 | 2.5 |

ATTACHMENT A: TOWN OF MONROE - SCHEDULE OF DISTRICT REGULATIONS

Rural Residential - 1 Acre District
Town of Monroe Zoning Chapter 57

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | | 9 | 10 | 11 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| District | Principal Permitted Uses | Accessory Uses | Special Uses Subject to Authorization and Site Plan Approval by the Planning Board | Minimum Lot Area (sq. ft.) | Minimum Lot Width (feet) | Minimum Front Yard (feet) | Minimum Side Yard | | Minimum Rear Yard (feet) | Maximum Lot Coverage | Maximum Building Height | |
| | | | | | | | One | Total | | | Feet | Stories |
| RR 1 ac. | 1) Agriculture or horticulture  2) Single-family detached dwelling  3) Municipal park | 1) Customary accessory uses and structures  2) Home occupation (§57-44I)  3) Gathering place (§57-13J)  4) Accessory apartment dwelling (§57-44A)  5) Noncommercial swimming pool  6) Signs, pursuant to Article XIII  7) Parking pursuant to Article XII | 1) Bus passenger waiting shelter(open) (§57-13F)  2) Cemetery (§57-13G)  3) Membership club (§57-13S)  4) Public utility building or structure (§57-13S)  5) Livestock keeping, breeding, housing and raising on lots of 20 acres or more (§57-13M)  6) Child daycare center (§57-13H)  7) Mobile home park on a 15-acre site (§57-13O)  8) Bed-and-breakfast (§57-13S)  9) Place of worship (§57-13Q)  10) Public or private school (§57-13R)  11) Adaptive reuse of a historic building (§57-13A)  12) Private or public golf course on sites at least 175 acres in size (§57-13K) | 1 acre  175 acres | 150 | 50 | 30 | 65 | 60 | 15% | 35 | 2.5 |

ATTACHMENT A: TOWN OF MONROE - SCHEDULE OF DISTRICT REGULATIONS
SR-20 Suburban Residential - 20,000 SF District
Town of Monroe Zoning Chapter 57

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | | 9 | 10 | 11 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Minimum Side Yard | | | | Maximum Building Height | |
| District | Principal Permitted Uses | Accessory Uses | Special Uses Subject to Authorization and Site Plan Approval by the Planning Board | Minimum Lot Area (sq. ft.) | Minimu m Lot Width | Minimum Front Yard (feet) | One | Total | Minimum Rear Yard | Maximu m Lot Coverage | Feet | Stories |
| SR-20 | 1) Single-family detached dwelling 2) Municipal park | 1) Customary accessory uses and structures 2) Home occupation (§57-44S) 3) Gathering place (§57-13H) 4) Accessory apartment dwelling (§57-44A) 5) Noncommercial swimming pool 6) Signs pursuant to Article XIII 7) Parking pursuant to Article XII | 1) Bus passenger waiting shelter(open) (§57-13F) 2) Cemetery (§57-13G) 3) Membership club (§57-13N) 4) Public utility building or structure (§57-13S) 5) Livestock keeping, breeding, housing and raising on lots of 20 acres or more (§57-13M) 6) Child daycare center (§57-13H) 7) Place of worship (§57-13Q) 8) Public or private school (§57-13R) 9) Mobile home park on a 15-acre site (§57-13O) 10) Adaptive reuse of a historic building (§57-13A) | 1 acre without central sewer facilities | 125 | 50 | 30 | 65 | 60 | 15% | 35 | 2.5 |
| | | | | 20,000 with central sewer facilities | 100 | 40 | 15 | 40 | 50 | 20% | 35 | 2.5 |

## ATTACHMENT A: TOWN OF MONROE - SCHEDULE OF DISTRICT REGULATIONS
### Suburban Residential – 15,000 SF District
#### Town of Monroe Zoning Chapter 57

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | | 9 | 10 | 11 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Minimum Side Yard | | Minimum Rear Yard (feet) | Maximum Lot Coverage | Maximum Building Height | |
| District | Principal Permitted Uses | Accessory Uses | Special Uses Subject to Authorization and Site Plan Approval by the Planning Board | Minimum Lot Area (sq. ft.) | Minimum Lot Width (feet) | Minimum Front Yard (feet) | One | Total | | | Feet | Stories |
| SR-15 | 1) Single-family detached dwelling<br>2) Municipal park | 1) Customary accessory uses and structures<br>2) Home occupation (§57-44B)<br>3) Gathering place (§57-13I)<br>4) Accessory apartment dwelling (§57-44A)<br>5) Noncommercial swimming pool<br>6) Signs, pursuant to Article XIII<br>7) Parking pursuant to Article XII | 1) Bus passenger waiting shelter (open) (§57-13F)<br>2) Cemetery (§57-13G)<br>3) Membership club (§57-13N)<br>4) Public utility building or structure (§57-13S)<br>5) Livestock keeping, breeding, housing and raising on lots of 20 acres or more (§57-13X)<br>6) Child daycare center subject to § 57-13H<br>7) Place of worship (§57-13Q)<br>8) Public or private school (§57-14R)<br>9) Mobile home park on a 15-acre site (§ 57-13O)<br>10) Adaptive reuse of a historic building (§57-13A) | 1 acre without central sewer facilities<br><br>15,000 with central sewer facilities | 125<br><br>85 | 50<br><br>40 | 30<br><br>15 | 65<br><br>40 | 60<br><br>40 | 15%<br><br>25% | 35<br><br>35 | 2.5<br><br>2.5 |

ATTACHMENT A: TOWN OF MONROE - SCHEDULE OF DISTRICT REGULATIONS
Suburban Residential – 10,000 SF District
Town of Monroe Zoning Chapter 57

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | | 9 | 10 | 11 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Minimum Side Yard | | | | Maximum Building Height | |
| District | Principal Permitted Uses | Accessory Uses | Special Uses Subject to Authorization and Site Plan Approval by the Planning Board | Minimum Lot Area (sq. ft.) | Minimum Lot Width (feet) | Minimum Front Yard (feet) | One | Total | Minimum Rear Yard (feet) | Maximum Lot Coverage | Feet | Stories |
| SR-10 | 1) Single-family detached dwelling<br>2) Municipal park | 1) Customary accessory uses and structures<br>2) Home occupation (§57-44B)<br>3) Gathering place (§57-13I)<br>4) Accessory apartment dwelling (§57-44A)<br>5) Noncommercial swimming pool<br>6) Signs, pursuant to Article XIII<br>7) Parking pursuant to Article XII | 1) Bus passenger waiting shelter (open) (§57-13F)<br>2) Cemetery (§57-13G)<br>3) Medical offices, only with direct frontage on and access to a county or state highway (§57-13N)<br>4) Membership club (§57-13N)<br>5) Public utility building or structure (§57-13S)<br>6) Livestock keeping, breeding, housing and raising on lots of 20 acres or more (§57-13M)<br>7) Place of worship (§57-13Q)<br>8) Public or private school (§57-13R)<br>9) Child daycare center (§57-13I)<br>10) Mobile home park on a 15-acre site (§57-13O)<br>11) Adaptive reuse of a historic building (§57-13A) | 1 acre without central sewer facilities<br><br>10,000 with central sewer facilities | 125<br><br>75 | 50<br><br>25 | 30<br><br>15 | 65<br><br>30 | 60<br><br>35 | 15%<br><br>30% | 35<br><br>35 | 2.5<br><br>2.5 |

ATTACHMENT A: TOWN OF MONROE - SCHEDULE OF DISTRICT REGULATIONS

Multiple Residence District
Town of Monroe Zoning
Chapter 57

| 1 District | 2 Principal Permitted Uses | 3 Accessory Uses | 4 Special Uses Subject to Authorization and Site Plan Approval by the Planning Board | 5 Minimum Lot Area (sq. ft.) | 6 Minimum Lot Width (feet) | 7 Minimum Front Yard (feet) | 8 Minimum Side Yard | | 9 Minimum Rear Yard (feet) | 10 Maximum Lot Coverage | 11 Maximum Building Height | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | One | Total | | | Feet | Stories |
| URM | 1) Single family detached dwelling<br>2) Municipal park | 1) Customary accessory uses and structures<br>2) Home occupation (§57-44B)<br>3) Gathering place (§57-13J)<br>4) Accessory apartment dwelling (§57-44A)<br>5) Noncommercial swimming pool<br>6) Recreational facility for exclusive use of residents and guests<br>7) Signs, pursuant to Article XIII<br>8) Parking pursuant to Article XIII | 1) Bus passenger waiting shelter (open) (§57-13F)<br>2) Cemetery (§57-13G)<br>3) Membership club (§57-13N)<br>4) Place of worship (§57-13Q)<br>5) Public or private school (§57-13R)<br>6) Child daycare center (§57-13H)<br>7) Public utility building or structure (§57-13S)<br>8) Mobile home park on a 15-acre site (§57-13O)<br>9) Adaptive reuse of a historic building (§57-13A) | 1 acre without central sewer facilities<br><br>10,000 with central sewer facilities | 125 | 50 | 30 | 65 | 60 | 15% | 35 | 2.5 |
| | | | 10) Multiple dwelling group (see §57-13P) | 5 acres | 150 | 60 | 30 | 60 | 60 | 35% | 35 | 2.5 |

ATTACHMENT A: TOWN OF MONROE - SCHEDULE OF DISTRICT REGULATIONS
Neighborhood Business District
Town of Monroe Zoning Chapter 57

| 1 District | 2 Principal Permitted Uses | 3 Accessory Uses | 4 Special Uses Subject to Authorization and Site Plan Approval by the Planning Board | 5 Minimum Lot Area (sq. ft.) | 6 Minimum Lot Width (feet) | 7 Minimum Front Yard (feet) | 8 Minimum Side Yard One | 8 Minimum Side Yard Total | 9 Minimum Rear Yard (feet) | 10 Maximum Lot Coverage | 11 Maximum Building Height Feet | 11 Maximum Building Height Stories |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NB | 1) Retail 2) Personal service 3) Restaurant or tavern, excluding drive-in or drive-through facility 4) Office 5) Neighborhood shopping center | 1) Customary accessory uses and structures 2) Signs, pursuant to Article XIII 3) Parking pursuant to Article XII | 1) Bus passenger waiting shelter(open) (§57-13³) 2) Public utility building or structure (§57-13S) 3) Child daycare center (§57-13H) | 20,000 | 100 | 40 | 25 | 50 | 30 | 50% | 35 | 2.5 |

NOTES:
* Any side yard shall be 50 feet wide when lot is adjacent to a residential zone.

ATTACHMENT A:  TOWN OF MONROE - SCHEDULE OF DISTRICT REGULATIONS

General Business District

Town of Monroe Zoning Chapter 57

| 1 District | 2 Principal Permitted Uses | 3 Accessory Uses | 4 Special Uses Subject to Authorization and Site Plan Approval by the Planning Board | 5 Minimum Lot Area (sq. ft.) | 6 Minimum Lot Width (feet) | 7 Minimum Front Yard (feet) | 8 Minimum Side Yard | | 9 Minimum Rear Yard (feet) | 10 Maximum Lot Coverage | 11 Maximum Building Height | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | One | Total | | | Feet | Stories |
| GB | 1) Automobile sales with accessory service facilities, including repair shop 2) Bank or savings-and-loan association 3) Retail 4) Personal service 5) Laundry or dry-cleaning 6) Municipal park 7) Newspaper or printing establishment 8) Office 9) Restaurant, tavern or drive-through restaurant 10) Workshops or studio or shop for custom work 11) Hospital 12) General shopping center on sites of 40,000 square feet or more | 1) Customary accessory uses and structures 2) Signs, pursuant to Article XIII 3) Parking pursuant to Article XII | 1)  Bottled gas distribution station 2)  Animal kennel (§57-13C) 3)  Bus passenger waiting shelter (open) (§57-13N) 4)  Indoor sports facilities, except shooting gallery which is prohibited 5)  Automotive service station (§57-13 D) 6)  Hotel (§57-13L) 7)  Public utility building or structure (§57-13S) 8)  Indoor movie theater 9)  Indoor pistol range 10) Child daycare center (sec § 57-13H) 11) Animal kennel or veterinary hospital (§57-13C) | 10,000 | 100 | 60 | 8* | 20 | 20 | 65% | 35 | 2.5 |

NOTES:
* Any side yard shall be 50 feet wide when lot is adjacent to a residential zone.

ATTACHMENT A: TOWN OF MONROE - SCHEDULE OF DISTRICT REGULATIONS

Light Industry District

Town of Monroe Zoning Chapter 57

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | | 9 | 10 | 11 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| District | Principal Permitted Uses | Accessory Uses | Special Uses Subject to Authorization and Site Plan Approval by the Planning Board | Minimum Lot Area (sq. ft.) | Minimum Lot Width (feet) | Minimum Front Yard (feet) | Minimum Side Yard | | Minimum Rear Yard (feet) | Maximum Lot Coverage | Maximum Building Height | |
| | | | | | | | One | Total | | | Feet | Stories |
| LI | 1) Newspaper or printing establishment 2) Office 3) Laboratory and research facilities 4) Warehouse 5) Nonnuisance industry 6) Hospital | 1) Customary accessory uses and structures 2) Signs pursuant to Article XIII 3) Parking pursuant to Article XII | 1) Bus passenger waiting shelter (open) [§57-139] 2) Self-service storage facilities [§57-131] 3) Truck terminal or distribution center 4) Building or landscape materials storage yard 5) Public utility building or structure [§57-135] 6) Animal kennel or veterinary hospital [§57-13C] | 2 acres without central sewer facilities | 200 | 50 | 50 | 100 | 50 | 40% | 50 | |
| | | | | 1 acre with central sewer facilities | 100 | 40 | 30* | 60 | 40 | 50% | 50 | |

NOTES:
* Any side yard shall be 50 feet wide when lot is adjacent to a residential zone.

ATTACHMENT A: TOWN OF MONROE - SCHEDULE OF DISTRICT REGULATIONS
Heavy Industry District
Town of Monroe Zoning Chapter 57

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | | 9 | 10 | 11 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Minimum Side Yard | | | | Maximum Building Height | |
| District | Principal Permitted Uses | Accessory Uses | Special Uses Subject to Authorization and Site Plan Approval by the Planning Board | Minimum Lot Area (sq. ft.) | Minimum Lot Width (feet) | Minimum Front Yard (feet) | One | Total | Minimum Rear Yard (feet) | Maximum Lot Coverage | Feet | Stories |
| III | 1) Automobile sales with accessory service facilities, including repair shop<br>2) Newspaper or printing establishment<br>3) Office<br>4) Research institute or laboratory<br>5) Warehouse<br>6) Workshops or studio or shop for custom work<br>7) Nonnuisance industry<br>8) Indoor sports facility<br>9) Retail | 1) Customary accessory uses and structures<br>2) Signs, pursuant to Article XIII<br>3) Parking pursuant to Article XII | 1) Bus passenger waiting shelter (open) (§57-131F)<br>2) Bottled gas distribution station<br>3) Adult bookstores, theaters and similar uses (57-13H)<br>4) Self-service storage facilities (§57-131T)<br>5) Truck terminal or distribution center<br>6) Banking or landscape materials storage yard<br>7) Public utility building or structure (§57-13S)<br>8) Hotel (§57-131J) | 1 acre | 100 | 40 | 20* | 40 | 20 | 65% | 40 | 1 |

NOTES:
* Any side yard shall be 50 feet wide when lot is adjacent to a residential zone.

ATTACHMENT A:  TOWN OF MONROE - SCHEDULE OF DISTRICT REGULATIONS
Business Park Overlay District
Town of Monroe Zoning Chapter 57

| 1 District | 2 Principal Permitted Uses | 3 Accessory Uses | 4 Special Uses Subject to Authorization and Site Plan Approval by the Planning Board | 5 Minimum Lot Area (sq. ft.) | 6 Minimum Lot Width (feet) | 7 Minimum Front Yard (feet) | 8 Minimum Side Yard One | 8 Minimum Side Yard Total | 9 Minimum Rear Yard (feet) | 10 Maximum Lot Coverage | 11 Maximum Building Height Feet | 11 Maximum Building Height Stories |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BP-O | Business Park, which may incorporate the following uses: 1) Retail 2) Office 3) Hotel with associated dining, conference or recreation facilities (57-13k) 4) Restaurants and tavern, including restaurant with a drive through 5) Regional shopping center 6) Integrated residential uses (see § 57-3 and 57-20C) 7) Health fitness center 8) Dayspa 9) Indoor movie theater 10) Bank 11) Personal service | | | 75 acres | 100 | 40 | 20 | 40 | 20 | 75% | 50 | |

Uses permitted in the BP-O may be developed in one or more phases on all or any part of the tracts of land for which a declaration of development has been filed.



**Legend**

**Municipal Boundaries**
- Village
- Town of Monroe
- Parcels
- Proposed KJ Annexation

**Zoning Districts**
- OSR-3  Open Space Residential
- RR-1  Rural Residential
- SR-20  Suburban Residential (20,000 sf)
- SR-15  Suburban Residential (15,000 sf)
- SR-10  Suburban Residential (10,000 sf)
- UR-M  Urban Residential-Multifamily
- NB  Neighborhood Business
- GB  General Business
- LI  Light Industry
- HI  Heavy Industry
- BP-O  Business Park Overlay
- RP-O  Ridgeline Protection Overlay
- WSP-O  Water Supply Protection Overlay
- Utility Tower Overlay

V OF KIRYAS JOEL

V OF MONROE

V OF HARRIMAN

The hatched area, (Proposed KJ Annexation) shown on the zoning map was the subject of annexation proceedings by the Village of Kiryas Joel and such annexation was the subject of legal challenges that remain pending in the Appellate Division. Upon a final determination of the legal proceedings the 164 acres will either be outside the Town and part of the Village, or shall remain in the Town of Monroe in which case the area shall be zoned as indicated on this zoning map.

Further, certain parcels of land located in the Town of Monroe are the subject of a petition and permissive referendum to be held on November 7, 2017, to incorporate same into a newly created Town of Palm Tree. At the time of the adoption of this map the Town of Palm Tree has not yet been formed and those parcels are zoned as shown hereon.

| Adopted Revisions | Zoning Map | Town of Monroe |
|---|---|---|
| LL 6 of 2017 - 11/20/17 | November 2017 | Orange County, NY |
| | Source: ESRI Web Mapping Service; USGS; NPV GIS Library<br>Scale: 1 inch = 4,500 feet | |

## RESOLUTION

A Meeting of the Town Board of the Town of Monroe was convened on November 20, 2017 at 7:00 p.m.

The following resolution was duly offered and seconded to wit:

## RESOLUTION ADOPTING A LOCAL LAW TO AMEND CHAPTER 57, ZONING, OF THE CODE OF THE TOWN OF MONROE

**WHEREAS**, Section 272-a (11) (a) of the New York State Town Law requires that zoning be adopted in accordance with a well-considered comprehensive plan; and

**WHEREAS**, the Town Board of the Town of Monroe (the "Town") is responsible for the preparation and adoption of the Town of Monroe 2017 Comprehensive Plan Update, pursuant to Section 272-a of the New York State Town Law; and

**WHEREAS**, the Town's existing Comprehensive Plan and Zoning has not been updated in a decade and does not accurately reflect the community's current vision and specific initiatives to help achieve that vision; and

**WHEREAS**, in 2015, the then Town Board confirmed that the Town's zoning regulations were in need of amendment and that rezoning had been in effect for over half a decade; and

**WHEREAS**, on March 7, 2016, the Town Board appointed Nelson Pope Voorhis, LLC ("Planner"), to provide services related to the development and preparation of the Monroe 2017 Comprehensive Plan Update ("CPU") and Updated Zoning Laws ("Zoning Amendments"); and

**WHEREAS**, by Resolution adopted on November 20, 2017, the Town Board adopted the 2017 Comprehensive Plan Update; and

**WHEREAS**, the proposed Zoning Amendments will amend the Town's current Zoning laws and included Zoning Map to be in accordance with the recently adopted 2017 Comprehensive Plan Update; and

**WHEREAS**, on June 5, 2017, the Town Board received and reviewed a final draft of a proposed Zoning Amendments and provided copies thereof to the Town Clerk, which were made available to the public; and

**WHEREAS**, on July 17, 2017, a public hearing was opened on the draft Zoning Amendments after being duly noticed; and

**WHEREAS**, on August 21, 2017, September 18, 2017, September 25, 2017, and October 16, 2017, the Town Board continued the public hearing on the Zoning Amendments after being duly noticed; and

**WHEREAS**, on October 16, 2017, the Town Board closed the public hearing on the Zoning Amendments, but permitted written comments to be submitted through November 9, 2017; and

**WHEREAS**, there has been public participation throughout the process, including community planning forums, the foregoing public hearings held by the Town Board on [date(s)], a public opinion survey, newsletters and website publication, research and review of background documents and review of draft of the Zoning Amendments; and

**WHEREAS**, by virtue of the foregoing, all interested individuals, organizations and agencies were afforded an opportunity to be heard and comment upon the Zoning Amendments; and

**WHEREAS**, the Town Board referred the proposed Zoning Amendments to the Orange County Department of Planning in accordance with Sections 239-l and 239-m of the New York State General Municipal Law and the County Department of Planning responded by means of its letter dated October 31, 2017, wherein the County Department of Planning recommended that the Town Board adopt the Zoning Amendments after consideration of the County's comments; and

**WHEREAS**, consistent with the New York State Environmental Quality Review Act ("SEQRA"), the Town Board, as Lead Agency, prepared a Generic Environmental Impact Statement with respect to the Proposed Action, which was defined as the 2017 Comprehensive Plan Update as well as the enactment of Zoning Amendments; and

**WHEREAS**, the Town Board has issued a Positive Declaration dated July 17, 2017 regarding the adoption of the 2017 Comprehensive Plan Update and Zoning Amendments, for the extensive reasoning contained in the FGEIS dated October 16, 2017, and thereby completed the SEQRA review of the proposed action pursuant to the criteria contained in Section 617 of 6 NYCRR; and

**WHEREAS**, the Zoning Amendments have been prepared in accordance with New York State law and in conjunction with the 2017 Comprehensive Plan Update provides a guide for land use and development decisions, the adoption of municipal regulations and the investment of public funds; and

**WHEREAS**, the Zoning Amendments are consistent with the provisions of the Comprehensive Plan Update; and

**WHEREAS**, the Town Board finds it in the best interest of the Town to adopt the Zoning Amendments.

**NOW THEREFORE BE IT RESOLVED** that:

Section 1.    The above "WHEREAS" clauses are incorporated herein by reference.

Section 2.     The Town Board for the Town of Monroe hereby determines that there is a critical and compelling need to promote the health, safety, and welfare of the public by adopting the proposed Local Law to Amend Chapter 57, Zoning, of the Code of the Town of Monroe, dated November 20, 2017, that are designed to implement, and are consistent with the provisions of the 2017 Comprehensive Plan Update.

Section 3.     The Town Board for the Town of Monroe hereby adopts the Zoning Amendments.

Section 4.     The Town Board hereby directs the Town Clerk to enter the Zoning Amendments in the minutes of this meeting, to enter the Zoning Amendments in the Local Law book of the Town, and to give due notice of the adoption of the Zoning Amendments to the Secretary of State.

Section 5.     This Resolution shall be effective immediately.

On a motion by Councilman McGinn, seconded by Councilman Cardone

|  | Yea | Nay | Abstain | Absent |
|---|---|---|---|---|
| Harley Doles, Supervisor | [   ] | [X   ] | [   ] | [   ] |
| Anthony Cardone, Acting Supervisor | [X   ] | [   ] | [   ] | [   ] |
| Gerard McQuade, Councilman | [   ] | [X   ] | [   ] | [   ] |
| Michael McGinn, Councilman | [X   ] | [   ] | [   ] | [   ] |
| Richard Colon, Councilman | [X   ] | [   ] | [   ] | [   ] |

The Resolution was thereupon duly adopted.